1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO:  1:20-cv-21105-KMW

TAMARA LAW,

    Plaintiff,

vs.

CARNIVAL CORPORATION d/b/a
CARNIVAL CRUISE LINES,

    Defendant.
_____/

LOCATION:  Remote Audio-Video Communication
           Pursuant to Supreme Court of Florida
           Administrative Order No. AOSC20-23

DATE:    February 18, 2021
TIME:    11:00 a.m. - 2:07 p.m.

**DEPOSITION OF CORPORATE REPRESENTATIVE**
**SUZANNE BROWN VAZQUEZ**

    Taken before Jeanette Sanchez, Florida
Professional Reporter, Notary Public in and for the
State of Florida at Large, pursuant to Notice of
Taking Deposition filed in the above case.

---

2

APPEARANCES:
ON BEHALF OF THE PLAINTIFF:
RIVKIND, MARGULIES & RIVKIND, P.A.
169 East Flagler Street
Suite 1422
Miami, Florida 33130
BY:  Brett Rivkind, Esquire

ON BEHALF OF THE DEFENDANT:
FOWLER, WHITE, BURNETT, P.A.
Brickell Arch, Fourteenth Floor
1395 Brickell Avenue
Miami, Florida 33131
BY:  Victor Pelaez, Esquire

I N D E X

E X A M I N A T I O N

SUZANNE BROWN VAZQUEZ
    DIRECT   CROSS  REDIRECT  RECROSS
MR. RIVKIND    3

EXHIBITS FOR IDENTIFICATION

PLAINTIFF'S                    P A G E
No. 1    Photograph           61
No. 2    Photograph           71
No. 3    Photograph           72
No. 4    Photograph           75

---

3

1  Thereupon:

2         SUZANNE BROWN VAZQUEZ,

3  was called as a witness and, having been first duly

4  sworn, was examined and testified as follows:

5              DIRECT EXAMINATION

6  BY MR. RIVKIND:

7         Q.   Okay.  Let's start with the simple

8  part.  Tell us your name and who you work for and

9  what you do for them.

10        A.   Suzanne Brown Vazquez.  Everyone calls

11 me Suzie.  I work for Carnival Corporation,

12 Carnival Cruise Line in Doral.  I am the director

13 of guest claims and staff counsel for the company.

14        Q.   Are you also an attorney?

15        A.   I am, yes.

16        Q.   How long have you been an attorney

17 for?

18        A.   Since 1997.  I graduated law school

19 and took the bar in 1997.

20        Q.   Have you done legal work, I mean, as

21 an attorney in the maritime field before this

22 position?

23        A.   Yes.  I started my career as a

24 prosecutor, and I was there for about four years

25 and then went to work for an insurance defense firm

---

4

1  out of New York that has a Miami office called

2  Wilson Elser, and they handled some maritime work

3  and some Carnival Cruise Line work, and because of

4  the work that I did on some of those files, I was

5  ultimately offered an in-house position with

6  Carnival.

7         Q.   And what do you do now at Carnival?

8  What kind of stuff do you do?

9         A.   So, generally speaking, I mean, I wear

10 a few hats, especially now through COVID that we

11 have had a lot of furloughs.  But, generally

12 speaking, I oversee all the guest-related claims

13 and litigation.  I serve as the 30(b)(6) corporate

14 representative many times.  I also advise the

15 company in operational matters as needed.  I, you

16 know, man the ticket contract and edit that and

17 also assist and get called into meetings when they

18 need legal advice on certain operational needs

19 issues.

20        Q.   Okay.  So you mentioned you serve as a

21 30(b)(6) witness for Carnival.  Just so a jury

22 would understand that, today you are appearing as a

23 30(b)(6) witness for Carnival, which means you are

24 here to speak on behalf of Carnival with respect to

25 this case, correct?

5

1         MR. PELAEZ:  Objection, form —
2         THE WITNESS:  Yes.
3         MR. PELAEZ:  — as to topics
4     indicated.
5  BY MR. RIVKIND:
6     Q.    Okay.  Understood.  Yes.
7         So you have been designated as the
8  representative of Carnival to address the areas of
9  inquiry we asked about that we wanted Carnival to
10 come to testify about today, correct?
11    A.    That is right, yes.
12    Q.    And you checked and reviewed those
13 areas of inquiry so you could prepare in accordance
14 with the requirements of that particular rule so
15 that you could come here with the information to
16 testify on behalf of Carnival?
17    A.    To the best of our ability, we've
18 researched everything for you.
19    Q.    Okay.  So why don't we talk about, you
20 know, what research you did, because I know, as you
21 said to the best of your ability, there might
22 be some limitations because of the COVID situation.
23        Can you tell me who you spoke to to
24 get information to testify on behalf of Carnival?
25    A.    Mostly I worked with our litigation

6

1  representative who does all of the discovery
2  requests on litigation files that is Monica
3  Borcegue.  She is the one who actively communicates
4  with both the ship and shoreside teams, depending
5  on the areas of inquiry.  So there is many
6  departments, obviously, with Carnival, both on the
7  ship and shoreside.
8         The ships themselves are working with
9  a skeleton crew right now.  So we did work with the
10 captain and staff captain and chief security
11 officer onboard the ECSTASY now.  We also worked
12 with some shoreside refurbishment team to get
13 information.
14        I am not sure who all else Monica
15 might have gone to to get the information that was
16 supplied to you in response to your discovery
17 request.
18        So we probably have to take that on a
19 question-by-question basis.  If there was a
20 particular set of information you wanted to know
21 where it came from, we would have to take that
22 piece by piece.
23        But I, generally, in preparation for
24 today, spoke to Monica; spoke to the adjuster,
25 Maurice Vega; spoke to counsel, obviously; and

7

1  reviewed all of the file materials to date.  I
2  looked at all the discovery responses that have
3  been produced to you.  I know by agreement you were
4  allowing me to reference the accident report and
5  the prior accident so that we could answer your
6  questions regarding those incidents.
7         And that is pretty much it.  I don't
8  think -- your client hasn't been deposed yet, so I
9  was -- I didn't have the benefit of being able to
10 read any deposition testimony that has been taken.
11 I guess this one is out of sequence.  I am going
12 first, but everything else I think I reviewed.
13    Q.    Okay.  So, as you know, I represent
14 Tamara Law in this case about an incident on
15 February 9, 2019, onboard the ECSTASY, correct?
16    A.    I think it was the 7th, not the 9th,
17 but...
18    Q.    Is it the 7th or the 9th?
19        MR. PELAEZ:  I think it was
20 February 7, 2019, is —
21        MR. RIVKIND:  Okay.  I see.
22        MR. PELAEZ: — my understanding.
23 BY MR. RIVKIND:
24    Q.    So in the responses to discovery —
25 and you mentioned that there was an incident or

8

1  accident report prepared — there was also
2  identification of three, I think, crew members who
3  actually inspected the stairs following the
4  incident, and I think one was the chief security
5  officer, and then there was two other crew members,
6  I think, from housekeeping.
7     A.    That sounds about right.
8     Q.    So I guess where I am getting at is
9  with respect to the preparation, whether you got
10 the information from somebody else, the — I forgot
11 her name already, but the lady that you spoke to in
12 your office, do you know to what extent there were
13 any communications with any of those three
14 individuals to talk to them to ask them questions
15 to prepare you to testify today?
16    A.    I do not know if anyone spoke directly
17 to the ACSO who was onboard at the time or not.  I
18 don't know.
19    Q.    Okay.  Yeah, because I think that
20 person was Ramon Sawan was the assistant chief
21 security officer who investigated this incident.
22    A.    Okay.  I am going to -- If you don't
23 mind, I am going to -- with your permission, can I
24 pull up the incident report so I can refer to it
25 and answer your questions.

9

1    Q.   Yeah.  Sure.  You can pull up, you
2  know, anything you would like.  I would appreciate
3  if you tell me what you are looking at, of course.
4         A.   So I am going to pull up the accident
5  report, which was actually drafted by that witness,
6  that would tell us the details of the investigation
7  following Ms. Law's fall on the ECSTASY, or
8  stubbing her toe.  I don't know if she fell or she
9  just stubbed her toe.
10        MR. PELAEZ:  Brett, I would like to
11        confirm our stipulation, our prior
12        agreement that Ms. Vazquez can review the
13        accident report to respond to your
14        questions as to any factual information
15        contained in it without waiving the work
16        product privilege assertion over the
17        document itself and any opinion work
18        product contained therein.
19        MR. RIVKIND:  Yes, we -- there is a
20        stipulation to that.  You can refer and
21        testify --
22        THE WITNESS:  Okay.
23        MR. RIVKIND:  -- about the information
24        necessary to testify about from the
25        accident report.  It doesn't waive

10

1  Carnival's assertion it's work product, nor
2  is it interpreted in any way that we agree
3  it is work product.  It is still work
4  product assertion until resolved by a judge
5  if we want to raise the actual issue with
6  the judge.  Probably we won't.  But as of
7  now, we have a stipulation.  All privileges
8  are preserved.
9         MR. PELAEZ:  Thank you.
10 BY MR. RIVKIND:
11       Q.   So --
12       A.   Okay.  So -- yeah.
13       Q.   No, go ahead.  I was actually reading
14 from the interrogatories, but if the incident
15 report has the two other crew members, that is fine
16 too?
17       A.   It does.  So the ACSO that actually
18 conducted the investigation was Ramon Sawan.
19       And, Jeannie, that's S-A-W-A-N, the
20 last name.
21       And then there was also the assistant
22 housekeeping manager who inspected the area along
23 with ACSO Sawan, and his name was Eden Hadzic,
24 H-A-D-Z-I-C.  And also the assistant carpenter came
25 with them.  Oh, and this is a difficult one.

11

1  Milton Marceline Dsilva, M-I-L-T-O-N,
2  M-A-R-C-E-L-I-N-E, and Dsilva is D-S-I-L-V-A.
3       Q.   Okay.  To your knowledge -- well,
4  strike that.
5       You are not -- you don't know one way
6  or the other whether there was any direct
7  communications with any of these three individuals
8  to provide information for today's deposition?
9       A.   I do not know if counsel or if Monica
10 has spoken to any of those three folks.  We do know
11 the findings of the investigation through the
12 accident report itself.
13       Q.   Okay.  Did you do anything to
14 determine whether these three individuals still --
15 I mean, I know the ships haven't been in operation
16 for a while, but are they still considered on stand
17 by as crew members?  Are we still considered
18 employed?  What is their status now?
19       A.   I think they are all off contact.  I
20 am not sure about Sawan.  I would have to
21 double-check that.  I don't believe he is onboard a
22 ship right now, but I can double-check that.  I
23 think the other two are repatriated in their home
24 countries awaiting the resumption of operation, but
25 eligible to come back into service when we can sail

12

1  again.
2       Q.   Okay.  The other two individuals,
3  according to answers to interrogatories and I think
4  what you just said, one is the assistant
5  housekeeping manager and the other is the assistant
6  carpenter.
7       A.   Yes.
8       Q.   Also, I was provided with the
9  procedures, you know, when you investigate any kind
10 of accident to a passenger, and it usually talks
11 about the security officer in charge of conducting
12 the investigation.  So my question I am getting to
13 is:  Do you know why those other two individuals
14 were brought into the inspection of the stairs at
15 the time, if you know?
16       A.   Yeah, it's -- it's sort of protocol to
17 find the person that's in charge of the area or get
18 someone from housekeeping, if it's a housekeeping
19 type of issue or a possible issue where there is
20 something that needs to be repaired.  So they get
21 those team members to come with them.  Because,
22 obviously, if there was something wrong or
23 defective with the nosing, the carpet, the stairs,
24 or whatever, they would want the carpenter right
25 on-site to try to fix it to prevent any future

13

1  incident from occurring.
2       Q.   Okay.  So you agree that if there's --
3  with what you just said, if there is anything
4  wrong, any defects, any hazards, any unsafe
5  conditions on the steps or stairs, that Carnival
6  should repair or fix those conditions as soon as
7  possible before somebody --
8       A.   Right.  So if there was some carpet
9  that -- right.  So if there was some carpet that
10  had come loose or a nosing or tread that had come
11  detached in some way, then they would, you know,
12  photograph it, cordon it off, and the carpenter
13  would get what he needs to try to repair it so that
14  no one else would be injured.
15       Q.   You agree that Carnival has a duty to
16  the passengers, such as Ms. Law, to exercise
17  reasonable care for their safety when they are on a
18  cruise with Carnival?
19       A.   Yes.  That is the maritime standard to
20  use reasonable care under the circumstances.
21       Q.   Would reasonable care under the
22  circumstances include exercising reasonable care to
23  identify any defects or unsafe conditions or
24  hazards on the stairs or steps where passengers
25  have to walk?

14

1       A.   Yes, the stairs themselves are
2  inspected daily and by numerous crew members, and
3  it's a very well traversed area.  So, yeah, they
4  are inspected daily.  And, obviously, if there is a
5  defect or a problem, the ship will address it.
6       Q.   As part of your preparation, did you
7  look into any repairs, modifications, or changes to
8  the area where Ms. Law fell, since --
9       A.   There were none -- there were none
10  related to this incident.  The area was found
11  completely normal.  The carpet was intact.  The
12  nosing and tread was intact, and there was nothing
13  out of order.
14       As you know, Ms. Law was pretty
15  heavily intoxicated that day.  She had had, like,
16  nine drinks, and so they found that to be the cause
17  of her incident.  So nothing needed to be done that
18  day.  The antiskid strips were normal with no
19  apparent safety concerns.
20       However, in October of 2019, so some
21  months after her fall in February, the ship went
22  into dry-dock, and as a normal course, they did
23  replace the carpet.  They just got a new style of
24  carpet throughout the entire ship, and they
25  replaced the carpet on the stairs.

15

1       Q.   Okay.  I am going to move to strike
2  your answer.  I am going to state why just so I can
3  rephrase the question because maybe we will be in
4  agreement as to the reason.
5       One is your answer includes much more
6  in answer to the question, but number two, it
7  includes a statement "as you know, Ms. Law was
8  pretty heavily intoxicated."
9       I do not agree that I know that.
10  Okay.  So --
11       A.   Okay.
12       Q.   -- don't assume what I know, please.
13  I just asked a question whether or
14  not -- so let me rephrase it just so we have a
15  clean record.
16       Did you look into whether there were
17  any repairs or modifications or changes to the
18  stairs where Ms. Law fell on February 7, 2019,
19  after her -- any time after her fall?  Did you look
20  into that?
21       A.   Yes, I did.
22       Q.   Okay.  And, to your knowledge, the
23  first repairs, modifications, or changes to those
24  stairs were made on -- in October of 2019 when the
25  vessel was in dry-dock; is that correct?

16

1       MR. PELAEZ:  Objection, form.
2       THE WITNESS:  That is correct.  There
3  were no repairs or modifications that were
4  required after her fall, because the area,
5  when it was inspected, was found to be
6  normal with no apparent safety concerns.
7       In the normal course of the dry-dock
8  schedule for this particular vessel, the
9  carpets throughout the ship were replaced
10  including the carpets on the subject
11  stairwell, Stairwell 50, and that was in
12  October of 2019.
13  BY MR. RIVKIND:
14       Q.   You mentioned daily inspections.  What
15  does Carnival do to exercise reasonable care to
16  make sure that the stairs are in the condition of
17  being normal and not containing any safety concerns
18  for the passengers?
19       A.   They are inspected and cleaned daily,
20  and I think twice daily by the housekeeping staff,
21  and they are vacuumed, et cetera.  So they are
22  visibly inspecting them all the time, the
23  housekeeping team is.  And, obviously, like I said,
24  both passengers and crew members use this stairwell
25  pretty frequently.  It's the aft staircase that

17

```
 1   connects many, many decks.  So it is a pretty
 2   high-traffic area.
 3          So if there was a defect or something
 4   loose, it would probably come to someone's
 5   attention very quickly.
 6       Q.   I had requested procedures to guide, I
 7   guess, your crew members or instruct them or some
 8   way set forth procedures for the implementation of
 9   exercising reasonable care to determine whether the
10   stairs that passengers are using, especially
11   frequently used stairs, are normal and have no
12   safety concerns.
13          Are there procedures in writing that
14   kind off instructs the crew members what to look
15   for on a daily basis when they are cleaning or
16   going -- doing anything to the steps?
17       A.   I mean, perhaps in the Carnival
18   College in the handbook when they are training the
19   housekeeping staff they tell them what to visually
20   look for, but in the procedures I've seen, it's
21   really just cleaning and inspecting visually on a
22   daily basis the areas that are being cleaned and
23   maintained in the normal course of business.
24       Q.   I think one of -- let me see if I have
25   that procedure.  I had it here.
```

18

```
 1          Okay.  I will find it.  It was a
 2   question really which you may be able to answer
 3   without me referring to the specifics --
 4       A.   Okay.
 5       Q.   -- because I -- you know, I was
 6   looking for those procedures when I asked.  The
 7   ones I got mainly address, you know, "Own a Spill"
 8   or more geared towards spillage and things like
 9   that.  I didn't see anything other than there was a
10   title "Prevention of Slip, Trips and Falls," but
11   with respect what it told the crew members to do, I
12   didn't see anything about when they inspect steps
13   or stairs to look at the nosing, to check the, you
14   know, make sure everything is normal, no safety
15   concerns on the steps.
16          Do you know if any such procedures
17   exist?
18       A.   Yes, the procedure is, when the
19   housekeeping staff is inspecting them daily, if
20   they find a discrepancy in any way, a piece of
21   carpet that's raised or a threshold that's loose or
22   whatever -- I am speaking specifically to
23   stairwells, obviously -- or something with the
24   handrail out of order, they will issue a work
25   request that goes into a database, and it triggers,
```

19

```
 1   you know, a flag to that particular department.
 2          So if it's the housekeeping manager,
 3   say, that puts in the work request, they will say
 4   that they are passing it to the -- whatever
 5   department it is, engine department or the
 6   carpentry department or whatever the department it
 7   is to address the concern.
 8          And then that work order then gets
 9   closed out in the system by the appropriate
10   department.  And then so you have records for those
11   inspections basically where a discrepancy was
12   found.  You'd have a work request and then a work
13   order, typically.
14       Q.   Did you do anything to look into any
15   records of any inspections of those steps prior to
16   the incident?
17       A.   Yes.  I think we went back about six
18   months or a year or so to look for the work orders
19   that might have been relevant to that staircase,
20   and it connects many decks.  So Monica pulled all
21   the work orders for the entire aft stairway, and I
22   think those were all produced to you in discovery
23   in the supplemental responses to request for
24   production.
25       Q.   Yes, and we will probably refer to
```

20

```
 1   those.
 2          But those work orders, they are work
 3   orders.  Is there anything beyond that to show the
 4   actual work when it was done, when it was
 5   completed?  You know, I see there is orders for
 6   different things, and I am going to ask you a
 7   couple that I don't understand what they are for,
 8   but I don't see where it says, you know, when, in
 9   fact, the requested work was actually done.
10       A.   That's usually listed on the work
11   order itself.  It will say the time that it was
12   closed out.
13       Q.   So closed out --
14       A.   Which means it was done --
15       Q.   Closed out would mean that the work
16   order was actually performed?
17       A.   Correct.  So the work request is the
18   request to perform the task.  The work order means
19   it was performed and closed out in the system.  And
20   so each of those would have a timestamp on them,
21   usually.
22       Q.   Is it two separate documents or one
23   document?
24       A.   So if -- I think this is how the
25   system works.  If it's just a pending request and
```

21

1  you went in, you would only see the request. And I
2  think you can also only print the work orders if
3  you want. But Monica knows to always pull
4  everything from the system related to the work
5  request.
6          So that includes closing it out, the
7  work order. Because sometimes, in the past, an
8  attorney would ask very specifically for just the
9  work orders, not the request, and Monica gave just
10 the orders and not the request, and that caused
11 some -- some confusion.
12         So now we just pull everything
13 relevant to that particular issue, stairway,
14 whatever is being requested.
15         MR. PELAEZ: Brett, I just want
16 to clarify, the document that was
17 produced (indiscernible).
18         (Technical difficulties.)
19         (Thereupon, a discussion was held
20 off the record.)
21         MR. PELAEZ: I was just clarifying
22 that the documents that were produced
23 regarding the work orders and work
24 requests, I am looking at them, and at the
25 top of the document -- I just wanted to

22

1  clarify for counsel — it says "work
2  request," and at the bottom it indicates
3  "work order," with different times, closed,
4  and by whom.
5          So I don't know if you want to ask
6  questions about that or anything, but I
7  just wanted to clarify for you.
8          MR. RIVKIND: Okay. Thank you.
9          We'll get to those probably at some
10 point.
11 BY MR. RIVKIND:
12         Q.   You also looked into any prior
13 incidents involving passengers who fell on those
14 steps or stairs?
15         A.   Yes. Yes, that is correct.
16         Q.   Can you tell me what research you did,
17 the criteria you used and how you reserved the
18 information you obtained?
19         A.   Sure. So Monica does most of our
20 prior incident searches. Sometimes Maurice will
21 assist as well or some of the admin team. But
22 Monica did this particular search. She went into
23 our InfoSHIP database, which was the accident
24 reporting database used at the time three years
25 prior to Ms. Law's cruise.

23

1          She also went into your RiskConsole
2  database, which is our claims database, to research
3  the same way, incidents involving trip-and-falls on
4  this particular, you know, aft stairway on the
5  ECSTASY. And she went back three years, my
6  understanding.
7          Q.   Okay. So the criteria as to you said
8  trip-falls versus just falls. So was it the
9  criteria used a passenger who reported that they
10 tripped for some reason?
11         A.   All falls, she searched for all falls.
12 So what she does within the InfoSHIP database is
13 part of that is basically a template that has
14 drop-down menus for incident location, incident
15 description, but then there's also a narrative
16 section. She searches all these of those fields
17 within the database for anything relevant to
18 stairs.
19         And then she filters down from there
20 to find the aft stairway, which was Aft Stairway
21 50, and then produced all falls on that stairway
22 three years prior to Ms. Law's cruise.
23         Q.   So they would include any
24 slip-and-falls also?
25         A.   Yes. There was a slip-and-fall.

24

1  There was a gentleman whose hip gave out. He heard
2  a popping sound, and he fell. And there were some
3  trips, and there was someone who slipped over the
4  edge. So it just included all falls, I think, on
5  that -- that stairwell from Deck, you know, 2 to 9
6  or...
7          Q.   Did you also bring reports for those
8  incidents to provide information with the same
9  stipulation that we had made about not waiving any
10 asserted --
11         A.   Yes. Yeah, Monica put them in a
12 folder for me with the photographs and the reports
13 themselves so that we can answer whatever questions
14 you have about them.
15         Q.   Okay. Did you also look at
16 photographs that were taken by your crew members at
17 or near the — following the incident?
18         A.   I have been. I have seen -- I've seen
19 the -- I think you guys did a vessel inspection.
20 I've seen those pictures, and I saw the pictures
21 from the accident report, and I also have
22 photographs of the prior incidents as well that we
23 can -- I can look at.
24         Q.   On the prior incidents, looking at the
25 photos, do you recall, was the stairs in question

25

1  materially the same as they were at the time of
2  Ms. Law's fall down the stairs?
3        A.   Yes. I am not sure if the carpet had
4  been replaced. I would have to go and look at the
5  pictures to see if the carpet is the exact same,
6  but the configuration is generally the same. When
7  the carpet's replaced, the nosings stay on, the
8  nosing stays on the top of the tread, so to speak,
9  and the carpet is replaced without having to remove
10 the nosing. So the nosings stay the same, and the
11 carpet is what -- you know, it's a high-traffic
12 area so every few years they will replace it when
13 it gets worn or if it gets torn or stained.
14       Q.   Do you know the last time before
15 Ms. Law's incident that the carpet on those steps
16 have been replaced?
17       A.   I don't, but we can go back and look
18 at the pictures to tell if it's the same carpet.
19       Q.   Okay. Let's do that when we talk
20 about those incidents.
21       A.   Okay. Okay.
22       Q.   I'll make a note.
23       A.   Okay.
24       Q.   Were you able to look at the
25 photographs that I attached to the lawsuit I filed

26

1  on behalf of Ms. Law for this incident?
2        A.   You know, I did read your complaint.
3  I didn't see any attachments to the complaint. So
4  maybe they're in a separate folder. I'm not sure
5  what photographs you are referring to.
6        Q.   Okay. Tell me what Carnival's
7  understanding or position is from their information
8  they gathered as to what happened in this
9  particular incident involving Ms. Law.
10       A.   You mean the result of our
11 investigation onboard?
12       Q.   Yes. We know she fell on the stairs.
13 You mentioned the location already. So we agree
14 it's the Aft Stairway 50, and it was from Deck 6 to
15 5?
16       A.   Yes, I believe that's right, uh-huh.
17       Q.   So we agree to that.
18            Is Carnival interested when a
19 passenger falls on their stairs to determine why
20 the passenger fell so that, like you said earlier,
21 they can identify if there is any safety concerns
22 that need to be addressed?
23       A.   Yes. In this case, Ms. Law reported
24 to, I think, the medical center. She had a really
25 bad laceration on her toe. She stubbed her toe

27

1  really bad and had a nail evulsion, and the
2  security staff then responded to the stairwell
3  again with the two witnesses that we discussed.
4            They found that there was no -- no
5  discrepancy in the stair, there was nothing wrong
6  with the nosing, the antiskid strips were down and
7  in place, the carpet was in place, and the stairs
8  were normal with no apparent safety concern.
9            And they did look at all the stairs
10 from Deck 6 to 5, which I believe was aft. I am
11 not sure if it's port or starboard as I sit here
12 today. I would have to look.
13           Ms. Law was found to be extremely
14 intoxicated while she was in the medical center.
15 She could not remember if she was holding the
16 handrails, et cetera. She was a little confused on
17 what happened or how it happened.
18           They, obviously, deactivated her
19 Sail & Sign account for alcohol purchases on that
20 evening for her own safety. It was determined that
21 she had some nine drinks throughout the day, was
22 drinking pretty heavily. And that was onboard.
23 I'm not sure what she had to drink, if anything, on
24 Princess Cay.
25       Q.   When you say she was determined to be

28

1  extremely intoxicated, who made that determination?
2        A.   It was noted in the medical records by
3  the medical staff. It was also noted by the
4  CSO himself -- the ACSO -- I'm sorry -- that
5  investigated. She was observed to be intoxicated,
6  as manifested by very slurred speech, strong odor
7  of alcohol emanating from her breath, and -- and
8  then they reviewed her purchases. She and her
9  traveling companion, her boyfriend, Mr. Law, and
10 determined they had both been drinking pretty
11 heavily throughout the day.
12       Q.   Did they have an unlimited drink
13 package?
14       A.   I think they did. They both were on
15 the CHEERS! package, and I think she had had nine
16 drinks. The last drink was about two hours before
17 the incident that I saw on the Sail & Sign
18 purchases.
19       Q.   So tell me about the unlimited
20 drink -- what did you call it? I forget the name
21 you just gave it.
22       A.   The CHEERS! package. Like, CHEERS!
23       Q.   Okay. What is that package, the
24 CHEERS! package?
25       A.   So, basically, it's a flat fee for the

29

1  **cruise to have up to 15 drinks a day at your, you**
2  **know, discretion.  So it's technically a savings,**
3  **you know, of drink per drink purchased throughout**
4  **the cruise.**
5       Q.     Since you are a lawyer and since you
6  have been handling claims with Carnival for a
7  while, would you agree with me that oftentimes,
8  when Carnival is faced with a slip-fall/trip-fall
9  case, you know, issues arise about whether the
10 passenger was intoxicated or not?
11      A.     **We have had instances, and many of**
12 **them, where someone becomes so inebriated for**
13 **their own reasonable care, so they, you know, tend**
14 **to lose their inhibitions and they tend to, you**
15 **know -- if you drink too much, you run the risk of,**
16 **you know, not -- not acting properly and**
17 **cautiously.**
18      Q.     What type -- what type of incidents
19 has Carnival as a responsible cruise ship company
20 identified could involve increased risk of
21 happening because of overconsumption of alcohol on
22 the cruise ships?
23            MR. PELAEZ:  Objection, beyond the
24      scope of the 30(b)(6) notice.
25            You can answer if you have personal

30

1  knowledge Ms. Vazquez.
2            THE WITNESS:  I think it's common
3  sense and the human condition that, if you
4  drink too much and you lose control of your
5  faculties, that you could fall down and
6  injure yourself.
7            I think that we pass [sic] our
8  passengers with using reasonable care for
9  their own safety, and I think anyone knows
10 that, if you -- that you should not drink
11 to excess to the point where you cannot
12 walk down a flight of stairs or can't walk
13 across the deck.
14            And so we do have procedures in place
15 to try to prevent passengers from getting
16 to that level of intoxication, and that is
17 in our bar service manual policies.
18            So if -- if a bartender or wait staff
19 member notices that a person is inebriated
20 to the extent that they think that they are
21 going to hurt themselves, they will stop
22 serving them.  And in certain
23 circumstances, such as this one, the CSO
24 will just deactivate their Sail & Sign card
25 and not allow them to purchase any more

31

1  alcohol that day and maybe for the rest of
2  the cruise, depending on the circumstances.
3  BY MR. RIVKIND:
4       Q.     Okay.  So would you agree that there
5  are safety concerns if there is overconsumption of
6  alcohol, even on a cruise ship?
7       A.     **I think anyone who becomes extremely**
8  **intoxicated could be a danger to themselves or**
9  **others, yes.**
10      Q.     Actually, often in sexual assault
11 cases on the cruise ships an issue comes up about
12 whether or not there was overconsumption of alcohol
13 involved, correct?
14            MR. PELAEZ:  Objection, speculation.
15      Beyond the scope of today's deposition.
16            You can answer if you have personal
17      knowledge.
18            THE WITNESS:  I am not going to speak
19      on behalf of the company today outside the
20      scope of the notice, of the 30(b)(6).  This
21      isn't a sexual assault case.  So I don't
22      think my personal history with any sexual
23      assault allegations against the cruise line
24      is relevant.
25 BY MR. RIVKIND:

32

1       Q.     Well, I just -- here is my point.  My
2  point is you are a responsible company, supposedly,
3  you owe a duty of reasonable care for the safety of
4  your passengers, and I just want to find out
5  whether over the time, in your experience, isn't it
6  true that the issue of intoxication or
7  overconsumption of alcohol is not an unusual issue.
8  In fact, it's a common issue to come up in lawsuits
9  against Carnival when a passenger is injured?
10            MR. PELAEZ:  Objection --
11            THE WITNESS:  I --
12            MR. PELAEZ:  -- form.
13            THE WITNESS:  I would not agree that
14      it's more common than not common.  I never
15      looked at the number of claims that
16      involved overservice of alcohol or alcohol
17      consumption or intoxication versus people
18      that just had an accident or incident or a
19      criminal allegation against someone else
20      where they weren't -- where alcohol didn't
21      play a factor.  I've never looked at --
22 BY MR. RIVKIND:
23      Q.     Well, since you are --
24      A.     **-- studied the cases in that manner.**
25      Q.     Since you are speaking here on behalf

33

1   of the company as to defenses and stuff and
2   intoxication is one of your defenses, what does --
3   has Carnival ever considered that 15 drinks per day
4   under the unlimited drink package increases the
5   risk of accidents or injuries happening on the
6   cruise ships?
7           MR. PELAEZ: Objection, beyond the
8       scope of the deposition notice. Form.
9       You can answer if you know.
10          THE WITNESS: So there was some
11      thought as to what the limit should be and
12      why and how, but it really depends on the
13      person. There are many people who can have
14      15 beers throughout the day and be
15      completely fine and not lose their
16      faculties. Other people can have two
17      cocktails and become inebriated very
18      quickly. It depends on the person. It
19      depends on the drinker, and we rely on our
20      guests, our adult guests to use reasonable
21      care for their own safety.
22          These are adults. These are
23      consenting adults, and if they want to
24      drink, they -- they need to do so without
25      drinking to excess to the point that they

34

1       can walk down a flight of stairs properly.
2           Unfortunately, it appears that Ms. Law
3       did not do that on the day in question.
4   BY MR. RIVKIND:
5       Q.   What's the reason to have an unlimited
6   or prepaid alcohol package like that? I don't want
7   to say unlimited. Unlimited up to 15 drinks, but
8   what's the purpose of that?
9           MR. PELAEZ: Objection, form. Beyond
10      the scope of today's deposition.
11      You can answer if you know,
12      Ms. Vazquez.
13          THE WITNESS: For certain people, it
14      would be a savings or a benefit for them.
15      There is people that really like to drink
16      on vacation and really enjoy themselves and
17      can do so safely, and so we allow them a
18      little bit of savings to purchase a package
19      in advance and take advantage of that
20      savings and enjoy themselves on the cruise,
21      but we expect them to do so safely and
22      responsibly.
23  BY MR. RIVKIND:
24      Q.   Is it a benefit to Carnival also to
25  have that package in place for the passengers and

35

1   to have passengers purchase that package?
2           MR. PELAEZ: Same objection, form.
3       Beyond the scope of today's deposition.
4       You can answer.
5           THE WITNESS: Yeah, I am not going to
6       get into about what a business likes to do,
7       but most businesses want to make money, and
8       Carnival certainly wants its guests to be
9       happy, and we -- we benefit from that, in
10      making our guests happy and making them
11      come back again and again and sail with us.
12          So we do offer them services that they
13      tell us they want, and that was one of the
14      services that many, many guests over many,
15      many years requested, and all of the other
16      cruise lines were doing it. And so,
17      operationally, it's sort of an industry
18      standard now.
19  BY MR. RIVKIND:
20      Q.   Was Ms. Law at the time of her
21  incident, according to Carnival's procedures and
22  this CHEERS! package she purchased, was she within
23  the allowable consumption of alcohol as far as
24  number of drinks?
25      A.   Yes. She had had nine drinks that day

36

1   on the ship. She was offshore for about four
2   hours. So I don't know what, if anything, she had
3   to drink at Princess Cay.
4       Q.   But according to the package she
5   already paid for, at the time she fell, she had the
6   opportunity to consume six more alcoholic beverages
7   without paying for those because she already paid
8   for them, correct?
9           MR. PELAEZ: Objection, form.
10          THE WITNESS: Six more you mean after
11      she came back onboard?
12  BY MR. RIVKIND:
13      Q.   Well, you said she used nine that day,
14  and she had the right to consume 15, without paying
15  for them?
16          MR. PELAEZ: Objection, form.
17  BY MR. RIVKIND:
18      Q.   Correct?
19      A.   Right. So if she tried to go back
20  after her fall and purchase a drink, then she would
21  have had the right to purchase five more, if her
22  Sail & Sign had not been deactivated. If they had
23  not identified her as being too intoxicated at that
24  point. So, obviously, they deemed her to be a risk
25  to herself and possibly to others, so they

37

1  deactivated her Sail & Sign account.
2       Now, has she been one of the people
3  that we were referencing earlier that can handle
4  their liquor and know how to drink responsibly and
5  know their limits, if they're -- if they had not
6  had an incident or did appear completely normal and
7  completely with all of their faculties intact, then
8  the bartender that they tried to order another
9  drink from would probably have served it to them.
10      It appears to me from the
11 investigation that was done, even if she had not
12 had her Sail & Sign deactivated, she probably would
13 have been denied another drink from the bartender
14 or wait staff, based on the way that she presented
15 to the medical center and the way that she
16 presented in the investigation to the ACSO.
17      Q.   She was entitled to 15 alcoholic
18 beverages per day, correct?
19      A.   Assuming she can handle her liquor,
20 assuming she can keep her faculties about her, and
21 assuming she is a responsible drinker, as we
22 require under the CHEERS! package, then, yes, any
23 adult that purchases it would be entitled to up to
24 15 drinks, as long as they are doing so safely,
25 reasonably, and responsibly.

38

1       Q.   And she had only consumed nine of the
2  15 at the time of her fall down the steps, correct?
3            MR. PELAEZ:  Objection.
4            THE WITNESS:  She had a lot of hard
5       liquor, and I -- you know, but it was nine.
6       Starting at 9:48 in the morning, she got
7       right to it with an Irish coffee and drank
8       pretty steadily throughout the day it
9       seems.
10 BY MR. RIVKIND:
11      Q.   I know you are a lawyer, but -- and I
12 move to strike your answer.  I didn't ask you what
13 type of liquor she was drinking, when she started.
14 All I said to you was, was she entitled to have 15
15 alcoholic beverages according to the CHEERS!
16 package, and then I asked you if at the time that
17 she had her incident if she had only used nine of
18 the 15 allowable alcoholic beverages.
19      I am going to rephrase the question.
20      And if we want to talk about the type
21 of alcohol or anything like that, I'll let your
22 lawyer ask you those questions or I will ask you
23 specifically what the type of alcohol was or what
24 your company should or shouldn't do if they observe
25 anybody, you know, intoxicated.

39

1            So let me start over again.
2            According to the CHEERS! package that
3  you purchase as a passenger ahead of time so you
4  don't have to pay for your alcohol, that package
5  entitles you to up to 15 alcoholic beverages per
6  day without paying for them, correct?
7            MR. PELAEZ:  Object to form.
8            THE WITNESS:  If you are going to
9       drink responsibly, then, yes, they would be
10      entitled to up to 15 drinks.  And that also
11      includes waters or other paid-for items
12      onboard.
13 BY MR. RIVKIND:
14      Q.   Okay.  So as of the purchase of the
15 last alcoholic beverage that Ms. Law had before her
16 incident, which was Number 9 of the allowable 15,
17 as you said earlier, where did she purchase that
18 particular alcoholic beverage?
19           MR. PELAEZ:  Objection, form.
20 BY MR. RIVKIND:
21      Q.   Let me -- I'm sorry.  I said
22 "purchase."  She doesn't have to purchase.  I'm
23 saying, where was she served that alcoholic
24 beverage?
25      A.   So I think I need to clarify

40

1  something.  I think it was ten drinks, not nine.  I
2  might have misspoken.  I would have to count, but I
3  do have the actual receipt, and it shows, you know,
4  the bars that were purchased at.  So if you
5  want to go in sequence from her first drink in the
6  morning, at 9:48 she had an Irish coffee.  And I am
7  only speaking of the day of the incident,
8  obviously, and that was in the coffee shop.
9       Q.   What I want to know is the -- whether
10 it was Number 9 or Number 10 for that particular
11 time frame that she was entitled to 15, where was
12 she served the last alcoholic beverage she had
13 before the incident?
14      A.   Oh, sorry.  I'm on the 8th.  I have
15 her charges up, and I'm just trying to figure out
16 where the bar is.  So I am sorry.  I am trying to
17 answer your question.
18           I just -- I saw "Do not use," but that
19 was the following day when they deactivated her.
20           So the last purchase of alcohol was at
21 7:08 p.m., and it was a Grey Goose martini in the
22 casino bar.
23      Q.   For some reason, I got some package,
24 welcome package and itinerary for the vessel
25 FANTASY instead of the ECSTASY, because I was going

41

1   to ask you on the package I have here -- because it
2   lists the different bars onboard the ECSTASY. I
3   mean, I counted eight of them, I think.
4        Do you know how many bars where you
5   can get alcoholic beverages --
6        MR. PELAEZ: Objection, beyond to
7   scope of today's deposition.
8        You can answer if you know personally,
9   Ms. Vazquez.
10       THE WITNESS: I mean, that probably
11  sounds about right. I would say between
12  five and ten. I don't know specifically.
13  You would also be able to get them in the
14  main dining room. I would really have to
15  look at a deck plan and research that for
16  you to know for sure.
17       But --
18  BY MR. RIVKIND:
19       Q.   Okay.
20       A.   -- on her -- we can look at hers and
21  see where she purchased them.
22       Q.   No. I just wanted to get an idea
23  about access to alcoholic beverages on the cruise
24  ship. Sounds like, you know, it's not disputed
25  it's easy to get an alcohol beverage on a cruise

42

1   ship?
2        A.   If you are above 21, yes.
3        Q.   So my question is: At 7:08 p.m., one
4   of your servers served her a Grey Goose martini; is
5   that correct?
6        A.   That's correct.
7        Q.   So if you are correct that Carnival
8   has procedures in place to not serve anybody
9   alcohol who seems to be overly intoxicated or
10  shouldn't have another drink, we can agree one of
11  two things, either she wasn't in such a condition
12  at 7:08 p.m. or one of your employees wasn't doing
13  their job correctly?
14       It's got to be one of those two.
15       MR. PELAEZ: Objection.
16       THE WITNESS: I think I would go with
17  the former.
18       MR. PELAEZ: Form.
19  BY MR. RIVKIND:
20       Q.   I'm sure you would like to go with the
21  former, but my question simply is: It has to be
22  one or the other, right?
23       MR. PELAEZ: Objection, form.
24       THE WITNESS: Right. But she didn't
25  fall until two hours later. So we don't

43

1   really know what she was doing in those two
2   hours, but we do know and common sense
3   dictates that, if you have been drinking
4   throughout the day and then you wait some
5   time, you -- the effects of the alcohol
6   start, you know, affecting your -- your
7   faculties.
8        So all we really know for sure is that
9   at 9 o'clock, when she stubbed her toe on
10  the stairwell and went to the medical
11  center, that the medical staff found her to
12  be not fall-down drunk, but definitely
13  slurring her speech, definitely, you know,
14  intoxicated, and the ACSO found the same
15  thing when he spoke with her.
16  BY MR. RIVKIND:
17       Q.   So if her last drink was at 7:08 p.m.
18  and she didn't have any drinks after that and the
19  first drink was early in the morning, did you do
20  anything to ask, you know, the bartender or anybody
21  at 7:08 p.m. what condition Ms. Law was observed to
22  be in at 7:08?
23       A.   I did not see any -- I did not see any
24  reference in the accident report where the ACSO
25  went back to identify the bartender that served her

44

1   the last drink two hours prior. No, I didn't see
2   that.
3        Q.   Can we agree or would you agree on
4   behalf of Carnival, that at the very least at 7:08
5   p.m. that, if your bartender was following the
6   procedures and whatever manual you referred to
7   earlier about service of alcohol to the passengers,
8   that he did not notice or observe any reason not to
9   serve her a Grey Goose martini?
10       A.   Right. If she had been, you know,
11  exhibiting the signs under their protocols of a
12  highly intoxicated person, she wouldn't have been
13  served. So we can assume that at 7:00 she had at
14  least her faculties about her. She might have been
15  enjoying herself. Obviously, she had been drinking
16  throughout the day, but she was not, you know,
17  fall-down drunk.
18       And I don't think there's any
19  assertion now on behalf of the company that she was
20  a fall-down drunk at 9 o'clock. I think what it
21  was is that she was observed to be under the
22  influence of alcohol, to the point where her
23  faculties were getting impaired and she wasn't able
24  to traverse the stairs correctly and she injured
25  herself so they deactivated her Sail & Sign card at

45

1 that time for alcohol purchases for her own safety.
2     Q.   Okay. I will move to strike that, and
3 I will try to get just the answer to the question.
4         But you did say something, is not
5 fall-down drunk according to you, under the
6 influence of alcohol, to the point her faculties
7 caused her to be able to traverse the stairs
8 correctly and she injured herself.
9         Did anybody -- does Carnival know of
10 anybody who witnessed the actual fall to the --
11 fall of Ms. Law in this case?
12     A.   No. No. Ms. Law said there was
13 nobody with her at the time. Well --
14         (Thereupon, a discussion was held
15         off the record.)
16         THE WITNESS: There was a notation I
17         believe in her passenger injury statement
18         that she felt like other guests were
19         around, but she couldn't identify any of
20         those guests, and no guests assisted her,
21         or there were no other witnesses that we
22         knew of.
23 BY MR. RIVKIND:
24     Q.   And did -- was Carnival able to
25 observe Ms. Law going -- traversing the stairs and

46

1 falling by some surveillance video footage that
2 exists regarding this incident?
3     A.   No. Unfortunately, on the ECSTASY,
4 these particular stairs are not covered by CCTV
5 cameras. So there would be no way to see that.
6     Q.   So how do you know that Ms. Law --
7 what do you base your statement on that Ms. Law
8 couldn't traverse the steps? If you didn't see her
9 fall, how do you know that is why she fell, because
10 she was unable to safely traverse stairs due to the
11 influence of alcohol?
12     A.   Both the medical personnel and the
13 chief -- assistant chief security officer noted her
14 to be slurring her speech, not with her full
15 faculties about her, and when they inspected the
16 stairs, there was nothing wrong with them, nothing
17 raised, nothing damaged, nothing protruding, no
18 carpet loose that would have caused her to trip and
19 fall. It was just kind of a freak accident where
20 she stubbed her toe literally on the "Watch Your
21 Step" sign of the metal and rubber nosing on the
22 stair, according to her.
23         She could not remember whether she was
24 holding on to the handrail or what she was doing
25 exactly. So because of that level of confusion by

47

1 her and also the observations that were made by the
2 trained medical staff and the chief -- assistant
3 chief security officer, it was determined that the
4 cause of her fall was the use of alcohol, that she
5 had poor judgment based on her alcohol use that
6 day.
7     Q.   Did the medical doctor put in there
8 intoxicated or smelled of alcohol?
9     A.   So the doctor doesn't normally make a
10 determination as to the cause of an accident
11 unless, of course, it somehow would go to the
12 treatment of the guest, but they did note in the
13 file -- they usually just write "ETOH positive" or
14 "smells, slurred speech." And I think it was the
15 nurse who first interacted with Ms. Law and noted
16 that in the medical chart, but I would have to pull
17 it up and look specifically.
18     Q.   Yeah. Can you pull up -- can you pull
19 up and tell me --
20     A.   Sure.
21     Q.   -- what they said?
22     A.   Sure.
23         The nurse noted initially -- and it
24 was nurse Alexandra Ong. That's O-N-G -- that "the
25 guest comes to the medical center with complaints

48

1 of right big toe trauma with mild bleeding and
2 small abrasion on left. Guest smells of alcohol.
3 The guest is conscious, coherent, and alert" was
4 the exact indication in the medical chart.
5     Q.   Okay. So let's go with the -- only
6 the facts you know because -- and let's go back to
7 what you were saying earlier what the medical staff
8 said, observed, whatever, and let's just talk about
9 what was noted in the official records of Carnival
10 from the ship's medical staff.
11         The only thing regarding consumption
12 of alcohol reported by your medical staff in the
13 ship's medical records you just read. It's a --
14 it's an entry February 7, 2019, 22:05, by the
15 nurse, Alexandra Ong, and it says the guest came to
16 the medical staff with a right big toe trauma and
17 bleeding and abrasion, but it says, "Guest smells
18 alcohol." But it also says, "Guest is conscious,
19 coherent, and alert," correct?
20     A.   Yes.
21     Q.   Okay. So let's talk about that
22 official notation and the only indication of
23 alcohol, and probably we can move on.
24         But do you ever -- did Carnival ever
25 do a study, like, since you have these CHEERS!

49

1  packages and up to 15 drinks, if you took every
2  passenger who was, you know, with those packages
3  and yanked them into the ship's medical department
4  at any time during the day when they were entitled
5  to those 15 drinks, what percentage of the
6  passengers do you think would smell of alcohol?
7           MR. PELAEZ:  Objection --
8           THE WITNESS:  I would have no idea.
9           MR. PELAEZ:  -- speculation, beyond
10         the scope of today's deposition.
11         If you have personal knowledge, you
12         can answer, Ms. Vazquez.
13         THE WITNESS:  I would have no idea.
14  BY MR. RIVKIND:
15      Q.   Right.
16           You keep saying that the -- you know,
17  the stairs were normal condition and everything was
18  fine and dandy and there were no unsafe or
19  dangerous conditions.
20           Do you know how it is that Ms. Law's
21  cut in her toes were so bad?  I mean, we're not
22  just talking about a little cut or a little stub.
23  I don't know if you have seen the pictures of her
24  toes, what happened to her and the surgery she
25  required.

50

1           MR. PELAEZ:  Objection.  Ms. Vazquez,
2           is not a medical doctor.  She's not here to
3           testify as a doctor or as an expert
4           witness.  I mean, if you want to ask her
5           questions about the incident and how it
6           occurred and what Carnival's position is as
7           to how it occurred or what facts we have
8           regarding that, that's fine.
9  BY MR. RIVKIND:
10      Q.   As the corporate representative in
11  charge of the guest claims and in your position and
12  also, you know, with your legal background, when
13  you have a passenger injured on one of your cruise
14  ships, like Ms. Law, and you see how severe the
15  injuries were, did you on behalf of Carnival look
16  into this finding that you say is in the incident
17  report that the stairs were fine and dandy, that
18  there was no unsafe or safety concerns on there, to
19  see why one of your passengers suffered such a
20  serious injury?
21           MR. PELAEZ:  Objection, form --
22           THE WITNESS:  Yeah, see, I --
23           MR. PELAEZ:  -- compound.
24           THE WITNESS:  I'm sorry.
25           I did not, but the investigator

51

1  onboard did, obviously, took pictures of
2  the area, inspected it with two other
3  witnesses, and they all found it to be of
4  no safety concern, nothing out of the
5  ordinary.  The steps were in the condition
6  they had found them in every day before,
7  and we know exactly how many people were on
8  the ship and how many people fell on these
9  particular stairs.
10         So there was no cause for concern for
11  the stairs themselves.  It clearly was a
12  freak accident where she stubbed her toe
13  severely and evulsed her nail, and I
14  understand she then later had an impact
15  fracture to her -- to her big toe.  So she
16  stubbed it very, very hard.
17         I don't know, I am not a biomechanical
18  human factors expert.  I don't understand
19  how she did it.  She wasn't even sure how
20  she did it.  And she couldn't even remember
21  whether she was holding the handrail, and
22  now I think -- she hasn't been deposed, but
23  I think there is some indication in her
24  interrogatory answers that she thinks she
25  might have fallen down.  She is not even

52

1  sure how it happened.  It was kind of a
2  freak accident, but caused by, most likely,
3  her poor judgment and/or failing to use
4  reasonable care for her own safety by
5  drinking a little too much that day.  That
6  is what the investigator onboard found.
7           MR. RIVKIND:  I move to strike.
8           MR. PELAEZ:  I'd ask --
9           THE WITNESS:  No, sir.  I am sorry.  I
10  answered your question.  You asked if I
11  had -- and I said no, but that on behalf of
12  the company, that is the investigation that
13  was done, and that was the finding onboard
14  in realtime by the witnesses.  So I know
15  you don't like those facts, and I know you
16  don't like the company's response, but that
17  is the company's response.
18           MR. RIVKIND:  I move to strike.
19           MR. PELAEZ:  Just for the record, the
20  witness is entitled to explain her
21  response.  But the motion to strike is
22  noted.
23  BY MR. RIVKIND:
24      Q.   Let's just for clarity purposes say
25  she did say that, I think it is important.

53

1  The stairs --
2  **A.  So it's not stricken.**
3  **Q.**  Listen, try not to be a lawyer in the
4  deposition. If you want to be a lawyer, get a
5  different job position and don't --
6  MR. PELAEZ: Okay. Let's move to
7  strike Mr. Rivkind's comments now.
8  Mr. Rivkind, Mr. Rivkind, let's just
9  ask questions, and Ms. Vazquez will answer.
10  MR. RIVKIND: I am just stating on the
11  record, yeah, that's what happens when a
12  corporation wants to produce attorneys as
13  corporate representatives you get attorney
14  answers. That's obvious.
15  MR. PELAEZ: Move to strike,
16  Mr. Rivkind's unnecessary and argumentative
17  comments. If you would please just ask
18  questions, and Ms. Vazquez can respond to
19  the questions, and we can all move along
20  faster.
21  MR. RIVKIND: It's based on 35 years
22  of experience.
23  But anyway...
24  BY MR. RIVKIND:
25  **Q.**  Let's -- let me see if I can get

54

1  factually, the stairs according to you, the
2  condition they were in at the time Ms. Law fell is
3  the same condition they were in, as you said, every
4  day before this incident happened for some period
5  of time, correct?
6  MR. PELAEZ: Objection, form,
7  misstates prior testimony.
8  THE WITNESS: What they found was that
9  the stairs on the day in question had no
10  apparent safety concerns, meaning that the
11  tread was fine, the rise was fine, the
12  carpet was fine, the rubber was affixed,
13  there was nothing sharp or protruding from
14  the metal nosing. They could not determine
15  any reason that the nosing themselves would
16  be inherently dangerous.
17  The misuse of the stair and the misuse
18  by the person traversing the stair is what
19  was found to be the cause of the accident.
20  And, again, I am not a
21  biomechanical -- I am not a human factors
22  expert to understand the nature of how she
23  stubbed her toe so badly.
24  BY MR. RIVKIND:
25  **Q.**  How did she misuse the -- well, how

55

1  did she misuse the stairs. You just made a
2  statement she misused the stairs. Well, tell me
3  how she misused the stairs.
4  **A.  When you are going down a flight of**
5  **stairs, you don't want to -- you don't want to hit**
6  **the end of the nosing of the stair as hard as she**
7  **did without a shoe on. She said she had flip-flops**
8  **on, but I don't know if her flip-flop came off, but**
9  **if she would have just carefully held the handrail,**
10  **walked calmly step by step by step by step,**
11  **obviously, she would not have stubbed her toe in**
12  **that fashion.**
13  **You have to be misusing the stairs**
14  **themselves or failing to use reasonable care for**
15  **your own safety traversing those stairs in order**
16  **for something like that to happen. You have to**
17  **either not be paying attention, running, doing**
18  **something that you shouldn't be doing; otherwise,**
19  **you would not injure yourself.**
20  **We have hundreds of thousands of**
21  **people that go up and down these stairs every year.**
22  **Q.**  I just want to know how you claim she
23  misused the stairs. I didn't ask --
24  MR. PELAEZ: Objection.
25  THE WITNESS: I think I just explained

56

1  it.
2  BY MR. RIVKIND:
3  **Q.**  I just want to know what -- what facts
4  you say how she misused the stairs. I think you
5  said it, because the accident wouldn't have
6  happened if she had not misused it, according to
7  you?
8  MR. PELAEZ: Objection, asked and
9  answered.
10  THE WITNESS: Right. I think anyone
11  that's using -- anyone that's using care
12  and caution when going down a flight of
13  stairs would not have this happen if they
14  were properly descending the staircase.
15  BY MR. RIVKIND:
16  **Q.**  Are you also assuming that the stairs
17  are, as you stated so many times during this
18  deposition, as they always are, no cause for
19  concerns, no safety concerns, and in good
20  condition, right? That is an assumption you are
21  making, correct?
22  **A.  I am not assuming that to be the case,**
23  **and we know from the work orders that that isn't**
24  **always the case. What I am assuming is that on the**
25  **day in question, on the evening where your client**

**57**

1  was injured, the stairs were of no apparent safety
2  concern.
3          Q.     You said it was like it was every day
4  before. I wrote it down. That was out of your
5  mouth. Do you want to now change your answer that
6  you gave before when you said the stairs were no
7  cause for concern, they were as they were every day
8  before? I can go back --
9          MR. PELAEZ: Objection, form.
10         THE WITNESS: Well --
11         MR. PELAEZ: Mr. Rivkind --
12         MR. RIVKIND: I can go back --
13         MR. PELAEZ: -- you've asked the
14  witness --
15         MR. RIVKIND: -- and find that.
16         MR. PELAEZ: -- what information --
17  you've asked the witness what information
18  she has regarding the inspection that took
19  place after the incident, what condition
20  the stairs were found in. The witness has
21  responded to that question numerous times
22  over and provided the information that is
23  available to the company.
24         I am not sure, you know, what it is
25  that you are asking the witness here or

**58**

1  what the issue is, but she's responded
2  multiple times already now as to what
3  condition the stairs were found in,
4  according to Carnival's employees who
5  inspected the stairs following the
6  incident.
7          Ms. Vazquez was not there. She
8  doesn't have personal information about
9  what the stairs looked like. She's
10  responding to your questions to the best of
11  her capacity. And I ask that you move on
12  at this point.
13         MR. RIVKIND: Well, I would if I got a
14  response. So you and I disagree, and I
15  don't want to get in a long lawyer talk
16  with you. So I disagree with you.
17  BY MR. RIVKIND:
18         Q.     Here is what I am getting at. You've
19  made some statements about how this incident would
20  have had to have happened, and you are saying it on
21  behalf of Carnival that she misused the steps.
22         You said that the steps were as they
23  were every day before and they were found not to
24  have any cause for concerns.
25         So when you say she must have misused

**59**

1  the steps, my question to you is: Are you assuming
2  that those steps were, in fact, as reported by your
3  people onboard the ship, that there was no cause
4  for safety concerns, that the stairs --
5          A.     On the day in question -- oh, sorry.
6          MR. PELAEZ: Objection, form.
7  BY MR. RIVKIND:
8          Q.     I am not asking you what they say.
9          A.     On the day in question --
10         Q.     Are you assuming in your answer on
11  behalf of Carnival -- you've already testified
12  about the inspections. My question is very direct
13  and simple. In your answer on behalf of Carnival
14  where you said that my client was misused the
15  stairs because her facilities or faculties were
16  impaired, are you assuming on behalf of Carnival
17  that the stairs were, in fact, in the condition
18  that you've many times in this deposition described
19  as having been no problems, no safety concerns,
20  and, as you put it, every -- the way they always --
21  they were every day before, is what you said?
22         MR. PELAEZ: Objection, form.
23  BY MR. RIVKIND:
24         Q.     Is that an assumption?
25         A.     No, it is not. Absolutely, it is not.

**60**

1  You moved to strike that answer. So I am going to
2  clarify for you since you --
3          Q.     Well, now you --
4          A.     -- now bring it up.
5          Q.     Now you --
6          A.     So every day meaning that it was
7  normal -- please don't argue with me. Please just
8  let me answer.
9          I am not assuming. I have seen
10 photographs of the stairwell taken contemporaneous
11 with the investigation on the evening in question
12 that your client stubbed her toe. I saw no raised
13 ledge -- I saw no reason -- if I was the
14 investigator, I would assume misuse of the stairs
15 as well, because there was nothing protruding,
16 nothing that should have -- if you are carefully
17 descending the stairwell, would have caused such an
18 injury.
19         So I am not assuming. I am reading
20 the record evidence. I am reading the corporate
21 documents and our accident investigation and
22 looking at photographs taken contemporaneous with
23 the investigation that show the area was fine,
24 without any apparent safety concern.
25         Q.     Let's show the photograph that we have

61

1  and that we attached to the lawsuit.

2       I am going to put up and it's going to

3  be Plaintiff's Exhibit 1.

4       (Thereupon, Plaintiff's Exhibit No. 1

5       was marked for identification.)

6  BY MR. RIVKIND:

7       Q.   Can you see Plaintiff's Exhibit 1?

8       A.   **I can.**

9       Q.   Have you ever seen that photograph

10  before?

11       A.   **I did see that in the discovery**

12  **materials. I have no idea what it is.**

13       Q.   If that's on the steps in question, is

14  that to you -- since you said you apparently are

15  able to look at photographs and make determinations

16  of whether there is anything of a safety concern,

17  does that look like a safety concern where, if

18  somebody's foot went in there, that that exposed

19  area, maybe they can cut their foot pretty badly?

20       MR. PELAEZ: Objection, form, lack of

21  foundation.

22       THE WITNESS: I -- I have no idea what

23  that picture is of, but it's not of the

24  stairs in question.

25  BY MR. RIVKIND:

62

1       Q.   How do you know that?

2       MR. PELAEZ: Objection, form.

3       THE WITNESS: The carpet beneath it,

4  the carpet -- the stairs at the time of

5  your client's incident were carpeted in

6  black, and there is a printed carpet there

7  that -- above that piece of metal. So that

8  was not on the stairs where Ms. Law stubbed

9  her toe.

10       I mean, I wouldn't think. I have no

11  idea who took that picture, when it was

12  taken, or what it was taken of, but it does

13  not appear to me to be the stairwell in

14  question.

15  BY MR. RIVKIND:

16       Q.   So if that's where Ms. Law got injured

17  and her foot got stuck in there and that is what

18  ripped her two nails and nail beds and caused this

19  severe laceration she suffered and that existed at

20  the time of the incident, would you reconsider your

21  statement that there were no safety concerns on the

22  steps where she got hurt?

23       MR. PELAEZ: Objection, form --

24       THE WITNESS: Mr. --

25       MR. PELAEZ: -- improper hypothetical,

63

1  speculation, lack of foundation.

2       You can answer if you know,

3  Ms. Vazquez.

4       THE WITNESS: I don't know what that

5  picture is of. I don't believe it to be

6  the stairwell in question. I have looked

7  at pictures of the stairwell in question,

8  and that -- that carpet next to it is

9  nowhere near the stairs.

10       So I don't know what that is or what

11  that picture is of, but it is not of the

12  aft stairwell on the ECSTASY between

13  Decks 5 and 6 as they appeared on

14  February 7th of 2019.

15       MR. PELAEZ: I can use a break when

16  you reach a good point.

17       MR. RIVKIND: Yeah, let's take a break

18  now because I am going to put another

19  exhibit up, but I am just trying to

20  determine which one.

21       MR. PELAEZ: All right. We will take

22  five.

23       Thank you.

24       (Thereupon, a short recess was taken.)

25  BY MR. RIVKIND:

64

1       Q.   So the photograph that we are going to

2  mark as Plaintiff's Exhibit 1, I had given that in

3  the discovery. So I don't know if you had an

4  opportunity ever to have seen that before.

5       A.   **I did. I saw those somewhere. I**

6  **don't know if it was attached to your complaint or**

7  **whether it was put in another folder for me.**

8       Q.   So that area is at the steps. I am

9  just -- if that's at the steps, it shows that there

10  is some exposed metal that doesn't have a cap on

11  it.

12       Did you see that in the picture?

13       MR. PELAEZ: Objection, form.

14       THE WITNESS: I saw that, but that is

15  not where she said she was hurt. So she

16  said she tripped on the watch your step

17  sign as she was descending the stairs. And

18  the other picture, which you didn't show

19  me, there appears to be a wall. There's a

20  wall and a metal -- the handrail goes into

21  the floor and then extends up. So I guess

22  now she is alleging she walked into a wall

23  and stubbed her toe. I don't know. But

24  that is not what she told the staff

25  onboard.

65

1    And I didn't see any pictures that
2    were taken onboard that depicted the
3    photograph that you showed me. So I don't
4    know who took that photo, when they took
5    it, or what it's of, but it does not appear
6    to be the stairway in question, to me.
7    BY MR. RIVKIND:
8        Q.    Did you have a chance to talk to the
9    attorney Mr. Pelaez during our break?
10       A.    No.
11       Q.    Okay. So first things first.
12       Your testimony is that the picture,
13   Plaintiff's Exhibit 1, to you, does not appear to
14   be even the stairs that Ms. Law fell on, correct?
15       A.    That's correct. So the stairs
16   themselves at the time were black carpeted. She
17   says that, as she was descending the stairs, she
18   stubbed her toe on the "Watch Your Step" sign,
19   which is affixed to the stair with black carpet
20   around it.
21       The photo that you didn't show me that
22   I pulled up in our break, because I went to look at
23   the complaint to see the other ones that I remember
24   seeing. I see there was a handrail in the wall,
25   and I guess you are now alleging that -- or she is

66

1    going to allege that she ran into the wall and
2    stubbed her toe there. That is not what he said
3    onboard. So that is a different set of facts than
4    were given to the staff onboard at the time.
5        Q.    Okay. I move to strike. That is
6    neither here nor there to the question, whether
7    it's different or not to you.
8        My question is just simple. Let's put
9    back Plaintiff's Exhibit 1. You have that?
10       Okay. Were you able to find that
11   photograph on the break when you said you went and
12   looked through photographs?
13       A.    Yes.
14       Q.    Okay. So my question to you is: Do
15   you see any -- do you see any safety concerns in
16   that picture?
17       MR. PELAEZ: Objection, form.
18       THE WITNESS: Again, I -- I can't tell
19   you what that is or what it's of or where
20   it is on the ship.
21   BY MR. RIVKIND:
22       Q.    Okay.
23       A.    If you go to the second photograph
24   that is attached to your complaint, it may be a
25   little clearer for the jury or whomever might be

67

1    watching this video because I have no idea what
2    that picture is or what it's of, but it's not of
3    the stairs where she claims she fell. It might be
4    a brass rail that is attached to the glass wall,
5    near the stairs, but I can't be sure.
6        Q.    Okay. If it -- but my question to you
7    is: Do you see a piece of that -- you know, the
8    strip, where you see the exposed area, you see some
9    piece of that area missing?
10       MR. PELAEZ: Objection, form.
11   BY MR. RIVKIND:
12       Q.    You can see that, can't you?
13       A.    I don't know what that is Mr. Rivkind.
14   So you can ask me a hundred times about this
15   photograph. I don't know what it is. I don't know
16   what it's of. I do think there is a clearer
17   picture that you attached to your complaint that
18   may be that area close up. I don't know. Or that
19   might be a close-up of the other photograph I am
20   referring to. I can't answer questions about that
21   photograph. I have no idea what that's of. But
22   that's not of the stair area where she claims she
23   was injured at onboard. It may be near it, and if
24   you want to show that other picture --
25       Q.    Yes.

68

1        A.    -- maybe we can discuss that.
2        Q.    Okay. So just as far as that
3    Plaintiff's Exhibit 1 is, you are not going to tell
4    me whether or not there is a piece missing or not
5    in that photograph; is that correct? You don't
6    have --
7        MR. PELAEZ: Objection to form.
8        THE WITNESS: So I'm now --
9    BY MR. RIVKIND:
10       Q.    You don't have --
11       A.    I am now look --
12       Q.    I am asking. Go back to the first
13   exhibit so we can limit Ms. Vazquez to my question,
14   please.
15       My question is very simple,
16   Plaintiff's Exhibit 1 -- and I would like to
17   preface the question too with your prior testimony
18   about when I asked if you were making assumptions
19   based on the investigation of your crew members and
20   you corrected me in your answer at least or took
21   the position that you were able to look at the
22   photographs yourself and see there were no safety
23   concerns by just looking at the photographs.
24       So I am asking you to look at this
25   photograph, Plaintiff's Exhibit 1, and I have a

69

1  question, simple: Do you have a position one way
2  or the other whether there is any safety concerns
3  there in that picture?
4      MR. PELAEZ: Objection, form.
5      THE WITNESS: I am -- I am going to
6      answer it again for, I think, the third
7      time. I don't know what that picture is
8      of. I don't know where it is alleged to be
9      on the ship. I don't think it is clear.
10     However, there is another photograph that
11     would maybe clarify things for the jury or
12     the finder of fact here.
13     So --
14 BY MR. RIVKIND:
15     Q.  Yes.
16     A.  -- I can't answer any question about
17 this and whether it poses a safety concern because
18 I don't know what it is or what it's of or where it
19 is.
20     Q.  Okay.
21     A.  But there is a separate photograph --
22     Q.  Fair enough.
23     A.  -- that I --
24     Q.  I understand there is another
25 photograph, and we are going to show you that

70

1  photograph. Relax, because we want to make -- we
2  are going to actually make it very clear for the
3  jury, much clearer than, you know -- that is why I
4  pointed out the specifics of what the nurse
5  actually said in the official records because we
6  want the jury to have everything very clear and not
7  be misled.
8      So, relax, we are getting there,
9  Ms. Vazquez.
10     MR. PELAEZ: Objection. Move to
11     strike.
12     THE WITNESS: Please stop being
13     condescending to me, Mr. Rivkind. It's not
14     going to make things go well today. It
15     really isn't. I don't need the mused
16     condescension from you. We are both
17     adults, and we are just doing a job. So
18     let's make it cordial, and let's keep it
19     light. Okay? I will answer your
20     questions, but I will not put up with
21     condescension. I just won't. Please knock
22     it off.
23 BY MR. RIVKIND:
24     Q.  Can we do the next exhibit, please.
25     Okay, Plaintiff's Exhibit that we will

71

1  mark 2.
2      (Thereupon, Plaintiff's Exhibit No. 2
3      was marked for identification.)
4  BY MR. RIVKIND:
5      Q.  Is this the photograph you are talking
6  about?
7      A.  That is the photograph that you
8  attached to your complaint that I don't believe is
9  the stairwell between Deck 6 and 5, where she
10 claims she was injured.
11     However, there does appear -- and you
12 circled it, if you can zoom in because my screen is
13 a little bit small -- where the glass wall meets
14 up -- looks like the brass handrail of the stairs
15 on -- depicted in the photograph, in Exhibit 2 on
16 the screen, it does appear that there is a piece
17 that might be missing from the brass.
18     Q.  Okay. And the other circle, can we
19 zoom in on that way -- or do you have another
20 picture of -- the one we just decided to show her.
21     (Thereupon, a discussion was held
22     off the record.)
23     MR. RIVKIND: Okay. I am going to
24     mark this exhibit as Plaintiff's Exhibit 3.
25     (Thereupon, Plaintiff's Exhibit No. 3

72

1  was marked for identification.)
2      MR. RIVKIND: I am just going to write
3      the numbers on them, Jeannie, for you to
4      make it easier, and then we'll send them to
5      you.
6  BY MR. RIVKIND:
7      Q.  Have you seen this photograph before?
8      A.  I don't recall that one. I think it
9  was sent to me, because I've definitely seen the
10 pictures of her toes. So it might have been in
11 that batch, but I don't know what that is of.
12     Q.  Is that a normal or -- normal
13 condition for a step to be where the stripping
14 protrudes out like that?
15     MR. PELAEZ: Objection, form.
16     THE WITNESS: I -- I don't know. I've
17     looked at the pictures that were taken
18     after your client's accident, and all of
19     the metal around that strip seems straight,
20     but I don't really know what that is or
21     whether that would be normal, whether that
22     would be, you know, normal wear and tear or
23     whether that would be something abnormal.
24 BY MR. RIVKIND:
25     Q.  Is it fair to say that in -- that this

73

1  photograph, Plaintiff's 3, if you look through the
2  photographs that were provided to you that we
3  looked at that your investigation team onboard took
4  and provided to you, that you don't see something
5  similar to what is shown in Plaintiff's Exhibit 3,
6  that protrusion like that?
7      MR. PELAEZ: Objection, form.
8      THE WITNESS: That is right. I mean,
9      the metal is not perfect on any of the
10     stairs, but I didn't see -- I mean, I don't
11     know how zoomed in that is. It looks
12     pretty zoomed in. So I don't even know
13     how -- you know, to scale, I don't even
14     know how big that dent is, but there is
15     a -- I just see a dent, yes.
16 BY MR. RIVKIND:
17     Q.   Right. And my point is just that the
18 other photographs the ones given to me, the
19 photographs you mentioned you reviewed that were
20 taken onboard by your crew, doesn't have a
21 photograph that looks similar to this one, correct?
22     A.   The stair where she alleges and she
23 told the ACSO that she fell on, there is some
24 pretty close-up photographs of that that do not
25 depict a dent like that. I just don't know what

74

1  that dent is. And, again, the metal nosing on
2  these stairs aren't perfect. There are wear and
3  tear because they are used, but when they inspected
4  them, there was nothing they saw on the stairs that
5  would protrude and cause such an injury to your --
6  to the extent that Ms. Law claimed she was injured.
7      Q.   Okay. And the piece of metal that was
8  exposed that you saw when -- in Plaintiff's 1 and 2
9  that you said, yes, there did appear to be a piece
10 missing, was there anything in the housekeepers or
11 the chief -- assistant chief security officer who
12 went to those steps where they -- was there any
13 notation or any pictures or anything depicting that
14 exposed metal?
15     A.   No.
16     Q.   I am going to show you -- have you
17 seen the pictures of the inspection that was done
18 fairly recently by -- you know, where my expert
19 went onboard and I guess Mr. -- your attorney on
20 behalf of Carnival was also present? Did you see
21 any of the photographs of the inspection.
22     A.   I saw some photographs. I don't know
23 if they were from your expert or from our team.
24     MR. PELAEZ: I will say the
25     photographs are photographs that I took

75

1  personally during the inspection and that I
2  provided to Ms. Vazquez. I do not have
3  possession of any of the photographs taken
4  by plaintiff's expert, Frank Fore, who was
5  there conducting the inspection on their
6  behalf.
7      (Thereupon, Plaintiff's Exhibit No. 4
8  was marked for identification.)
9  BY MR. RIVKIND:
10     Q.   Okay. I am going to show you what we
11 are going to mark as Plaintiff's Exhibit 4.
12     4, right?
13     Okay. In Plaintiff's Exhibit 4, do
14 you see that same metal, I don't know, railing, or
15 I don't know what they call it, that I showed you
16 before that you agreed there was a piece missing?
17     MR. PELAEZ: Objection, form.
18     THE WITNESS: No, I don't -- I don't
19     know if that is the same area at all. In
20     fact, that is very misleading because that
21     area right there is on top of carpeted -- a
22     carpeted -- you know, like, if your foot
23     were to go into it, it would hit carpet,
24     not that raised area. It's like a foot
25     difference. So I don't know what --

76

1  BY MR. RIVKIND:
2      Q.   Well, I mean, I am talking about the
3  piece that I showed you missing that was exposed in
4  Plaintiff's Exhibit 1 and then 2, and I guess my
5  question just is, is this is the inspection of
6  apparently that piece that you said apparently was
7  missing and is no longer missing is my point.
8      A.   I -- I don't --
9      MR. PELAEZ: Is there a question?
10     THE WITNESS: -- agree with you.
11     MR. PELAEZ: Objection, form.
12     Objection, form. I don't even understand
13     if there was a question there.
14 BY MR. RIVKIND:
15     Q.   Well, do you know if that piece she
16 said -- where you said, yes, I agree with you that
17 it looks like a piece is missing, whether that was
18 ever fixed or repaired or the piece was put back
19 that was missing?
20     A.   So I just need to be clear. The
21 photographs that you showed me that you attached as
22 exhibits to the complaint file in this case, I do
23 not believe depict the exact staircase where
24 Mrs. Law, or Ms. Law, alleges that she fell.
25     Q.   Okay. I understand --

77

1   A.   I also do not believe that that area
2   that you showed me in the previous exhibits -- bear
3   with me. I don't remember the exhibit number, but
4   they were the ones attached to your complaint -- is
5   on the staircase itself or flush with the floor.
6       I do not know if this picture that we
7   are looking at now is at all the same area or
8   staircase, so I -- but I do know that the picture
9   that's showing right now on the screen that you
10  claim was taken by your expert is not flush with
11  the floor. There is no way to stub your toe on
12  that unless you are kicking it because it's
13  elevated 6 to 12 inches off the floor. And below
14  it, beneath it, is carpet.
15      Q.   Okay. Putting that aside, the –
16  let's just assume, then, if – if the piece that
17  was missing in the picture I showed you before,
18  putting aside the facts as you believe them to be
19  at this point, just put that aside, just if that
20  picture is the steps and there was a piece missing
21  and you saw the exposed metal there, my expert,
22  when he went onboard the ship says it's been fixed
23  and the piece has been – there is now -- it's
24  fully attached like that. So there is no exposed
25  metal or whatever you want to call it that you saw

78

1   in that picture any longer.
2       So my question really just is simple
3   is: Regardless of you pointing out again and again
4   whether it's the same stairs, not the same stairs,
5   or how my client got hurt, whose fault it was,
6   things like that, just do you know when the – that
7   piece that was exposed, assuming this is the same
8   thing, got connected and got fixed?
9       MR. PELAEZ:   Objection, form.
10      THE WITNESS:   Mr. Rivkind, I cannot
11      assume that it's the same area. Because
12      the pictures very clearly show that it's
13      not the same area. If you just compare
14      them side by side and look at the
15      attachment to your complaint and look at
16      that photo, it's not even the same
17      guardrail coming around. It's a completely
18      different area.
19      So I do not know who took the picture
20      that you attached in your complaint. I do
21      not know what area that is. I do not know
22      if that area is elevated or flush with the
23      floor, but I do know if it is flush with
24      the floor in the other photograph, not this
25      one that's on the screen now, you would

79

1   have to walk into a wall to stub your toe
2   on it.
3       Okay. So let's just clarify that.
4       And now you are asking me to assume
5   something I cannot assume, that the
6   photograph attached to your complaint is
7   the same area that I am looking at now. I
8   do not believe it to be.
9       It defies my knowledge of our ships
10  and how they are refurbished because the
11  entire area, the entire stairwell would
12  have to have been reconfigured, it looks
13  like to me, for that to be the same
14  stair – set of stairs.
15      But I do know that the photograph that
16  is on the screen now, wherever that is –
17  and I assume it's the subject stairway,
18  because I have seen similar photographs
19  taken by counsel when he was at the same
20  inspection that you were at on the ECSTASY
21  recently – that that area is elevated, and
22  you would not be able to stub your toe on
23  it, unless you were kicking the wall.
24  BY MR. RIVKIND:
25      Q.   Well, I didn't say that's where she

80

1   stubbed her toe. So let's – let's -- let's
2   clarify that. I know you don't have the benefit of
3   her deposition yet, but if you read the lawsuit you
4   would understand more the mechanics of how she said
5   she got hurt. And part of it is that her foot did
6   get caught on the protruded nosing, which caused a
7   fall that, during that, caused her foot to get into
8   that exposed metal area you saw on the picture, and
9   that is what ripped her toe so badly and cut it so
10  badly and caused these serious injuries.
11      So we are trying to get to the bottom
12  of why you had that exposure of that piece that
13  she – that cut her foot so badly, exposed like
14  that on the day in question, and it seems to me
15  that, I guess, as of today, you are unable to
16  address any questions regarding that. Is that
17  correct?
18      MR. PELAEZ:   Objection.
19      THE WITNESS:   That is absolutely –
20      MR. PELAEZ:   Move to strike. Move to
21      strike. Improper testimony by counsel.
22      The witness has answered questions
23      regarding the stairs, the condition in
24      which they were found, whether any
25      discrepancies or issues were found with the

81

1  stairs.
2      The witness has testified repeatedly
3  that there was no indication that the photo
4  provide by plaintiff's counsel is of the
5  actual area where plaintiff fell or that
6  she advised security onboard where she fell
7  and the area that was inspected following
8  the incident.
9      If you have questions regarding it,
10 Mr. Rivkind, then please, you know, ask
11 your questions. But the witness has
12 testified, repeatedly now, that Carnival's
13 crew members did not find a condition, you
14 know, that plaintiff alleges was there,
15 meaning a missing cover or some other
16 missing piece in the exact area where she
17 told our crew members the incident
18 happened.
19     THE WITNESS: And I would just like to
20 clarify that what Mr. Rivkind just said,
21 that paragraph that he just read into the
22 record defies all logic and reason based on
23 the photos that I have seen and the
24 investigation as we know. So there is --
25 there is no way it could have happened the

82

1  way you just described, Mr. Rivkind.
2  BY MR. RIVKIND:
3      Q.   Okay. Is that your expert opinion
4  Ms. Vazquez?
5      MR. PELAEZ: Objection. Move to
6  strike.
7      Don't answer the question.
8      Argumentative.
9      Don't answer.
10     MR. RIVKIND: Well, it was volunteered
11 on top of your long speaking objection. So
12 I got two attorneys talking. So I move to
13 strike it.
14 BY MR. RIVKIND:
15     Q.   So the -- okay. Let's go back to
16 Plaintiff's Exhibit 1.
17     A.   Okay.
18     Q.   And let's just see if we can move on.
19     So Plaintiff's Exhibit 1 that I
20 attached to the lawsuit, along with reference to
21 why I attached it, are you able to say at all what
22 that's a picture of?
23     A.   No.
24     Q.   Okay. Are you able to say where that
25 is in relationship to the area where my client fell

83

1  on the day in question?
2      A.   No.
3      Q.   Are you able to say whether that
4  condition is a potential safety concern or not?
5      A.   No.
6      MR. PELAEZ: Objection.
7  BY MR. RIVKIND:
8      Q.   Okay. Are you able to say whether
9  your --
10     A.   Let me rephrase that. Potential, yes.
11 It could be a potential, depending on the
12 circumstances of where it is.
13     Q.   Are you able to say whether your crew
14 member team who investigated the incident made any
15 reference to this condition during their
16 investigation?
17     A.   They did not find a condition similar
18 to that on the aft stairway on the ECSTASY going
19 from Deck 6 to 5 where your client claims she fell.
20     Q.   And are you able to say if what's
21 depicted in Exhibit 1, which, as you said, appears
22 to be some part of it missing, are you able to say
23 whether and when that missing part that is shown in
24 this picture was repaired or replaced?
25     MR. PELAEZ: Objection, form.

84

1      THE WITNESS: I want to clarify. I
2  testified that I have no idea if there is a
3  part missing there. I do not know if --
4  where that is, what it's of, if it's the
5  underneath of something that has been
6  flipped over. I have no idea.
7      I -- I think the other picture is a
8  little clearer, and that is the part that I
9  conceded to you that it appears to me on
10 the railing next to the wall that there is
11 a piece of brass railing missing. I can't
12 be sure, but it looks to me, as a
13 layperson, in the other picture, not this
14 one, that there may be a part missing next
15 to the wall.
16 BY MR. RIVKIND:
17     Q.   And if that --
18     A.   I did not say there was a part missing
19 here. I don't know.
20     Q.   Okay. If there is a part missing and
21 the part wasn't missing any longer at the time of
22 the inspection, are you able to testify when the
23 part was replaced, put back so that it wasn't
24 missing any longer?
25     MR. PELAEZ: Objection, form.

85

1   THE WITNESS:  I am going to say again
2   I don't believe that -- I don't know what
3   this picture is of.  The other picture that
4   is attached to your complaint I do not
5   believe to be the same area that your
6   expert took photos of from Deck 6 to 5 in
7   the recent ship inspection.  I don't
8   believe that those are the exact same area
9   of the stairwell from Deck 6 to 5.  I don't
10  know.
11  I guess that is going to be the
12  subject of some expert's discussion, but it
13  looks to me, as a layperson looking at the
14  photograph, that it's not the same and the
15  area depicted in the photographs attached
16  to your complaint, if that is, in fact, an
17  aerial view of the top landing of Deck 6,
18  going down the stairwell to Deck 5, that
19  that piece would not be flush with the
20  floor, so that you would not stub your toe
21  on it because we know that the piece that
22  was shown by your expert in his photograph
23  is elevated from the floor.
24  BY MR. RIVKIND:
25  Q.   Okay.  Putting aside whether it's the

86

1   expert's photograph, the -- going to the photograph
2   attached to the complaint and, again, putting aside
3   the facts of the incident or for purposes of the
4   question, so we don't get in any debates, my
5   question is:  With respect to the piece that you
6   did say appears to be missing in that photograph,
7   whatever your earlier testimony was as to which
8   photograph it will reflect, but just assume it's
9   that photograph like you told me, do you know if
10  that was ever repaired and, you know, and the piece
11  that's missing replaced?
12  MR. PELAEZ:  Objection, form.
13  THE WITNESS:  I don't know what that
14  photograph — not -- not the one that you
15  still have on the screen, because we've
16  established conclusively that I have no
17  idea what that is, where it's of, and where
18  it was taken of or by whom.
19  The second photograph attached to your
20  complaint does appear to be -- to be one of
21  the stairwells somewhere on the ECSTASY,
22  and I only say that simply because the
23  carpeting seems the same and the staircase
24  looks similar to the one where your client
25  claims she fell from Deck 6 to 5.

87

1   In looking at what we know now, area,
2   the aft stairwell of the ECSTASY going from
3   Deck 6 to 5, we know conclusively from the
4   photographs that the way the handrail is
5   configured, it doesn't actually touch the
6   floor, which it doesn't appear to be the
7   case, to me, in the picture that is
8   attached to your complaint.  So I think
9   that is of a different area.
10  We'd have to go and look and inspect
11  every railing all over the ECSTASY to know
12  whether that condition still looks the
13  same.  I just don't know where — where it
14  is.  So it would be very difficult to
15  ascertain that without going back to the
16  ECSTASY and looking at every carpeted
17  stairwell to see if we can find the similar
18  handrail the way that it appears in that
19  aerial photograph that is attached to your
20  complaint.
21  BY MR. RIVKIND:
22  Q.   You are not suggesting that my client
23  took a picture of a completely different stairwell
24  than the one she got hurt on, are you?
25  MR. PELAEZ:  Objection, form.

88

1   THE WITNESS:  I -- I have to tell you,
2   Mr. Rivkind, I cannot tell.  It does not
3   appear, to me, to be the same area of the
4   stairwell from Deck 6 to Deck 5.  And now,
5   even more so, looking at the photographs
6   that we know are Decks 6 and 5 that were
7   just taken by you and Mr. Pelaez, and your
8   experts when they boarded recently, it does
9   not at all appear to be the same
10  configuration.  Because in the picture that
11  is attached to your complaint, it looks to
12  me, as a layperson looking at that
13  photograph -- and it is an aerial
14  photograph.  So it's hard to see.  Similar
15  to the picture your expert took, it is
16  misleading in the angle that it's taken,
17  because it's taken from an aerial
18  perspective.  It looks, to me, that that
19  piece that we -- it looks like there is a
20  piece of the metal missing, it does look,
21  to me, that that meets the floor and the
22  wall at the same time.
23  But the way that the handrail is
24  configured on the ECSTASY from Deck 6 to
25  Deck 5, the handrail when it rounds the

89

1    steps coming down from Deck 7, it's
2    carpeted. The handrail is elevated about 6
3    inches. So it's not flush with the floor.
4        So that if you were to stub your toe
5    in the wall, if you were going to hit the
6    wall, you would be hitting carpet.
7        Whereas, in the picture that is
8    attached to your complaint, it looks like
9    if you were going to hit the wall, it looks
10   like you would be hitting the metal meeting
11   the glass.
12   BY MR. RIVKIND:
13       Q.   So one possibility is that the
14   photographs you are looking at you are saying that
15   your team provided might be of a different area
16   than the photographs I am showing you that my
17   client provided me; is that correct? Is that a
18   fair statement?
19       A.   I -- it is a fair statement to say,
20   but I don't know -- the pictures that your client
21   gave you, I have no idea what they are of or where
22   exactly they are on the ECSTASY. The second
23   further-out photo does appear to be a stairwell on
24   the ECSTASY. It does not appear to be the exact
25   same stairwell where she alleges she fell, which is

90

1    from Deck 6 to Deck 5 that was photographed both by
2    your expert now and our investigator back when the
3    incident happened.
4        Q.   Well, so we are -- I mean, our
5    investigator was taken to the area that Carnival
6    indicated was the location of the incident. So I
7    am not -- I am not conceding it is not the same
8    stairs yet or not. I am just telling you that
9    these are pictures my client provided that were
10   taken of where she fell.
11       So I guess we will have to get down to
12   that discrepancy, if there is one, or if it just
13   has to do with, you know, the fact that we are
14   using copies of photographs and putting them up on
15   the screen. I don't know. But --
16       A.   Well, I will say this. She was very
17   clear to the medical staff and to the ACSO that it
18   was between Decks 6 and 5, and I believe they
19   took -- we'd have to ask the ACSO. I believe she
20   showed him to the area.
21       So that is the area they photographed
22   because that is exactly where she told them she
23   fell, and she told them she fell not in any of
24   these other photo -- the missing piece of railing.
25   She said she tripped over the "Watch Your Step"

91

1    sign itself as she was descending the actual stair,
2    not the bannister surrounding the staircase.
3        That is what she told investigators at
4    the time, and that is the area that they
5    photographed, and that is what they inspected and
6    looked at.
7        Q.   Okay. I don't think we can do
8    anything more other than know that you have your
9    set of photographs your investigator took that you
10   are looking at and I have my set of photographs
11   that I am showing you, and you are testifying that
12   my photographs that I am showing you are not
13   recognizable by you today because they don't look
14   like the photographs of the area where your
15   investigators took photographs of. Is that a fair
16   statement? And then we can move on.
17       A.   Yes. I do not see the area depicted
18   in your -- the photos that you attached to your
19   complaint, I don't see that area depicted in the
20   photographs taken in conjunction with the shipboard
21   investigation.
22       Q.   Okay.
23       A.   Nor do I believe it to be the
24   photographs -- the same area that your expert
25   photographed.

92

1        Q.   Okay. Fair enough.
2        Let's go to -- you have the next
3    topic, I guess, would be medical treatment.
4        Have you reviewed the ship's medical
5    records for the treatment my client received, you
6    know, the one we referred to about the nurse saying
7    that the guest smelled of alcohol? That -- those
8    same set of records, have you reviewed those?
9        A.   Yes. I have read the ship's medical
10   records, yes.
11       Q.   Do you know whether during the time
12   that Ms. Law remained onboard the ship following
13   her presentation to the ship's medical, whether she
14   was given any antibiotics?
15       MR. PELAEZ: I'm going to object to
16   the examination as beyond the scope of the
17   30(b)(6). You can answer to the extent you
18   know, Ms. Vazquez.
19       THE WITNESS: Yes, she was. She was
20   already on -- not Amoxicillin. It was like
21   a penicillin of some type. So they advised
22   her to continue using that medication,
23   which --
24   BY MR. RIVKIND:
25       Q.   Was there any -- I am sorry. Go

**93**

1 ahead. I'm sorry. I didn't mean to cut you off.
2     **A.**   Yeah, I guess she was already on that
3 **antibiotic, and they advised her to continue it and**
4 **to follow up with an orthopedist as soon as she got**
5 **back to shore, obviously.**
6     **Q.**   Do you have any information that she
7 didn't follow up with an orthopedist?
8     **A.**   If you will just bear with me a
9 **second. I did see that she was noncompliant with**
10 **something. I think she did go to the hospital, but**
11 **she was -- I don't know if she didn't finish the**
12 **antibiotic or -- I'm not sure. It was -- I'm**
13 **sorry. The drug was Amoxiclav she was already on.**
14 **And she did follow up with a doctor when she got**
15 **home, an orthopedic physician, on the 12th of**
16 **February.**
17     **Q.**   Okay. Was there any attempt by the
18 ship's medical staff, while he was onboard, to
19 consult with any shoreside medical expert or
20 department that you have available for consultation
21 with -- to the ship's medical staff to consider
22 whether the treatment for her injury was
23 appropriate or whether she needed to be, you know,
24 taken shoreside for further treatment with a
25 specialist before the end --

**94**

1     MR. PELAEZ: Objection.
2 BY MR. RIVKIND:
3     **Q.**   -- of the cruise?
4     MR. PELAEZ: Beyond the scope.
5     THE WITNESS: No, the doctor on --
6     MR. PELAEZ: You can answer. If you
7 know.
8     THE WITNESS: The doctor onboard
9 determined that it made sense -- they
10 diagnosed with her with an evulsed big toe
11 and a severe sprain or strain to the big
12 toe. Obviously, she came back and they
13 changed the dressing a couple of times, to
14 keep it clean and made sure she was taking
15 her antibiotics and told her she needed to
16 see an orthopedist when she, you know, got
17 home. Obviously, it wasn't a
18 life-threatening or -- you know, injury,
19 but they advised her that she should follow
20 up when she got home for whatever treatment
21 she might need.
22 BY MR. RIVKIND:
23     **Q.**   Did you look into at all the
24 qualifications of the medical doctor who was in
25 charge of her care and treatment?

**95**

1     MR. PELAEZ: Objection, beyond the
2 scope of --
3     THE WITNESS: No.
4     MR. PELAEZ: -- this deposition
5 notice.
6 BY MR. RIVKIND:
7     **Q.**   I want to go take a look -- do you
8 have the -- you made reference to those work
9 requests and work orders earlier or we talked about
10 it briefly.
11     Do you have those with you?
12     **A.**   I do, I think.
13     THE WITNESS: I think they were in the
14 supplemental responses to the request for
15 production. Is that right, Victor?
16     MR. PELAEZ: Yeah.
17     THE WITNESS: Okay. I'll find them.
18 Okay. Okay.
19 BY MR. RIVKIND:
20     **Q.**   There's not a whole lot, but on the --
21     **A.**   You still are -- you're still screen
22 **sharing that photograph. So can we go back to**
23 **the --**
24     **Q.**   Yeah. We can take that off. Thank
25 you.

**96**

1     The work orders or request that you
2 investigated to obtain, I think you said earlier --
3 what was the criteria for the request of
4 information? Was it the whole --
5     **A.**   I'm sorry. I don't -- I don't think I
6 **understand your question.**
7     **Q.**   Yeah, what did you search for?
8     MR. PELAEZ: I will put it on the
9 record that there was an agreement between
10 plaintiff's counsel and Carnival's counsel
11 to limit the request for any work orders or
12 evidence or information regarding
13 modifications, repairs, corrections to the
14 subject stairs and the nosing, and the
15 limitation on the subject vessel, the
16 ECSTASY, was limited to the Interior Aft
17 Staircase Number 50 for the six months
18 preceding the plaintiff's incident through
19 three months afterwards.
20 BY MR. RIVKIND:
21     **Q.**   And was the search for the entire
22 stairs from -- that ran all the decks, or was it
23 limited to any particular decks?
24     **A.**   I -- no, I think she did all of -- the
25 **same with the prior incident search. She did all**

97

1  of the aft stairway.
2          MR. PELAEZ:  Port and starboard.
3          THE WITNESS:  Port and starboard for
4      whatever deck -- on the ECSTASY, I am not
5      sure how many decks it goes.  Definitely, I
6      think up through 8.  I want to say 2
7      through 8, maybe 3 to 8.
8  BY MR. RIVKIND:
9      Q.  So the first one I am looking at says
10  "Work Request: HL324075" at the top and then --
11      A.  Okay.
12      Q.  -- "Work Order:  WO502756" at the
13  bottom.  Do you have that one?
14      A.  Yes.
15      Q.  Hopefully, it's in the same order
16  that -- that we have them.  It will make it easier.
17      A.  Yeah, I opened that one up.
18      Q.  It says under the "Subject" -- are you
19  able to tell me what the subject was?  I know it
20  says, "Port side black carpet ne."  Do you know
21  what means?
22      A.  I don't.  "Black carpet," probably
23  needs.  It might have gotten caught off.  Needs.  I
24  don't know.  It says "Notes" at the bottom, "black
25  side carpet needs to be fixed" -- "need to fix."

98

1      Q.  What's a side carpet if you are
2  looking at these stairs that, you know, counsel
3  just announced what the search was for that we
4  agreed to?  What would the reference to "side
5  carpet" be?
6      A.  It's not a reference to "side carpet."
7  It's the port side stairwell.  So Deck 8 to Deck 7
8  port side because there is port and starboard of
9  the stairs, and they flank down either side.  So
10  you need to let the staff know which side has the
11  tear to help them identify it easier and quicker.
12      Q.  Okay.  No, I was just looking at the
13  "Notes."  You know, I see where you are saying the
14  "Subject," but "Notes," it says, "Black side carpet
15  need to fix."
16          But you are saying they were referring
17  to port side when they wrote this?
18      A.  Well, I am sorry.  I was looking at
19  the "Subject" line that says "aft staircase forward
20  Deck 8 down to Deck 7 port side black carpet need"
21  and then "Notes:  Black side carpet needs to be
22  fixed."
23          I don't -- I can't say definitively,
24  but in the photographs that we were looking at that
25  your expert took, below that area is carpeted,

99

1  right, and I believe it to have been carpeted on
2  the day in question as well with black carpet, so
3  that it may mean that area.  But it also may mean
4  the stairs themselves.  I -- I would not know.
5      Q.  Then let's go to the next one.
6      A.  Okay.
7      Q.  Which is your 324077?
8      A.  Yes.  It looks like they put them in
9  chronological order for us.
10      Q.  This says, "Port side carpet missing
11  pc."
12          Do you know what that means?
13      A.  "Aft guest staircase Deck 6 port side
14  carpet missing pc."
15          I don't know what "pc" stands for.
16  "Port side carpet missing" -- missing piece maybe,
17  there's like a missing piece of carpet.
18      Q.  Okay.  The next one, I guess, is
19  HL327368?
20      A.  Yes.
21      Q.  This one says, "1 black ledge
22  missing."
23          Do you know what that is, a black
24  ledge?
25      A.  I do not.  I don't know if that is the

100

1  nosing itself or -- I don't know what "black ledge"
2  would mean.
3      Q.  Okay.  The next one is HL327563?
4      A.  Yes.
5      Q.  Again, it's talking about the all
6  black ledge, and it says, "to paint."  The black
7  ledge, do we know what they are referring to when
8  they say the "black ledge"?
9      A.  I -- I didn't see any areas on the
10  staircase that I looked at of areas that were
11  painted.  So I don't know.
12      Q.  Okay.
13      A.  We would have to maybe look at another
14  photograph to see what areas would actually be
15  painted versus carpeted.
16      Q.  If we are able to get somebody in
17  housekeeping and depose them, they'd probably be
18  able to help with this?
19      A.  I think so.  Or someone from the ship.
20  Someone, you know --
21      Q.  Yes.
22      A.  -- somebody from the ship.
23      Q.  All right.  The next one I have --
24      A.  They probably won't be able to tell
25  you any more level of specificity for this

**101**

1  particular work request, but they would have a
2  better understanding of the configuration of the
3  ship and the maintenance that's done to it.
4      Q.  Yeah, maybe the terminology that we
5  are not sure about.
6      A.  Right.
7      Q.  Okay.  The next one is HL328961?
8      A.  Yes.
9      Q.  It says, "Port side step strip to
10  fix."
11      Not much detail there, but what --
12  what does that appear to indicate?
13      A.  To me, in my experience, that's going
14  to be the actual nosing, the threshold itself.
15  They call them strips, the nonskid strips.
16      Q.  And --
17      A.  Or you could also call it a nosing.
18      Q.  Okay.  The next one is HL331349.  Then
19  it says, "Portside 1 watch your step sign damage."
20  So I guess that's self-explanatory, that "Watch
21  Your Step" sign you talked about earlier was
22  damaged?
23      A.  Yeah.  There is one at the top and one
24  at the bottom of each stair.  So one of them
25  obviously needed to be replaced.

**102**

1      Q.  Is there any way to get any more
2  detail about these repairs other than what has been
3  provided?
4      A.  No.  The InfoSHIP, the work orders
5  system is -- it's not the best for level of detail,
6  but it's very efficient for getting things done
7  quickly on the ship, so --
8      Q.  Okay.
9      A.  It's just what's used to -- for
10  routine maintenance and service maintenance.
11      Q.  Next one, HL331351.
12      What is "portside 2"?  "Aft stairs
13  portside 2"?
14      A.  Well, the work order before this one
15  was 10-20, and it says "portside 1."
16      "Aft stairs portside 2."
17      Q.  Are there two sets of stairs?
18      A.  It may be -- it may be their language
19  to say that the "Watch Your Step" sign 1 is the one
20  at the top and the "Watch Your Step" sign at the
21  bottom is 2.  I don't know why they wouldn't just
22  do work orders for both of those signs.  So it
23  doesn't make sense.  But these two work orders were
24  done basically at the same time it looks like, on
25  10-20-2018, to replace the sign.

**103**

1      Q.  I mean, it doesn't mean that on the
2  aft there is two -- there is -- on the port there
3  is two sets of stairs?
4      A.  No.  I think -- it's my understanding
5  port -- unless they are just describing it
6  incorrectly by ship's language, because they
7  normally say port and starboard stairs.  So I
8  don't -- I really don't understand that entry, but
9  it looks like those went hand in hand and were the
10  same general area to replace the "Watch Your Step"
11  sign.
12      Q.  Okay.  The next one is HL331352.
13      Do you have that?
14      A.  Yes.  And this is the same day, about
15  the same time, with another "Watch Your Step" sign
16  on a different deck.  And it, again, says
17  "portside 1."  So I don't know what that means.
18      I can find out pretty easily by
19  sending a request to the ship.
20      Q.  Okay.
21      A.  So we can supplement in an answer to
22  interrogatory or something for you if you --
23      Q.  I am sure we can work that out --
24      A.  -- want clarification.
25      Q.  Yeah.

**104**

1      A.  Okay.
2      Q.  The next one is -- there's only a
3  couple more -- HL331353.
4      A.  This is another corresponding work
5  request for the same type of work on the same day.
6  It was, I guess, the assistant housekeeping manager
7  or trainee noticed another "Watch Your Step" sign
8  on Deck 6 and 7 that needed to be replaced.
9      Q.  Okay.  Next one would be HL338094.
10      A.  This is on Deck 9, starboard side
11  staircase, the rubber skid strip was detached and
12  needed to be replaced.
13      Q.  Are we talking about the same stairs?
14  I mean, when I say the same stairs, I am not
15  talking about, you know, the site of the incident,
16  just the same stairs that lead through all the
17  decks?
18      A.  So we searched both aft -- well, it's
19  the aft stairwell, which is denoted as Stairwell
20  50, but there is port and starboard.  You know, it
21  comes down port and starboard side all the way
22  through the ship.  So this is Deck 9 aft starboard
23  side.  So it's a different deck and different side,
24  but, yes, it's all the same stairwell.
25      Q.  Okay.  The next one HL339643, same

105

1  stairwell, and now, I guess that is
2  self-explanatory, piece of carpet needed to be
3  glued?
4      **A.   Yes.**
5      **Q.**   Okay.  That covers all the work orders
6  I was provided.  Is that all the ones that were
7  able to be retrieved within the parameters we
8  agreed to?
9      **A.   Yes.**
10     **Q.**   Okay.  I want to go to the -- just the
11 accident reporting criteria that was given to me in
12 the supplemental production.  You probably have
13 that too.  It was a red --
14     **A.   Okay.**
15     **Q.**   -- Carnival accident reporting
16 criteria.
17     **A.   Okay.**
18     **Q.**   I know that the position of Carnival
19 is that the investigation as to -- as to why my
20 client fell, the investigation that took place with
21 the chief security officer and the housekeeping --
22 or assistant chief of security and the housekeeping
23 crew, that that investigation as to the cause was
24 prepared in anticipation of litigation; is that
25 correct?

106

1      **A.   The investigation, yes, and the**
2  **witness statements, et cetera, those are done in**
3  **anticipation of litigation.**
4      **Q.**   So is your testimony that after
5  somebody falls like Ms. Law did -- or in this case,
6  when Ms. Law fell, suffered that injury on the
7  steps, that the primary motivating factor for going
8  and inspecting the steps and doing an investigation
9  was anticipation of litigation?
10     **A.   Yes.  That is -- generally speaking,**
11 **we ask the ship if anyone sustains treatment beyond**
12 **first aid or needs treatment beyond first aid for**
13 **an accident onboard, it's the history of the**
14 **company that those types of incidents generate**
15 **claims and lawsuits such as this one, and so we try**
16 **to get an investigation going to be able to defend**
17 **the company and understand the nature of what**
18 **happened and memorialize the events.**
19     **Q.**   In that accident reporting criteria,
20 there is a note at the bottom that says, "Assaults
21 and fatalities that result in illness, natural
22 deaths, homicides, or suicides, these are
23 investigated by security services under the
24 direction of legal counsel in anticipation of
25 litigation."

107

1          That sounds to me that those type of
2  incidents are investigated differently; is that
3  correct?
4          MR. PELAEZ:  Objection to form.
5          THE WITNESS:  So back then in 2019 --
6  yeah, and they are still sort of
7  investigated differently, but in the old
8  system that we had in 2019 when your client
9  was injured, if it was an accident
10 investigation, it would be the
11 investigative summary and the witness
12 statements and photos and everything would
13 be uploaded into InfoSHIP.
14         Back then, if there was a criminal
15 allegation or something like a marine
16 incident, like an allision, collision, or
17 grounding, that would go to shoreside
18 security to more heavily run their
19 investigation with the ship.
20         Does that make sense?  So it didn't go
21 in the same InfoSHIP database.  So if you
22 were trying to look for both accidents and
23 incidents in a prior incident search, you'd
24 have to go to two sources.
25         Now it has all been merged into one

108

1  database, but back then the procedure is a
2  little outdated, I guess, in that regard.
3  BY MR. RIVKIND:
4      **Q.**   Okay.  And the next page, there is a
5  note that says — because I know you said that
6  anybody that goes for treatment beyond first aid
7  and received treatment beyond first aid triggers
8  the cruise line's anticipation of litigation
9  motive.
10         That note says that "Passenger
11 accidents that have severe swelling, inability to
12 ambulate, suspected or possible ligament damage, or
13 complaints of moderate or severe pain has to always
14 be reported, regardless of whether they receive any
15 treatment by the physician onboard"?
16     **A.   Right.  So we implemented that several**
17 **years ago because what was happening in the medical**
18 **center is that someone would go down and say,**
19 **"I" -- you know, "I bumped my knee" or "I fell, and**
20 **I hurt my knee," but they didn't really get**
21 **treatment beyond first aid.  Right.  They just got**
22 **a bag of ice, and they were able to ambulate okay.**
23 **But then those people would come back and say,**
24 **"Well, I tore my meniscus."**
25     **But since they were only getting first**

109

1  aid at the time, technically, it wouldn't trigger
2  them to do the accident report. So we were getting
3  very frustrated. So we added that in to make sure
4  that, you know, we had a more thorough accident
5  investigation in anticipation of litigation so that
6  we were able to memorialize events that, you know,
7  were going to generate a claim.
8      Q.  So, in other words, then, you can have
9  an incident on -- onboard the cruise ship where
10 somebody does get -- was getting hurt or injured
11 and no reports were generated as a result of the
12 incident, if it didn't meet the criteria you just
13 discussed?
14     A.  Right. So if they don't report it,
15 obviously, we are not going to be able to
16 investigate it. If they report something to guest
17 services, guest services is instructed to tell them
18 to go to the medical staff, and then the medical
19 center triggers the accident criteria for the
20 company at the request of the legal department
21 to -- to try to, you know, memorialize these
22 incidents and investigate them in anticipation of
23 litigation.
24     We try not to miss any, but, you know,
25 obviously if somebody is not going to report it or

110

1  if it's a very minor injury that, you know, we
2  don't think a claim is going to come -- flow from
3  it, then it may not get reported.
4      It might be somewhere in another
5  database, but -- but it's not going to generate an
6  accident investigation.
7      Q.  Yeah, I guess what I am getting is
8  this provision that says passenger, results severe
9  swelling, inability to ambulate, et cetera, that we
10 just read, should always be reported regardless of
11 whether the passenger is seen by the physician.
12 And then I asked you, you know, if there is --
13 somebody can get injured on the cruise ship and
14 there's no report generated, and you said,
15 "Obviously, if it is not reported."
16     I just want to be clear, when -- when
17 you are using the word "if it's not reported," this
18 manual is addressed to your crew members.
19     So what you said before is what was
20 happening was passengers were reporting that they
21 got injured, but there were certain situations
22 where they didn't receive what you said, you know,
23 more than first aid where those incidents weren't
24 being reported by Carnival, not by the passenger,
25 because the -- Carnival would have to have known

111

1  about the incident to make this determination and
2  this note.
3      You know what I mean?
4      MR. PELAEZ: Objection, form.
5      THE WITNESS: Sort of. I mean, it's
6  kind of splitting hairs. So we added that
7  in to try to ensure that incidents or
8  accidents that we think are going to
9  generate claims that we anticipate
10 litigation arising from them, that we ask
11 them to investigate them pursuant to those
12 accident reporting criteria.
13 BY MR. RIVKIND:
14     Q.  And if it isn't the type of claim that
15 you anticipate litigation, then Carnival doesn't
16 investigate the accident?
17     A.  Typically not, not -- not from the
18 legal department's perspective. If we don't think
19 a claim is going to be generated, we don't ask the
20 staff to then go and do a thorough investigation
21 the way that they do when there is a severe injury.
22     So if somebody goes to the medical
23 center and said, "You know, I just cut my finger.
24 I need a Band-Aid," that generally is not going to
25 result in a claim and that's generally not going to

112

1  get -- you know, result in accident investigation
2  in anticipation of litigation onboard.
3      Q.  Yeah. And so we are clear, legal
4  counsel didn't, after Ms. Law fell, get notified
5  that she fell and then instruct the crew to do an
6  investigation. The crew's investigation that they
7  did of this incident was pursuant to the procedures
8  of Carnival when the crew members are supposed to
9  investigate an accident and do a report?
10     A.  Right. We gave them the parameters as
11 when -- as to when we think that anticipation is
12 going -- I mean, litigation is going to arise. We
13 are going to anticipate a claim coming. We have to
14 give them parameters so that in realtime they can
15 do these investigations.
16     Q.  Okay. And so the note that I asked
17 you about that you said was in 2019, I think, those
18 were additional parameters you provided to the crew
19 because there was experience of situations certain
20 incidents weren't getting reported because of the
21 other parameters that turned out to be a little bit
22 more serious than originally expected.
23     Is that a fair statement?
24     A.  Yes, and I -- we didn't ask -- the
25 legal department didn't ask in 2019. It was many

113

1  years ago that we added that.  It's changed over
2  time.  So it used to be guest services and the CSO
3  could initiate if they anticipated litigation, and
4  then we tried to streamline it through the medical
5  department with certain exceptions.
6          It's something that has evolved in the
7  company over time as to, you know, what incidents
8  result in claims and what incidents need to be
9  thoroughly investigated.
10          MR. RIVKIND:  Okay.  You want to take
11          five minutes, and we're just going to go
12          through the prior incidents and then we
13          should be done.
14          MR. PELAEZ:  Okay.
15          THE WITNESS:  Sure thing.
16          (Thereupon, a short recess was taken.)
17  BY MR. RIVKIND:
18          Q.    Before we get to the priors, I found
19  that procedure.  It was called "Preventive
20  Measures - Slips, Trips and Falls" from
21  housekeeping, and it says, "Good housekeeping is
22  the first and most important or fundamental level
23  of preventing falls due to slips and trips."
24          Would you agree with that statement
25  that "Good housekeeping is the first and most

114

1  important fundamental level of preventing falls due
2  to slips and trips"?
3          MR. PELAEZ:  Couldn't hear you there,
4          Suzie.  I think you were trying to speak.
5          THE WITNESS:  Oh, I'm muted.  There
6          you go.  Hi.
7          Yes, I would agree with that, I think,
8          at least from a housekeeping perspective.
9  BY MR. RIVKIND:
10          Q.    Okay.  So -- and then it says
11  regarding procedure for work order reports, it
12  says, "The objective is to ensure that all
13  maintenance issues are reported and addressed
14  promptly or as soon as possible."
15          Is that correct?
16          A.    Yes, that is correct.
17          Q.    Okay.  So without getting, again, in a
18  discussion about the photographs and whether they
19  are the same stairs or not the same stairs -- that
20  will all flesh out and work out as we move
21  forward -- my question only is:  Assuming -- let's
22  just say there was a piece missing, whether -- and
23  that -- and that presented a potential issue, like
24  we said earlier, regardless of how my client fell,
25  okay, and that presented a maintenance issue, if it

115

1  was repaired or fixed according to this procedure
2  of work order reports, then that issue should have
3  been reported and addressed promptly or as soon as
4  possible, correct?
5          A.    So the picture that -- I assume you
6  are talking about the pictures that are attached to
7  your complaint?
8          Q.    Yes, including the one I showed you,
9  including the one you said you did -- were able to
10  tell what I was referring to and that did appear to
11  have a piece missing.
12          A.    Yes, I don't know that that would
13  constitute a safety concern that they would
14  immediately want to fix that, because it's not a
15  walking area, nobody should -- you shouldn't be
16  walking into a wall.  And I do believe, if it's the
17  same area, that it is elevated with carpet.  So
18  it's not a place where anyone is going to touch or
19  walk or traverse or hold in the normal course or
20  operation of the ship.
21          However, if they deem that it needed
22  to be repaired or replaced or somebody noticed that
23  it -- they wanted to make a repair there, it
24  probably would generate a work order.
25          Q.    Okay.

116

1          A.    Or someone would have to order that
2  piece, some there might -- would be maybe a
3  purchase order for that piece.
4          Q.    And in the work orders that you or
5  Carnival searched for within the parameters we
6  agreed with opposing counsel that he announced
7  earlier, no work order surfaced where -- that would
8  cover what we discussed about that picture.
9  Because you included all the work orders of all the
10  stairs and stuff that maybe didn't even have
11  anything to do with Ms. Law's incident, because you
12  told me that you did a thorough research of
13  everything.
14          Would that search have -- if a work
15  order existed, would you have found it in that
16  search?
17          A.    I would -- I would have to ask Monica,
18  because that piece that appears to be missing in
19  the photograph that is attached to your lawsuit
20  looks to me to be part of the handrail that's
21  elevated above the floor as it comes up for the
22  person to grab on to it.  So that would be a
23  handrail and might not be generated in a search
24  that she did because she would be searching for
25  stair, stairwell, aft stairwell.  So unless they

117

1   put in the work order the handrail on the aft
2   stairwell -- you know, I am just not -- I am not
3   really sure if she searched handrails or if she
4   would have taken handrails out of that search.
5       So I will agree to get with Monica
6   right after this and go over the results of that
7   search to make sure that either it included
8   handrails and that no handrail maintenance work
9   orders were taken out.  Since this was a
10  trip-and-fall over the stairs, she might not have
11  thought handrails were relevant.  So I will -- I
12  will find you -- I will determine whether there are
13  any work orders related to handrails conclusively,
14  and if there are, we will produce them.
15      Q.   On the similar or request for prior
16  incidents, again, just --
17      MR. PELAEZ:  Sorry, to -- Brett, sorry
18  to interrupt you for a second.  I just
19  wanted to clarify that what was -- my
20  understanding of what was requested was for
21  any work or repairs performed on the steps,
22  handrails, nosings, nonskid --
23      THE WITNESS:  Oh.
24      MR. PELAEZ:  -- strips, carpet, et
25  cetera, for the subject stairs, the Aft

118

1   Staircase 50 along all decks.  So we can --
2   we will, of course, go back and confirm,
3   but I just wanted --
4       THE WITNESS:  I will.
5       MR. PELAEZ:  -- to clarify that that
6   was the parameters --
7       THE WITNESS:  Okay.  Good.
8       MR. PELAEZ:  -- of the search as I
9   understand what was requested.
10      THE WITNESS:  Okay.  Then Monica would
11  have given you everything.
12  BY MR. RIVKIND:
13      Q.   Okay.  The similar incidences, I guess
14  it's provided in supplemental answers to
15  interrogatories?
16      A.   I am not sure --
17      Q.   Do you have that?
18      A.   -- where they live.  I know I have
19  them, and I also brought the actual reports
20  themselves to answer your questions, but Victor
21  will have to help me as to where they live in the
22  discovery folder.
23      MR. PELAEZ:  In the supplemental
24  answers to interrogatories in the materials
25  I provided.  I think if you look at 10-C.

119

1       THE WITNESS:  Thank you.  That was
2   very helpful.  Oh, wait, I only have 10-B,
3   10-D -- oh, got it.  Okay.  I pulled it up.
4       MR. RIVKIND:  What -- and what number
5   are you looking at now in the supplemental
6   responses?  I thought you said 10, Victor.
7       MR. PELAEZ:  No.  It's supplemental
8   response to Interrogatory Number 4.
9       MR. RIVKIND:  Oh, okay.  I'm sorry.  I
10  thought I heard you say 10.  Okay.
11      MR. PELAEZ:  10 is just the -- the
12  reference --
13      THE WITNESS:  Folder.
14      MR. PELAEZ:  -- I provided to
15  Ms. Vazquez.  That was an index number.
16      MR. RIVKIND:  Yeah, I'm looking for
17  Interrogatory 10 and I don't see one.
18  BY MR. RIVKIND:
19      Q.   Okay.  So the search that you did
20  revealed how many -- well, first, again, what were
21  the parameters for what you were going to disclose
22  as far as prior incidents?
23      A.   Any and all trips or falls -- I think
24  Monica did all falls, she confirmed for me -- on
25  the subject ship on all of the aft stairways, both

120

1   port and starboard from Deck 2 to all the 8 or
2   however many levels there are, Aft Staircase
3   Number 50.
4       Q.   Okay.  And how many incidents did the
5   search reveal?
6       A.   About six falls on various levels.
7       Q.   Okay.  Were you -- well, let's just go
8   through them since there is -- you have six in the
9   supplemental, because she brought stuff, you said,
10  to provide any more details if we need.
11      A.   Yes.
12      Q.   The first one 9-30-16 of Santonia (as
13  pronounced) -- the description, by the way, that's
14  provided here, is this the description that the
15  investigation put or that the passenger reported?
16      A.   The passenger said that he misplaced
17  his foot on the stair.  Would you like me to go to
18  the accident report themselves to confirm?
19      Q.   Yeah, so I can get an idea of how --
20  where the description --
21      A.   Sure.
22      Q.   -- came from.
23      A.   Yes.  He wrote in his own statement in
24  his own words in his own handwriting that "As I was
25  descending the stairs, I misplaced my foot" -- "my

121

1  left foot." So he just told the investigators he
2  just misstepped and fell.
3       Q.   Okay. And then the next one is
4  Bennett?
5       A.   Yeah, that was a 16-year-old named
6  Hayden Bennett. Let me go to that report. So
7  Hayden was actually going up the stairs and lost
8  his flip-flop and then tripped. So I think he got
9  tripped up with his flip-flop somehow. They were
10 slides, really. It's like the ones that...
11      Q.   The first one, it says "Exact location
12 unknown between Lido Deck 10 and 6." Is that
13 because the passenger was unable to identify the
14 exact location, or do you know?
15      A.   That is what he said. He is not sure
16 exactly where it was, but he knows it was somewhere
17 between -- he said he was descending the starboard
18 stairs aft outside panorama dining room until about
19 Deck 6, but I don't know exactly where it happened.
20      So he had started up on 10 and was
21 descending down, going to Deck 6, which is probably
22 where his cabin was, but he is not sure exactly
23 where exactly he fell.
24      Q.   In Santonio (as pronounced), is there
25 any indication, since you have the report out, of

123

1  up on the antiskid strip, "on the rubber strip. As
2  a result, he tripped, lost his balance and fell."
3       Q.   Does the report indicate whether or
4  not any -- there were any findings of any safety
5  concerns or any problems with the stairs at that
6  time?
7       A.   No, there was nothing found, no
8  discrepancies found with the stairs. They did note
9  that he was on the CHEERS! package. But since he
10 didn't report it until the next day, they didn't
11 really make a finding as to whether he was
12 intoxicated because he didn't report it because
13 nobody saw him at the time of the incident, but he
14 had a lot to drink the day before, according to his
15 Sail & Sign charges.
16      Q.   Jennifer Brooks, the next one,
17 10-4-18, says her shoe got caught on the third
18 step. When they say "got caught," it doesn't
19 really say what it got caught on. Do you know what
20 they refer to when they say "got caught on"? Does
21 that report give you any further information as to
22 what her foot got caught on?
23      A.   Let me see. "From Deck 8 to 7, her
24 shoe got caught on the third step and she fell
25 forward. She was wearing healed sandals --

122

1  alcohol involved?
2       A.   Let me look. It doesn't say it in --
3  it didn't mark that as cause of the fall, just
4  improper placement of foot and poor judgment
5  descending the stairs. But let me read the
6  narrative just to confirm that there was no -- I
7  don't see any indication of alcohol.
8       Q.   Okay. Ricky Mynor (ph.) the next one,
9  that's just somebody said they heard a popping
10 sound left hip, lost his balance?
11      A.   That was a 64-year-old. Yes, he
12 apparently had prior hip problems and issues with
13 the hip and falling, instability, and so he -- he
14 felt a pop and fell down the stairs.
15      Q.   Let's go to 2-27-18, John Austin Doyle
16 (ph).
17      A.   Okay.
18      Q.   He said his left shoe got stuck on an
19 antiskid rubber strip causing him to trip and fall
20 and injure his left foot?
21      A.   Yes. I guess he reported it the next
22 day.
23      This says Deck 9 to 8 and he slipped
24 on the third step from the bottom, but then in the
25 narrative it said he felt like his shoe got tripped

124

1  checked, inspected" -- she was wearing wedged
2  sandals, and somehow the wedge sandal got caught or
3  tripped up on the end of the step.
4       Q.   Any findings about the condition of
5  the steps by the people in charge of doing the
6  investigation?
7       A.   No. I mean, the findings were that it
8  appeared normal with no apparent safety concerns,
9  nothing protruding, appeared normal.
10      Q.   Anything about CHEERS! package or
11 intoxication on that one?
12      A.   Let me see.
13      No, I don't see any reference to
14 alcohol. In the findings it was just "Failure to
15 check/monitor, poor judgment and descending
16 stairs."
17      Q.   Is that a choice to select?
18      A.   They usually do findings. Sometimes
19 there is three or four findings as to what they
20 believe caused the accident.
21      Q.   Is that a drop-down menu that you can
22 select from in the computer?
23      A.   I -- I don't know with an InfoSHIP.
24 It probably is in that portion of the database.
25 Yes, it probably is, and then you can add your

125

1  notes.
2      Q.   What was that phrase you just used as
3  to the cause that was found for that incident?  You
4  said that was -- let me see if I have it here.
5      A.   There was no mention -- there -- when
6  they find alcohol to be a factor, they usually note
7  it.  So that is the section that I went to so that
8  I don't have to read the whole narrative to
9  determine everything, and there was no, you know,
10  indication of alcohol, which was your question.
11      Q.   You said something about checked poor
12  judgment, descending stairs, something like that?
13      A.   I think those were his notes
14  afterwards, but let me go back to the AR.  I got
15  out of it.  The woman with the wedged heal,
16  Jennifer something.
17      Q.   Jennifer Brooks, yeah.
18      A.   He wrote, "Failure to check/monitor,
19  poor judgment.  Injured guest failed to judge the
20  stair properly."
21           And that is what she wrote in her
22  statement too.  She said -- "What caused the
23  accident?"  She said, "My shoe just got caught.  I
24  had no safety concerns at the time of the accident
25  from the stairs."

126

1           She just -- you know, she just, I
2  guess, dragged her shoe.  Rather than lifting her
3  foot up, she -- she didn't lift her foot up, and
4  her heels caused her to trip.
5      Q.   Okay.  And I think the last one is
6  Mabel (ph.) Sexton Gregory, "Guest was found lying
7  on the ground on the landing area, after apparently
8  suffering a fall sustaining serious injuries.
9  Cause of fall unknown."
10           What can you tell me about that
11  incident?
12      A.   She was an elderly woman about
13  80 years old that was with her handicap son, and
14  she doesn't know what caused her to fall, but she
15  just fell.  She doesn't remember what happened or
16  what caused her to fall.  But she fractured her
17  wrist and had a little -- a cut on her head or ear.
18      Q.   What was the cause of the fall
19  by Carnival?
20      A.   It's really unknown.  It was just
21  walking, falling from a -- they don't really have a
22  conclusion because they don't really -- she had no
23  idea what happened.  She doesn't know if she just
24  missed a step or if she fell or if she had a
25  medical event.  I think she was medically debarked.

127

1           And the son that was with her was
2  mentally handicapped and couldn't tell us either.
3  So nobody really knows what happened there.
4           But the area was inspected and found
5  to be of no safety concerns, so -- but they didn't
6  really do a finding in that.
7      Q.   Okay.  That covers the ones that were
8  disclosed, correct?
9      A.   Yes.
10      Q.   Okay.  With respect now to my client's
11  report.
12      A.   Okay.
13      Q.   Again, with the prior stipulation that
14  we reached, of course.
15           With respect to my client's report,
16  was there one of those choices made?  And you may
17  have said it.  I just don't know whether it was
18  your answer or the actual language used, but was
19  there one in the report about the cause of
20  Ms. Law's fall, you know --
21      A.   Yes.  It -- it tells you the activity,
22  which was walking.  "Event mechanism:  Falls on
23  same level."  Immediate cause was found to be "Use
24  of alcohol.  Injured guest failed to be cautious
25  while descending stairs.  Root cause:  Use of

128

1  alcohol."  I guess a second cause, which is also
2  use of alcohol.
3           "After the alleged incident, the
4  injured guest was observed inebriated by alcohol as
5  manifested by her slurred speech and strong smell
6  of alcohol from her breath.  The 'Watch Your Step'
7  signs are prominently placed on the stairs and
8  found in normal condition.  However, due to the
9  inebriated state of the injured guest, she was not
10  cautious while descending the steps."
11      Q.   So in the procedures that I was
12  provided, it says under "Corrective and Preventive
13  Actions, All accidents shall be rated following
14  provision established by the attached risk matrix.
15  Ratings should always take into consideration the
16  frequency and severity of the incident."
17           Can you explain that?  Are you aware
18  of that provision?
19      A.   Yes.  Within the accident report, we
20  ask them to do that as well, just so that we can
21  use it for whatever reasons we need it for, for
22  compliance and also for our own self-critical
23  analysis, basically.
24           So, yes, there is that section in the
25  accident report.

129

1    Q.   What is the risk matrix?  What is --
2    what is that?  Because it's not attached.
3        A.   They -- yeah, so they rate it from I
4    think it's 1 to 5 for severity of the injury and
5    then 1 to 5 for frequency.
6        So the higher the severity would be a
7    5.  A low severity would be a 1.  And then a
8    frequency -- if it happens a lot, it's going to be
9    a higher number.  If it's something that doesn't
10   happen very often at all, it would be a one.
11       Q.   With respect --
12       A.   I think it's 1 to 5.
13       Q.   With respect to Ms. Law, the first
14   1 to 5 category in the risk matrix, what was that
15   assigned?
16       A.   Severity was a 1 at -- because at the
17   time, they didn't know there was a fracture.  I
18   think if they had known that the toe was fractured,
19   it probably would have been a little higher because
20   fractures generate a higher injury rating, but at
21   the time she was diagnosed with a sprain and an
22   evulsion of her nail.
23       Q.   And how about frequency?  What number
24   was there?
25       A.   It's listed as 1.

130

1    Q.   And where is that -- those numbers
2    that you read from?  Is that on the accident
3    report?
4        A.   They are contained within the internal
5    self-critical analysis section of the accident
6    report.
7        Q.   What is that?
8        A.   It's just a section that we designed
9    into the database so that we could analyze the
10   frequency of incidents and determine if there was,
11   you know, corrective or remedial actions that
12   needed to happen.  It's a way to manage and monitor
13   and, you know, keep our ships as safe as possible.
14       Q.   How does that categorize?  So in other
15   words, if you are trying to fulfill those two
16   purposes, you know, the frequency of the incidents,
17   and, you know, for whatever reasons, whether it's
18   risk assessment, whether it's for insurance
19   purposes, whether it's for safety, whatever it is,
20   how does that get categorized?
21       In other words, if you want to assign
22   the risk or frequency, is there something somebody
23   does to look into a database or inquire as to the
24   type of incident and how many times it's happened
25   in order to be able to accurately do that

131

1    assessment as to frequency?
2        MR. PELAEZ:  Objection, form.
3        THE WITNESS:  I am not sure what the
4    CSO does onboard.  Although, they, of
5    course, are the only ones that do the
6    accident reports.  So they know.  I don't
7    know if they actually pull the data out of
8    InfoSHIP or not.  I -- I don't know.  I
9    mean, they know what they are doing.  They
10   know how to -- but I -- I've never seen the
11   training or protocols as to how to rate the
12   severity or the frequency.  They probably
13   have that training.  I just -- I am not
14   aware of it.
15   BY MR. RIVKIND:
16       Q.   Do they rate the frequency onboard the
17   ship?
18       A.   Yes.
19       Q.   As part of the accident investigation?
20       A.   Yes.
21       Q.   Underneath, it says, "Any of these
22   accidents monitored," I guess including the
23   frequency numbers "should be monitored" --
24   "monitored by the loss prevention department."
25       Are you in the loss prevention

132

1    department or part of it?
2        A.   We are -- we haven't been called that
3    for many years.  So that probably needs to be
4    changed.  We are the legal services department,
5    which is basically under risk management.  But,
6    yes, my department used to be called the loss
7    prevention department.
8        Q.   And what do you do to study frequency
9    to see if there is a trend in any particular type
10   of incidents or accidents, like, you know,
11   trip-and-falls or people getting their feet stuck
12   on nosing or stuff like that?  What --
13       A.   So it's no longer the legal services
14   department that does that.  We have a safety team,
15   occupational health and safety team and also a --
16   an ABG, a corporate side that pulls incidents and
17   accidents based on severities.  I believe they do
18   it weekly, and then they, you know, report up to
19   the board on serious stuff.
20       Q.   Do you know where falls down stairs
21   falls within the hierarchy, I guess, of
22   identifying, you know, frequency of accidents that
23   happen on cruise ships?
24       MR. PELAEZ:  Objection, form.
25       THE WITNESS:  I -- I don't know.  I

133

1    know on these particular stairs and this
2    particular ship, the incidents are very
3    rare.  But, obviously, I haven't looked at
4    fleet-wide whether other open-deck
5    staircases would have a frequency level
6    higher than 1.  But I know that for this
7    particular ship in the stairway, the
8    frequency is 1.  They are very rare.
9    BY MR. RIVKIND:
10       Q.    Okay.  So, yeah, I mean, what I was
11   getting at is, like, I know from the past that some
12   companies, you know, whether it's for insurance
13   purposes or whatever, identify like a pie, you
14   know, of our accidents and the cost to our company.
15   The biggest one is slip-and-falls, or the biggest
16   one is staircases or whatever.
17           And I am just wondering if -- if -- if
18   you are familiar with that type of analysis that
19   Carnival has down?
20       A.    I'm --
21           MR. PELAEZ:  Objection to form.
22           THE WITNESS:  It's been done
23   probably -- yeah.
24           MR. PELAEZ:  Objection, beyond --
25           THE WITNESS:  I'm sure it's done

134

1    all --
2            MR. PELAEZ:  -- the scope of today's
3    deposition.
4            You can answer if you have personal
5    knowledge.
6            THE WITNESS:  I think it's done all
7    the time by various departments.  In my
8    experience in 16 years, trip-and-falls down
9    stairs are much rarer than other types of
10   accidents or incidents.
11           Most of the slip resistancy ratings on
12   the outer deck stairs are -- they always
13   seem to test wet and dry with a perfect
14   coefficient of friction, same with the
15   interior stairs.  So I -- I think they are
16   much rarer, but it's not my job to actually
17   pull and analyze that data.
18           MR. RIVKIND:  Okay.  Fair enough.
19   I think that's it.  Let me just take a
20   look here at my notes.
21           THE WITNESS:  Okay.
22           MR. RIVKIND:  Okay.  No further
23   questions.  Thank you.  Always a pleasure.
24           THE WITNESS:  Thanks, everybody.
25   Have a -- have a great day, everybody.

135

1            (Thereupon, a discussion was held
2    off the record.)
3            MR. PELAEZ:  We'll read.
4            (Thereupon, the deposition was
5    concluded at 2:07 p.m.)

136

1    CERTIFICATE OF SHORTHAND REPORTER
2
3    STATE OF FLORIDA    )
                          ) SS.
     COUNTY OF MIAMI-DADE)
4
5            I, Jeanette Sanchez, Florida
     Professional Reporter, do hereby certify that I was
6    authorized to and did stenographically report
     deposition of SUZANNE BROWN VAZQUEZ, that a review
7    of the transcript was requested; and that the
     foregoing transcript, pages 1 through 135 is a true
8    record of my stenographic notes.

9            I FURTHER CERTIFY that I am not a
     relative, employee, or attorney, or counsel of any
10   of the parties, nor am I a relative or employee of
     any of the parties' attorney or counsel connected
11   with the action, nor am I financially interested in
     the action.

12           DATED, this 24th day of March 2021.

13

14

15   _____
     JEANETTE SANCHEZ
16   Florida Professional Reporter

17

18
19
20
21
22
23
24
25

**137**

CERTIFICATE OF OATH

STATE OF FLORIDA

COUNTY OF DADE

I, the undersigned authority, certify that SUZANNE BROWN VAZQUEZ personally appeared before me and was duly sworn.

WITNESS my hand and official seal this 24th day of March, 2021.

- - - - - - - - - - - - - - -
JEANETTE SANCHEZ

Notary Public State of Florida

My commission Expires: 4-4-22

Commission #GG 178495

---

**138**

JURAT PAGE

STATE OF FLORIDA      )
                      )SS.
COUNTY OF MIAMI-DADE )

I, hereby certify that I have read the foregoing transcript pages 1 to 135 and find the same to be true and accurate.

Any corrections made by me are set forth on the errata page attached hereto.

- - - - - - - - - - - - - - - - - -
(SUZANNE BROWN VAZQUEZ)

Sworn to and subscribed before me on this, _____ day of _____, 2021.

- - - - - - - - - - - - - - - - - -
Notary Public in and for the State of Florida at Large.

My Commission expires:

---

**139**

JEANNIE REPORTING
28 West Flagler Street
Suite 610
Miami, Florida 33130

TO: SUZANNE BROWN VAZQUEZ
c/o FOWLER, WHITE, BURNETT, P.A.
Brickell Arch, Fourteenth Floor
1395 Brickell Avenue
Miami, Florida 33131

March 24, 2021

IN RE: TAMARA LAW v. CARNIVAL CORPORATION
CASE NO: 1:20-cv-21105-KMW

Dear SUZANNE BROWN VAZQUEZ,

With reference to the examination of YOURSELF, deponent in the above-styled cause, taken on February 18, 2021 under oath, please be advised that the transcript of the Deposition has been transcribed and is awaiting your signature.

Please arrange to conclude this matter at your earliest convenience. We would suggest that you telephone this office and arrange an appointment suitable for all concerned.

However, if this has not been taken care of by April 24, 2021 we shall conclude the reading and signing of said deposition has been waived, and shall then proceed to file the original of the said transcript with the party who took the deposition, without further notice to any parties.

Sincerely,

- - - - - - - - - - - - - - - - - - - - - - - - -
Jeanette Sanchez

cc: All Counsel of Record.

---

**140**

ERRATA SHEET

F.R.C.P. RULE 1.310 PROVIDES IN PART:
[e]"...Any changes in form or substance that the witness wants to make shall be entered upon a separate correction page by the officer with a statement of the reasons given by the witness for making them..."

PAGE/LINE          CHANGE/CORRECTION          REASON

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

I, _____, do hereby certify that I have read the foregoing transcript of my deposition, given on February 18, 2021, and that together with any additions or corrections made herein, it is true and correct.

- - - - - - - - - - - - - - - - - - -
SUZANNE BROWN VAZQUEZ

1

**'**

**'Watch** [1] - 128:6

# 1

**1** [31] - 2:17, 61:3, 61:4, 61:7, 64:2, 65:13, 66:9, 68:3, 68:16, 68:25, 74:8, 76:4, 82:16, 82:19, 83:21, 99:21, 101:19, 102:15, 102:19, 103:17, 129:4, 129:5, 129:7, 129:12, 129:14, 129:16, 129:25, 133:6, 133:8, 136:7, 138:7
**1.310** [1] - 140:2
**10** [7] - 40:10, 119:6, 119:10, 119:11, 119:17, 121:12, 121:20
**10-20** [1] - 102:15
**10-20-2018** [1] - 102:25
**10-4-18** [1] - 123:17
**10-B** [1] - 119:2
**10-C** [1] - 118:25
**10-D** [1] - 119:3
**11:00** [1] - 1:15
**12** [1] - 77:13
**12th** [1] - 93:15
**135** [2] - 136:7, 138:7
**1395** [2] - 2:7, 139:6
**1422** [1] - 2:3
**15** [16] - 29:1, 33:3, 33:14, 34:7, 36:14, 37:17, 37:24, 38:2, 38:14, 38:18, 39:5, 39:10, 39:16, 40:11, 49:1, 49:5
**16** [1] - 134:8
**16-year-old** [1] - 121:5
**169** [1] - 2:3
**178495** [1] - 137:17
**18** [3] - 1:14, 139:12, 140:21
**1997** [2] - 3:18, 3:19
**1:20-cv-21105-KMW** [2] - 1:3, 139:9

# 2

**2** [13] - 2:17, 24:5, 71:1, 71:2, 71:15, 74:8, 76:4, 97:6, 102:12, 102:13, 102:16, 102:21,

**120** [1] - 1
**2-27-18** [1] - 122:15
**2019** [12] - 7:15, 7:20, 14:20, 15:18, 15:24, 16:12, 48:14, 63:14, 107:5, 107:8, 112:17, 112:25
**2021** [8] - 1:14, 136:12, 137:11, 138:17, 139:8, 139:12, 139:17, 140:21
**21** [1] - 42:2
**22:05** [1] - 48:14
**24** [2] - 139:8, 139:17
**24th** [2] - 136:12, 137:11
**28** [1] - 139:1
**2:07** [2] - 1:15, 135:5

# 3

**3** [7] - 2:13, 2:18, 71:24, 71:25, 73:1, 73:5, 97:7
**30(b)(4)** [4] - 4:13, 4:21, 4:23, 29:24
**30(b)(6)** [2] - 31:20, 92:17
**324077** [1] - 99:7
**33130** [2] - 2:4, 139:2
**33131** [2] - 2:7, 139:7
**35** [1] - 53:21

# 4

**4** [6] - 2:18, 75:7, 75:11, 75:12, 75:13, 119:8
**4-4-22** [1] - 137:17

# 5

**5** [20] - 26:15, 27:10, 63:13, 71:9, 83:19, 85:6, 85:9, 85:18, 86:25, 87:3, 88:4, 88:6, 88:25, 90:1, 90:18, 129:4, 129:5, 129:7, 129:12, 129:14
**50** [7] - 16:11, 23:21, 26:14, 96:17, 104:20, 118:1, 120:3

# 6

**6** [22] - 26:14, 27:10, 63:13, 71:9, 77:13, 83:19, 85:6, 85:9,

**85**:17, 86:25, 87:3, 88:4, 88:6, 88:24, 89:2, 90:1, 90:18, 99:13, 104:8, 121:12, 121:19, 121:21
**61** [1] - 2:17
**610** [1] - 139:2
**64-year-old** [1] - 122:11

# 7

**7** [8] - 7:20, 15:18, 48:14, 89:1, 98:7, 98:20, 104:8, 123:23
**71** [1] - 2:17
**72** [1] - 2:18
**75** [1] - 2:18
**7:00** [1] - 44:13
**7:08** [7] - 40:21, 42:3, 42:12, 43:17, 43:21, 43:22, 44:4
**7th** [3] - 7:16, 7:18, 63:14

# 8

**8** [8] - 97:6, 97:7, 98:7, 98:20, 120:1, 122:23, 123:23
**80** [1] - 126:13
**8th** [1] - 40:14

# 9

**9** [9] - 7:15, 24:5, 39:16, 40:10, 43:9, 44:20, 104:10, 104:22, 122:23
**9-30-16** [1] - 120:12
**9:48** [2] - 38:6, 40:6
**9th** [2] - 7:16, 7:18

# A

**a.m** [1] - 1:15
**ABG** [1] - 132:16
**ability** [2] - 5:17, 5:21
**able** [30] - 7:9, 18:2, 25:24, 41:13, 44:23, 45:7, 45:24, 61:15, 66:10, 68:21, 79:22, 82:21, 82:24, 83:3, 83:8, 83:13, 83:20, 83:22, 84:22, 97:19, 100:16, 100:18, 100:24, 105:7, 106:16, 108:22, 109:6, 109:15,

**115**:9, 130:25
**abnormal** [1] - 72:23
**above-styled** [1] - 139:12
**abrasion** [2] - 48:2, 48:17
**absolutely** [2] - 59:25, 80:19
**access** [1] - 41:23
**accident** [43] - 7:4, 7:5, 8:1, 9:4, 9:13, 9:25, 11:12, 12:10, 22:23, 24:21, 32:18, 43:24, 46:19, 47:10, 51:12, 52:2, 54:19, 56:5, 60:21, 72:18, 105:11, 105:15, 106:13, 106:19, 107:9, 109:2, 109:4, 109:19, 110:6, 111:12, 111:16, 112:1, 112:9, 120:18, 124:20, 125:23, 125:24, 128:19, 128:25, 130:2, 130:5, 131:6, 131:19
**accidents** [11] - 33:5, 107:22, 108:11, 111:8, 128:13, 131:22, 132:10, 132:17, 132:22, 133:14, 134:10
**accordance** [1] - 5:13
**according** [12] - 12:3, 35:21, 36:4, 38:15, 39:2, 45:5, 46:22, 54:1, 56:6, 58:4, 115:1, 123:14
**account** [2] - 27:19, 37:1
**accurate** [1] - 138:8
**accurately** [1] - 130:25
**ACSO** [10] - 8:17, 10:17, 10:23, 28:4, 37:16, 43:14, 43:24, 73:23, 90:17, 90:19
**acting** [1] - 29:16
**action** [2] - 136:10, 136:11
**Actions** [1] - 128:13
**actions** [1] - 130:11
**actively** [1] - 6:3
**activity** [1] - 127:21
**actual** [9] - 10:5, 20:4, 40:3, 45:10, 81:5, 91:1, 101:14, 118:19, 127:18
**add** [1] - 124:25

**added** [3] - 109:3, 111:6, 113:1
**additional** [1] - 112:18
**additions** [1] - 140:22
**address** [5] - 5:8, 14:5, 18:7, 19:7, 80:16
**addressed** [4] - 26:22, 110:18, 114:13, 115:3
**adjuster** [1] - 6:24
**admin** [1] - 22:21
**Administrative** [1] - 1:13
**adult** [2] - 33:20, 37:23
**adults** [3] - 33:22, 33:23, 70:17
**advance** [1] - 34:19
**advantage** [1] - 34:19
**advice** [1] - 4:18
**advise** [1] - 4:14
**advised** [5] - 81:6, 92:21, 93:3, 94:19, 139:12
**aerial** [4] - 85:17, 87:19, 88:13, 88:17
**affecting** [1] - 43:6
**affixed** [2] - 54:12, 65:19
**aft** [26] - 16:25, 19:21, 23:4, 23:20, 27:10, 63:12, 83:18, 87:2, 97:1, 98:19, 99:13, 102:12, 102:16, 103:2, 104:18, 104:19, 104:22, 116:25, 117:1, 119:25, 121:18
**Aft** [5] - 23:20, 26:14, 96:16, 117:25, 120:2
**afterwards** [1] - 96:19, 125:14
**ago** [2] - 108:17, 113:1
**agree** [17] - 10:2, 13:2, 13:15, 15:9, 26:13, 26:17, 29:7, 31:4, 32:13, 42:10, 44:3, 76:10, 76:16, 113:24, 114:7, 117:5
**agreed** [4] - 75:16, 98:4, 105:8, 116:6
**agreement** [4] - 7:3, 9:12, 15:4, 96:9
**ahead** [3] - 10:13, 39:3, 93:1
**aid** [7] - 106:12, 108:6, 108:7, 108:21, 109:1, 110:23
**Aid** [1] - 111:24

**alcohol** [43] - 27:19, 28:7, 29:21, 31:1, 31:6, 31:12, 32:7, 32:16, 32:20, 34:6, 35:23, 38:21, 38:23, 39:4, 40:20, 41:25, 42:9, 43:5, 44:7, 44:22, 45:1, 45:6, 46:11, 47:4, 47:5, 47:8, 48:2, 48:12, 48:18, 48:23, 49:6, 92:7, 122:1, 122:7, 124:14, 125:6, 125:10, 127:24, 128:1, 128:2, 128:4, 128:6

**alcoholic** [11] - 36:6, 37:17, 38:15, 38:18, 39:5, 39:15, 39:18, 39:23, 40:12, 41:5, 41:23

**alert** [2] - 48:3, 48:19

**Alexandra** [1] - 47:24, 48:15

**allegation** [2] - 32:19, 107:15

**allegations** [1] - 31:23

**allege** [1] - 66:1

**alleged** [2] - 69:8, 128:3

**alleges** [4] - 73:22, 76:24, 81:14, 89:25

**alleging** [2] - 64:22, 65:25

**allision** [1] - 107:16

**allow** [2] - 30:25, 34:17

**allowable** [3] - 35:23, 38:18, 39:16

**allowing** [1] - 7:4

**ambulate** [3] - 108:12, 108:22, 110:9

**Amoxicillin** [1] - 92:20

**Amoxiclav** [1] - 93:13

**analysis** [3] - 128:23, 130:5, 133:18

**analyze** [2] - 130:9, 134:17

**angle** [1] - 88:16

**announced** [2] - 98:3, 116:6

**answer** [37] - 7:5, 8:25, 15:2, 15:5, 15:6, 18:2, 24:13, 29:25, 31:16, 33:9, 34:11, 35:4, 38:12, 40:17, 41:8, 45:3, 49:12, 53:9, 57:5, 59:10, 59:13, 60:1, 60:8, 63:2, 67:20,

68:20, 69:6, 69:16, 70:19, 82:7, 82:9, 92:17, 94:6, 103:21, 118:20, 127:18, 134:4

**answered** [3] - 52:10, 56:9, 80:22

**answers** [5] - 12:3, 51:24, 53:14, 118:14, 118:24

**antibiotic** [2] - 93:3, 93:12

**antibiotics** [2] - 92:14, 94:15

**anticipate** [3] - 111:9, 111:15, 112:13

**anticipated** [1] - 113:3

**anticipation** [9] - 105:24, 106:3, 106:9, 106:24, 108:8, 109:5, 109:22, 112:2, 112:11

**antiskid** [4] - 14:18, 27:6, 122:19, 123:1

**anyway ..** [1] - 53:23

**AOSC 20-23** [1] - 1:13

**apparent** [7] - 14:19, 16:6, 27:8, 54:10, 57:1, 60:24, 124:8

**appear** [15] - 37:6, 62:13, 65:5, 65:13, 71:11, 71:16, 74:9, 86:20, 87:6, 88:3, 88:9, 89:23, 89:24, 101:12, 115:10

**APPEARANCES** [1] - 2:1

**appeared** [4] - 63:13, 124:8, 124:9, 137:8

**appearing** [1] - 4:22

**appointment** [1] - 139:15

**appreciate** [1] - 9:2

**appropriate** [2] - 19:9, 93:23

**April** [1] - 139:17

**AR** [1] - 125:14

**Arch** [2] - 2:6, 139:6

**area** [56] - 10:22, 12:17, 14:3, 14:8, 14:10, 16:4, 17:2, 25:12, 51:2, 60:23, 61:19, 64:8, 67:8, 67:9, 67:18, 67:22, 75:19, 75:21, 75:24, 77:1, 77:7, 78:11, 78:13, 78:18, 78:21, 78:22, 79:7, 79:11, 79:21, 80:8, 81:5,

81:7, 81:16, 82:25, 85:5, 85:8, 85:15, 87:1, 87:9, 88:3, 89:15, 90:5, 90:20, 90:21, 91:4, 91:14, 91:17, 91:19, 91:24, 98:25, 99:3, 103:10, 115:15, 115:17, 126:7, 127:4

**areas** [7] - 5:8, 5:13, 6:5, 17:22, 100:9, 100:10, 100:14

**argue** [1] - 60:7

**argumentative** [2] - 53:16, 82:8

**arise** [2] - 29:9, 112:12

**arising** [1] - 111:10

**arrange** [2] - 139:14, 139:15

**ascertain** [1] - 87:15

**aside** [5] - 77:15, 77:18, 77:19, 85:25, 86:2

**assault** [3] - 31:10, 31:21, 31:23

**Assaults** [1] - 106:20

**asserted** [1] - 24:10

**assertion** [4] - 9:16, 10:1, 10:4, 44:19

**assessment** [2] - 130:18, 131:1

**assign** [1] - 130:21

**assigned** [1] - 129:15

**assist** [2] - 4:17, 22:21

**assistant** [10] - 8:20, 10:21, 10:24, 12:4, 12:5, 46:13, 47:2, 74:11, 104:6, 105:22

**assisted** [1] - 45:20

**assume** [10] - 15:12, 44:13, 60:14, 77:16, 78:11, 79:4, 79:5, 79:17, 86:8, 115:5

**assuming** [13] - 37:19, 37:20, 37:21, 56:16, 56:22, 56:24, 59:1, 59:10, 59:16, 60:9, 60:19, 78:7, 114:21

**assumption** [2] - 56:20, 59:24

**assumptions** [1] - 68:18

**attached** [28] - 25:25, 61:1, 64:6, 66:24, 67:4, 67:17, 71:8, 76:21, 77:4, 77:24, 78:20, 79:6, 82:20, 82:21, 85:4, 85:15, 86:2, 86:19, 87:8, 87:19, 88:11, 89:8,

91:18, 115:6, 116:19, 128:14, 129:2, 138:10

**attachment** [1] - 78:15

**attachments** [1] - 26:3

**attempt** [1] - 93:17

**attention** [2] - 17:5, 55:17

**attorney** [9] - 3:14, 3:16, 3:21, 21:8, 53:13, 65:9, 74:19, 136:9, 136:10

**attorneys** [2] - 53:12, 82:12

**Audio** [1] - 1:12

**Audio -Video** [1] - 1:12

**Austin** [1] - 122:15

**authority** [1] - 137:7

**authorized** [1] - 136:5

**available** [2] - 57:23, 93:20

**Avenue** [2] - 2:7, 139:6

**awaiting** [2] - 11:24, 139:13

**aware** [2] - 128:17, 131:14

---

### B

**background** [1] - 50:12

**bad** [3] - 26:25, 27:1, 49:21

**badly** [5] - 54:23, 61:19, 80:9, 80:10, 80:13

**bag** [1] - 108:22

**balance** [2] - 122:10, 123:2

**Band** [1] - 111:24

**Band -Aid** [1] - 111:24

**bannister** [1] - 91:2

**bar** [3] - 3:19, 30:17, 40:16, 40:22

**bars** [3] - 40:4, 41:2, 41:4

**bartender** [6] - 30:18, 37:8, 37:13, 43:20, 43:25, 44:5

**base** [1] - 46:7

**based** [6] - 37:14, 47:5, 53:21, 68:19, 81:22, 132:17

**basis** [3] - 6:19, 17:15, 17:22

**batch** [1] - 94:2

**bear** [2] - 77:2, 93:8

**become** [1] - 33:17

**becomes** [2] - 29:12,

31:7

**beds** [1] - 62:18

**beers** [1] - 33:14

**BEHALF** [2] - 2:2, 2:5

**behalf** [16] - 4:24, 5:16, 5:24, 26:1, 31:19, 32:25, 44:4, 44:19, 50:15, 52:11, 58:21, 59:11, 59:13, 59:16, 74:20, 75:6

**below** [2] - 77:13, 98:25

**beneath** [2] - 62:3, 77:14

**benefit** [5] - 7:9, 34:14, 34:24, 35:9, 80:2

**Bennett** [2] - 121:4, 121:6

**best** [4] - 5:17, 5:21, 58:10, 102:5

**better** [1] - 101:2

**between** [7] - 41:11, 63:12, 71:9, 90:18, 96:9, 121:12, 121:17

**beverage** [5] - 39:15, 39:18, 39:24, 40:12, 41:25

**beverages** [7] - 36:6, 37:18, 38:15, 38:18, 39:5, 41:5, 41:23

**beyond** [17] - 20:3, 29:23, 31:15, 33:7, 34:9, 35:3, 41:6, 49:9, 92:16, 94:4, 95:1, 106:11, 106:12, 108:6, 108:7, 108:21, 133:24

**big** [6] - 48:1, 48:16, 51:15, 73:14, 94:10, 94:11

**biggest** [2] - 133:15

**biomechanical** [2] - 51:17, 54:21

**bit** [3] - 34:18, 71:13, 112:21

**black** [5] - 62:6, 65:16, 65:19, 97:20, 97:22, 97:24, 98:20, 98:21, 99:2, 99:21, 99:23, 100:1, 100:6, 100:8

**Black** [1] - 98:14

**bleeding** [2] - 48:1, 48:17

**board** [1] - 132:19

**boarded** [1] - 88:8

**Borcegue** [1] - 6:3

**bottom** [8] - 22:2,

80:11, 97:13, 97:24,
101:24, 102:21,
106:20, 122:24
**boyfriend** [1] - 28:9
**brass** [4] - 67:4,
71:14, 71:17, 84:11
**break** [5] - 63:15,
63:17, 65:9, 65:22,
66:11
**breath** [2] - 28:7,
128:6
**Brett** [4] - 2:4, 9:10,
21:15, 117:17
**brickell** [2] - 2:6,
139:6
**Brickell** [2] - 2:7,
139:6
**briefly** [1] - 95:10
**bring** [2] - 24:7, 60:4
**Brooks** [2] - 123:16,
125:17
**brought** [3] - 12:14,
118:19, 120:9
**BROWN** [9] - 1:19,
2:12, 3:2, 136:6,
137:8, 138:14,
139:5, 139:10,
140:25
**Brown** [1] - 3:10
**bumped** [1] - 108:19
**BURNETT** [2] - 2:6,
139:5
**business** [2] - 17:23,
35:6
**businesses** [1] - 35:7
**but..** [1] - 7:17
**BY** [73] - 2:4, 2:8, 3:6,
5:5, 7:23, 10:10,
16:13, 22:11, 31:3,
31:25, 32:22, 34:4,
34:23, 35:19, 36:12,
36:17, 38:10, 39:13,
39:20, 41:18, 42:19,
43:16, 45:23, 49:14,
50:9, 52:23, 53:24,
54:24, 56:2, 56:15,
58:17, 59:7, 59:23,
61:6, 61:25, 62:15,
63:25, 65:7, 66:21,
67:11, 68:9, 69:14,
70:23, 71:4, 72:6,
72:24, 73:16, 75:9,
76:1, 76:14, 79:24,
82:2, 82:14, 83:7,
84:16, 85:24, 87:21,
89:12, 92:24, 94:2,
94:22, 95:6, 95:19,
96:20, 97:8, 108:3,
111:13, 113:17,
114:9, 118:12,

119:18, 131:15,
133:9

## C

**c/o** [1] - 139:5
**cabin** [1] - 121:22
**calmly** [1] - 55:10
**cameras** [1] - 46:5
**cannot** [4] - 30:11,
78:10, 79:5, 88:2
**cap** [1] - 64:10
**capacity** [1] - 58:11
**captain** [2] - 6:10
**card** [2] - 30:24, 44:25
**care** [15] - 13:17,
13:20, 13:21, 13:22,
16:15, 17:9, 29:13,
30:8, 32:3, 33:21,
52:4, 55:14, 56:11,
94:25, 139:17
**career** [1] - 3:23
**carefully** [2] - 55:9,
60:16
**CARNIVAL** [3] - 1:8,
1:8, 139:9
**Carnival** [48] - 3:11,
3:12, 4:3, 4:6, 4:7,
4:21, 4:23, 4:24, 5:8,
5:9, 5:16, 5:24, 6:6,
13:5, 13:15, 13:18,
16:15, 17:17, 26:18,
29:6, 29:8, 29:19,
32:9, 33:3, 34:24,
35:8, 42:7, 44:4,
45:9, 45:24, 48:9,
48:24, 50:15, 58:21,
59:11, 59:13, 59:16,
74:20, 90:5, 105:15,
105:18, 110:24,
110:25, 111:15,
112:8, 116:5,
126:19, 133:19
**Carnival 's** [7] - 10:1,
26:6, 35:21, 50:6,
58:4, 81:12, 96:10
**carpenter** [1] - 10:24,
12:6, 12:24, 13:12
**carpentry** [1] - 19:6
**carpet** [42] - 12:23,
13:8, 13:9, 14:11,
14:23, 14:24, 14:25,
18:21, 25:3, 25:5,
25:9, 25:11, 25:15,
25:18, 27:7, 46:18,
54:12, 62:3, 62:4,
62:6, 63:8, 65:19,
75:23, 77:14, 89:6,
97:20, 97:22, 97:25,
98:1, 98:5, 98:6,

98:14, 98:20, 98:21,
99:2, 99:10, 99:14,
99:16, 99:17, 105:2,
115:17, 117:24
**carpet 's** [1] - 25:7
**carpeted** [9] - 62:5,
65:16, 75:21, 75:22,
87:16, 89:2, 98:25,
99:1, 100:15
**carpeting** [1] - 86:23
**carpets** [2] - 16:9,
16:10
**CASE** [2] - 1:3, 139:9
**case** [12] - 1:24, 4:25,
7:14, 26:23, 29:9,
31:21, 45:11, 56:22,
56:24, 76:22, 87:7,
106:5
**cases** [2] - 31:11,
32:24
**casino** [1] - 40:22
**categorize** [1] -
130:14
**categorized** [1] -
130:20
**category** [1] - 129:14
**caught** [10] - 80:6,
97:23, 123:17,
123:18, 123:19,
123:20, 123:22,
123:24, 124:2,
125:23
**caused** [14] - 21:10,
45:7, 46:18, 52:2,
60:17, 62:18, 80:6,
80:7, 80:10, 124:20,
125:22, 126:4,
126:14, 126:16
**causing** [1] - 122:19
**caution** [1] - 56:12
**cautious** [2] - 127:24,
128:10
**cautiously** [1] - 29:17
**Cay** [2] - 27:24, 36:3
**cc** [1] - 139:24
**CCTV** [1] - 46:4
**center** [8] - 26:24,
27:14, 37:15, 43:11,
47:25, 108:18,
109:19, 111:23
**certain** [6] - 4:18,
30:22, 34:13,
110:21, 112:19,
113:5
**certainly** [1] - 35:8
**CERTIFICATE** [2] -
136:1, 137:1
**certify** [4] - 136:5,
137:7, 138:6, 140:19
**CERTIFY** [1] - 136:8

**cetera** [5] - 16:21,
27:16, 106:2, 110:9,
117:25
**chance** [1] - 65:8
**change** [1] - 57:5
**CHANGE /
CORRECTION** [1] -
140:6
**changed** [3] - 94:13,
113:1, 132:4
**changes** [4] - 14:7,
15:17, 15:23, 140:2
**charge** [5] - 12:11,
12:17, 50:11, 94:25,
124:5
**charges** [2] - 40:15,
123:15
**chart** [2] - 47:16, 48:4
**check** [3] - 11:21,
11:22, 18:13
**check /monitor** [2] -
124:15, 125:18
**checked** [5] - 5:12,
124:1, 125:11
**CHEERS** [11] - 28:15,
28:22, 28:24, 35:22,
37:22, 38:15, 39:2,
48:25, 123:9, 124:10
**chief** [11] - 6:10, 8:4,
8:20, 46:13, 47:2,
47:3, 74:11, 105:21,
105:22
**choice** [1] - 124:17
**choices** [1] - 127:16
**chronological** [1] -
99:9
**circle** [1] - 71:18
**circled** [1] - 71:12
**circumstances** [5] -
13:20, 13:22, 30:23,
31:2, 83:12
**claim** [8] - 55:22,
77:10, 109:7, 110:2,
111:14, 111:19,
111:25, 112:13
**claimed** [1] - 74:6
**claims** [14] - 3:13,
4:12, 23:2, 29:6,
32:15, 50:11, 67:3,
67:22, 71:10, 83:19,
86:25, 106:15,
111:9, 113:8
**clarification** [1] -
103:24
**clarify** [12] - 21:16,
22:1, 22:7, 39:25,
60:2, 69:11, 79:3,
80:2, 81:20, 84:1,
117:19, 118:5
**clarifying** [1] - 21:21

**clarity** [1] - 52:24
**clean** [2] - 15:15,
94:14
**cleaned** [2] - 16:19,
17:22
**cleaning** [2] - 17:15,
17:21
**clear** [7] - 69:9, 70:2,
70:6, 76:20, 90:17,
110:16, 112:3
**clearer** [4] - 66:25,
67:16, 70:3, 84:8
**clearly** [2] - 51:11,
78:12
**client** [16] - 7:8, 56:25,
59:14, 60:12, 78:5,
82:25, 83:19, 86:24,
87:22, 89:17, 89:20,
90:9, 92:5, 105:20,
107:8, 114:24
**client 's** [4] - 62:5,
72:18, 127:10,
127:15
**close** [3] - 67:18,
67:19, 73:24
**close -up** [2] - 67:19,
73:24
**closed** [6] - 19:9,
20:12, 20:13, 20:15,
20:19, 22:3
**closing** [1] - 21:6
**cocktails** [1] - 33:17
**coefficient** [1] -
134:14
**coffee** [3] - 38:7, 40:6,
40:8
**coherent** [2] - 48:3,
48:19
**College** [1] - 17:18
**collision** [1] - 107:16
**coming** [3] - 78:17,
89:1, 112:13
**comments** [2] - 53:7,
53:17
**Commission** [2] -
137:17, 138:21
**commission** [1] -
137:17
**common** [5] - 30:2,
32:8, 32:14, 43:2
**communicates** [1] -
6:3
**Communication** [1] -
1:12
**communications** [2] -
8:13, 11:7
**companies** [1] -
133:12
**companion** [1] - 28:9
**company** [15] - 3:13,

4:15, 29:19, 31:19, 32:2, 33:1, 38:24, 44:19, 52:12, 57:23, 106:14, 106:17, 109:20, 113:7, 133:14
company 's [2] - 52:16, 52:17
compare [1] - 78:13
complaint [22] - 26:2, 26:3, 64:6, 65:23, 66:24, 67:17, 71:8, 76:22, 77:4, 78:15, 78:20, 79:6, 85:4, 85:16, 86:2, 86:20, 87:8, 87:20, 88:11, 89:8, 91:19, 115:7
complaints [2] - 47:25, 108:13
completed [1] - 20:5
completely [6] - 14:11, 33:15, 37:6, 37:7, 78:17, 87:23
compliance [1] - 128:22
compound [1] - 50:23
computer [1] - 124:22
conceded [1] - 84:9
conceding [1] - 90:7
concern [12] - 19:7, 27:8, 51:4, 51:10, 57:2, 57:7, 60:24, 61:16, 61:17, 69:17, 83:4, 115:13
concerned [1] - 139:16
concerns [22] - 14:19, 16:6, 16:17, 17:12, 18:15, 26:21, 31:5, 50:18, 54:10, 56:19, 58:24, 59:4, 59:19, 62:21, 66:15, 68:23, 69:2, 123:5, 124:8, 125:24, 127:5
conclude [1] - 139:14, 139:17
concluded [1] - 135:5
conclusion [1] - 126:22
conclusively [3] - 86:16, 87:3, 117:13
condescending [1] - 70:13
condescension [2] - 70:16, 70:21
condition [1] - 16:16, 30:3, 42:11, 43:21, 49:17, 51:5, 54:2, 54:3, 56:20, 57:19, 58:3, 59:17, 72:13,

132:16
corporation [1] - 53:12
CORPORATION [2] - 1:8, 139:9
Corporation [1] - 3:11
correct [32] - 4:25, 5:10, 7:15, 15:25, 16:2, 20:17, 22:15, 31:13, 36:8, 38:18, 37:18, 38:2, 39:6, 42:5, 42:6, 42:7, 48:19, 54:5, 56:21, 65:14, 65:15, 68:5, 73:21, 80:17, 89:17, 105:25, 107:3, 114:15, 114:16, 115:4, 127:8, 140:23
corrected [1] - 68:20
correction [1] - 140:3
corrections [3] - 96:13, 138:9, 140:22
Corrective [1] - 128:12
corrective [1] - 130:11
correctly [3] - 42:13, 44:24, 45:8
corresponding [1] - 104:4
cost [1] - 133:14
counsel [15] - 3:13, 6:25, 11:9, 22:1, 79:19, 80:21, 81:4, 96:10, 98:2, 106:24, 112:4, 116:6, 136:9, 136:10
Counsel [1] - 139:24
count [1] - 40:2
counted [1] - 41:3
countries [1] - 11:24
COUNTY [3] - 136:3, 137:4, 138:3
couple [3] - 20:7, 94:13, 104:3
course [9] - 9:3, 14:22, 16:7, 17:23, 47:11, 115:19, 118:2, 127:14, 131:5
COURT [1] - 1:1
Court [1] - 1:13
cover [2] - 81:15, 116:8
covered [1] - 46:4
covers [1] - 105:5, 127:7
COVID [4] - 4:10, 5:22
crew [21] - 6:9, 8:2, 8:5, 10:15, 11:17, 14:2, 16:24, 17:7, 17:14, 18:11, 24:16,

68:19, 73:20, 81:13, 81:17, 83:13, 105:23, 110:18, 112:5, 112:8, 112:18
crew 's [1] - 112:6
criminal [2] - 32:19, 107:14
criteria [10] - 22:17, 23:7, 23:9, 96:3, 105:11, 105:16, 106:19, 109:12, 109:19, 111:12
critical [2] - 128:22, 130:5
CROSS [1] - 2:13
cruise [22] - 13:18, 22:25, 23:22, 29:1, 29:4, 29:19, 29:22, 31:2, 31:6, 31:11, 31:23, 33:6, 34:20, 35:16, 41:23, 41:25, 50:13, 94:3, 108:8, 109:9, 110:13, 132:23
Cruise [2] - 3:12, 4:3
CRUISE [1] - 1:8
CSO [4] - 28:4, 30:23, 113:2, 131:4
cut [8] - 49:21, 49:22, 61:19, 80:9, 80:13, 93:1, 111:23, 126:17

### D

D-S-I-L-V-A [1] - 11:2
d/b/a [1] - 1:8
DADE [3] - 136:3, 137:4, 138:3
daily [8] - 14:2, 14:4, 16:14, 16:19, 16:20, 17:15, 17:22, 18:19
damage [2] - 101:19, 108:12
damaged [2] - 46:17, 101:22
dandy [2] - 49:18, 50:17
danger [1] - 31:8
dangerous [2] - 49:19, 54:16
data [2] - 131:7, 134:17
database [13] - 18:25, 22:23, 22:24, 23:2, 23:12, 23:17, 107:21, 108:1, 110:5, 124:24, 130:9, 130:23
date [1] - 7:1
DATE [1] - 1:14

DATED [1] - 136:12
deactivate [1] - 30:24
deactivated [6] - 27:18, 36:22, 37:1, 37:12, 40:19, 44:25
Dear [1] - 139:10
deaths [1] - 106:22
debarked [1] - 126:25
debates [1] - 86:4
decided [1] - 71:20
Deck [32] - 24:5, 26:14, 27:10, 71:9, 83:19, 85:6, 85:9, 85:17, 85:18, 86:25, 87:3, 88:4, 88:24, 88:25, 89:1, 90:1, 98:7, 98:20, 99:13, 104:8, 104:10, 104:22, 120:1, 121:12, 121:19, 121:21, 122:23, 123:23
deck [7] - 30:13, 41:15, 97:4, 103:16, 104:23, 133:4, 134:12
Decks [3] - 63:13, 88:6, 90:18
decks [7] - 17:1, 19:20, 96:22, 96:23, 97:5, 104:17, 118:1
deem [1] - 115:21
deemed [1] - 36:24
defect [2] - 14:5, 17:3
defective [1] - 12:23
defects [2] - 13:4, 13:23
defend [1] - 106:16
DEFENDANT [1] - 2:5
Defendant [1] - 1:9
defense [1] - 3:25
defenses [2] - 33:1, 33:2
defies [1] - 79:9, 81:22
definitely [4] - 43:12, 43:13, 72:9, 97:5
definitively [1] - 98:23
denied [1] - 37:13
denoted [1] - 104:19
dent [4] - 73:14, 73:15, 73:25, 74:1
department [17] - 19:1, 19:5, 19:6, 19:10, 49:3, 93:20, 109:20, 112:25, 113:5, 131:24, 132:1, 132:4, 132:6, 132:7, 132:14
department 's [1] - 111:18

80:23, 81:13, 83:4, 83:15, 83:17, 87:12, 124:4, 128:8
conditions [4] - 13:5, 13:6, 13:23, 49:19
conducted [1] - 10:18
conducting [2] - 12:11, 75:5
configuration [3] - 25:6, 88:10, 101:2
configured [2] - 87:5, 88:24
confirm [4] - 9:11, 118:2, 120:18, 122:6
confirmed [1] - 119:24
confused [1] - 27:16
confusion [2] - 21:11, 46:25
conjunction [1] - 91:20
connected [2] - 78:8, 136:10
connects [2] - 17:1, 19:20
conscious [2] - 48:3, 48:18
consenting [1] - 33:23
consider [1] - 93:21
consideration [1] - 128:15
considered [3] - 11:16, 11:17, 33:3
constitute [1] - 115:13
consult [1] - 93:19
consultation [1] - 93:20
consume [1] - 36:6, 36:14
consumed [1] - 38:1
consumption [3] - 32:17, 35:23, 48:11
contact [1] - 11:19
contained [3] - 9:15, 9:18, 130:4
containing [1] - 16:17
contemporaneous [2] - 60:10, 60:22
continue [1] - 92:22, 93:3
contract [1] - 4:16
control [1] - 30:4
convenience [1] - 139:15
copies [1] - 90:14
cordial [1] - 70:18
cordon [1] - 13:12
CORPORATE [1] - 1:18
corporate [5] - 4:13, 50:10, 53:13, 60:20,

**departments** [2] - 6:6, 134:7
**depict** [2] - 73:25, 76:23
**depicted** [6] - 65:2, 71:15, 83:21, 85:15, 91:17, 91:19
**depicting** [1] - 74:13
**deponent** [1] - 139:12
**depose** [1] - 100:17
**deposed** [2] - 7:8, 51:22
**DEPOSITION** [1] - 1:18
**deposition** [19] - 7:10, 11:8, 31:15, 33:8, 34:10, 35:3, 41:7, 49:10, 53:4, 56:18, 59:18, 80:3, 95:4, 134:3, 135:4, 136:6, 139:18, 139:19, 140:21
**Deposition** [2] - 1:24, 139:13
**descending** [13] - 56:14, 60:17, 64:17, 65:17, 91:1, 120:25, 121:17, 121:21, 122:5, 124:15, 125:12, 127:25, 128:10
**described** [2] - 59:18, 82:1
**describing** [1] - 103:5
**description** [4] - 23:15, 120:13, 120:14, 120:20
**designated** [1] - 5:7
**designed** [1] - 130:8
**detached** [2] - 13:11, 104:11
**detail** [3] - 101:11, 102:2, 102:5
**details** [2] - 9:6, 120:10
**determination** [3] - 28:1, 47:10, 111:1
**determinations** [1] - 61:15
**determine** [8] - 11:14, 17:9, 26:19, 54:14, 63:20, 117:12, 125:9, 130:10
**determined** [5] - 27:20, 27:25, 28:10, 47:3, 94:9
**diagnosed** [2] - 94:10, 129:21
**dictates** [1] - 43:3
**difference** [1] - 75:25

**different** [13] - 20:6, 22:3, 41:2, 53:5, 66:3, 66:7, 78:18, 87:9, 87:23, 89:15, 103:16, 104:23
**differently** [1] - 107:2, 107:7
**difficult** [2] - 10:25, 87:14
**difficulties** [1] - 21:18
**dining** [2] - 41:14, 121:18
**DIRECT** [2] - 2:13, 3:5
**direct** [2] - 11:6, 59:12
**direction** [1] - 106:24
**directly** [1] - 8:16
**director** [1] - 3:12
**disagree** [2] - 58:14, 58:16
**disclose** [1] - 119:21
**disclosed** [1] - 127:8
**discovery** [6] - 6:1, 6:16, 7:2, 7:24, 19:22, 61:11, 64:3, 118:22
**discrepancies** [2] - 80:25, 123:8
**discrepancy** [4] - 18:20, 19:11, 27:5, 90:12
**discretion** [1] - 29:2
**discuss** [1] - 68:1
**discussed** [3] - 27:3, 109:13, 116:8
**discussion** [6] - 21:19, 45:14, 71:21, 85:12, 114:18, 135:1
**disputed** [1] - 41:24
**DISTRICT** [2] - 1:1, 1:1
**DIVISION** [1] - 1:2
**dock** [3] - 14:22, 15:25, 16:7
**doctor** [8] - 47:7, 47:9, 50:2, 50:3, 93:14, 94:5, 94:8, 94:24
**document** [4] - 9:17, 20:23, 21:16, 21:25
**documents** [3] - 20:22, 21:22, 60:21
**done** [16] - 3:20, 14:17, 20:4, 20:9, 20:14, 37:11, 52:13, 74:17, 101:3, 102:6, 102:24, 106:2, 113:13, 133:22, 133:25, 134:6
**Doral** [1] - 3:12
**double** [2] - 11:21, 11:22
**double -check** [2] -

11:21, 11:22
**down** [30] - 23:14, 23:19, 25:2, 27:6, 30:5, 30:12, 34:1, 38:2, 43:12, 44:17, 44:20, 45:5, 51:25, 55:4, 55:21, 56:12, 57:4, 85:18, 89:1, 90:11, 98:9, 98:20, 104:21, 108:18, 121:21, 122:14, 124:21, 132:20, 133:19, 134:8
**Doyle** [1] - 122:15
**drafted** [1] - 9:5
**dragged** [1] - 126:2
**drank** [1] - 38:7
**dressing** [1] - 94:13
**drink** [24] - 27:23, 28:12, 28:16, 28:20, 29:3, 29:15, 30:4, 30:10, 33:4, 33:24, 34:15, 36:3, 36:20, 37:4, 37:9, 37:13, 39:9, 40:5, 42:10, 43:17, 43:19, 44:1, 123:14
**drinker** [2] - 33:19, 37:21
**drinking** [7] - 27:22, 28:10, 33:25, 38:13, 43:3, 44:15, 52:5
**drinks** [14] - 14:16, 27:21, 28:16, 29:1, 33:3, 34:7, 35:24, 35:25, 37:24, 39:10, 40:1, 43:18, 49:1, 49:5
**drop** [2] - 23:14, 124:21
**drop-down** [2] - 23:14, 124:21
**drug** [1] - 93:13
**drunk** [4] - 43:12, 44:17, 44:20, 45:5
**dry** [4] - 14:22, 15:25, 16:7, 134:13
**dry-dock** [3] - 14:22, 15:25, 16:7
**Dsilva** [2] - 11:1, 11:2
**due** [4] - 46:10, 113:23, 114:1, 128:8
**duly** [2] - 3:3, 137:9
**during** [7] - 49:4, 56:17, 65:9, 75:1, 80:7, 83:15, 92:11
**duty** [2] - 13:15, 32:3

**E**

**e)"...Any** [1] - 140:2
**ear** [1] - 126:17
**earliest** [1] - 139:15
**early** [1] - 43:19
**easier** [2] - 72:4, 97:16, 98:11
**easily** [1] - 103:18
**East** [1] - 2:3
**easy** [1] - 41:25
**ECSTASY** [19] - 6:11, 7:15, 9:7, 23:5, 40:25, 41:2, 46:3, 63:12, 79:20, 83:18, 86:21, 87:2, 87:11, 87:16, 88:24, 89:22, 89:24, 96:16, 97:4
**Eden** [1] - 10:23
**edge** [1] - 24:4
**edit** [1] - 4:16
**effects** [1] - 43:5
**efficient** [1] - 102:6
**eight** [1] - 41:3
**either** [5] - 42:11, 55:17, 98:9, 117:7, 127:2
**elderly** [1] - 126:12
**elevated** [7] - 77:13, 78:22, 79:21, 85:23, 89:2, 115:17, 116:17
**eligible** [1] - 11:25
**Elser** [1] - 4:2
**emanating** [1] - 28:7
**employed** [1] - 11:18
**employee** [2] - 136:9, 136:9
**employees** [2] - 42:12, 58:4
**end** [3] - 55:6, 93:25, 124:3
**engine** [1] - 19:5
**enjoy** [2] - 34:16, 34:20
**enjoying** [1] - 44:15
**ensure** [2] - 111:7, 114:12
**entered** [1] - 140:3
**entire** [5] - 14:24, 19:21, 79:11, 96:21
**entitled** [7] - 37:17, 37:23, 38:14, 39:10, 40:11, 49:4, 52:20
**entitles** [1] - 39:5
**entry** [2] - 48:14, 103:8
**errata** [1] - 138:10
**ERRATA** [1] - 140:1
**especially** [2] - 4:10, 17:10

**Esquire** [2] - 2:4, 2:8
**established** [2] - 86:16, 128:14
**et** [5] - 16:21, 27:16, 106:2, 110:9, 117:24
**ETOH** [1] - 47:13
**evening** [3] - 27:20, 56:25, 60:11
**event** [2] - 126:25, 127:22
**events** [2] - 106:18, 109:6
**evidence** [2] - 60:20, 96:12
**evolved** [1] - 113:6
**evulsed** [2] - 51:13, 94:10
**evulsion** [2] - 27:1, 129:22
**Exact** [1] - 121:11
**exact** [7] - 25:5, 48:4, 76:23, 81:16, 85:8, 89:24, 121:14
**exactly** [8] - 46:25, 51:7, 89:22, 90:22, 121:16, 121:19, 121:22, 121:23
**EXAMINATION** [1] - 3:5
**examination** [2] - 92:16, 139:11
**examined** [1] - 3:4
**exceptions** [1] - 113:5
**excess** [2] - 30:11, 33:25
**exercise** [2] - 13:16, 16:15
**exercising** [2] - 13:22, 17:9
**exhibit** [5] - 63:19, 68:13, 70:24, 71:24, 77:3
**Exhibit** [22] - 61:3, 61:4, 61:7, 64:2, 65:13, 66:9, 68:3, 68:16, 68:25, 70:25, 71:2, 71:15, 71:24, 71:25, 73:5, 75:7, 75:11, 75:13, 76:4, 82:16, 82:19, 83:21
**exhibiting** [1] - 44:11
**EXHIBITS** [1] - 2:15
**exhibits** [2] - 76:22, 77:2
**exist** [1] - 18:17
**existed** [2] - 62:19, 116:15
**exists** [1] - 46:2
**expect** [1] - 34:21
**expected** [1] - 112:22

**experience** [5] - 32:5, 53:22, 101:13, 112:19, 134:8
**expert** [16] - 50:3, 51:18, 54:22, 74:18, 74:23, 75:4, 77:10, 77:21, 82:3, 85:6, 85:22, 88:15, 90:2, 91:24, 93:19, 98:25
**expert 's** [2] - 85:12, 86:1
**experts** [1] - 88:8
**Expires** [1] - 137:17
**expires** [1] - 138:21
**explain** [2] - 52:20, 128:17
**explained** [1] - 55:25
**explanatory** [2] - 101:20, 105:2
**exposed** [1] - 61:18, 64:10, 67:8, 74:8, 74:14, 76:3, 77:21, 77:24, 78:7, 80:8, 80:13
**exposure** [1] - 80:12
**extends** [1] - 64:21
**extent** [4] - 8:12, 30:20, 74:6, 92:17
**extremely** [3] - 27:13, 28:1, 31:7

**F**

**F.R.C.P** [1] - 140:2
**faced** [1] - 29:8
**facilities** [1] - 59:15
**fact** [8] - 20:9, 32:8, 59:2, 59:17, 69:12, 75:20, 85:16, 90:13
**factor** [3] - 32:21, 106:7, 125:6
**factors** [2] - 51:18, 54:21
**facts** [7] - 48:6, 50:7, 52:15, 56:3, 66:3, 77:18, 86:3
**factual** [1] - 9:14
**factually** [1] - 54:1
**faculties** [10] - 30:5, 33:16, 37:7, 37:20, 43:7, 44:14, 44:23, 45:6, 46:15, 59:15
**failed** [1] - 125:19, 127:24
**failing** [1] - 52:3, 55:14
**Failure** [2] - 124:14, 125:18
**fair** [8] - 69:22, 72:25, 89:18, 89:19, 91:15,

92:1, 112:23, 134:18
**fairly** [1] - 74:18
**fall** [30] - 9:7, 14:21, 15:19, 16:4, 23:25, 25:2, 29:8, 30:5, 36:20, 38:2, 42:25, 43:12, 44:17, 44:20, 45:5, 45:10, 45:11, 46:9, 46:19, 47:4, 80:7, 117:10, 122:3, 122:19, 126:8, 126:9, 126:14, 126:16, 126:18, 127:20
**fall-down** [4] - 43:12, 44:17, 44:20, 45:5
**fall/trip** [1] - 29:8
**fallen** [1] - 51:25
**falling** [3] - 46:1, 122:13, 126:21
**Falls** [2] - 18:10, 113:20
**falls** [21] - 23:3, 23:8, 23:11, 23:21, 23:24, 24:4, 26:19, 106:5, 113:23, 114:1, 119:23, 119:24, 120:6, 127:22, 132:11, 132:20, 132:21, 133:15, 134:8
**familiar** [1] - 133:18
**FANTASY** [1] - 40:25
**far** [3] - 35:23, 68:2, 119:22
**fashion** [1] - 55:12
**faster** [1] - 53:20
**fatalities** [1] - 106:21
**fault** [1] - 78:5
**February** [10] - 1:14, 7:15, 7:20, 14:21, 15:18, 48:14, 63:14, 93:16, 139:12, 140:21
**fee** [1] - 28:25
**feet** [1] - 132:11
**fell** [37] - 9:8, 14:8, 15:18, 22:13, 24:2, 26:12, 26:20, 36:5, 46:9, 51:8, 54:2, 65:14, 67:3, 73:23, 76:24, 81:5, 81:6, 82:25, 83:19, 86:25, 89:25, 90:10, 90:23, 105:20, 106:6, 108:19, 112:4, 112:5, 114:24, 121:2, 121:23, 122:14, 123:2, 123:24, 126:15,

126:24
**felt** [3] - 45:18, 122:14, 122:25
**few** [2] - 4:10, 25:12
**field** [1] - 3:21
**fields** [1] - 23:16
**figure** [1] - 40:15
**file** [4] - 7:1, 47:13, 76:22, 139:18
**filed** [2] - 1:24, 25:25
**files** [2] - 4:4, 6:2
**filters** [1] - 23:19
**financially** [1] - 136:10
**finder** [1] - 69:12
**findings** [7] - 11:11, 123:4, 124:4, 124:7, 124:14, 124:18, 124:19
**fine** [9] - 10:15, 33:15, 49:18, 50:8, 50:17, 54:11, 54:12, 60:23
**finger** [1] - 111:23
**finish** [1] - 93:11
**firm** [1] - 3:25
**first** [23] - 3:3, 7:12, 15:23, 40:5, 43:19, 47:15, 65:11, 68:12, 97:9, 106:12, 108:6, 108:7, 108:21, 108:25, 110:23, 113:22, 113:25, 119:20, 120:12, 121:11, 129:13
**five** [4] - 36:21, 41:12, 63:22, 113:11
**fix** [6] - 12:25, 13:6, 97:25, 98:15, 101:10, 115:14
**fixed** [6] - 76:18, 77:22, 78:8, 97:25, 98:22, 115:1
**flag** [1] - 19:1
**Flagler** [2] - 2:3, 139:1
**flank** [1] - 98:9
**flat** [1] - 28:25
**fleet** [1] - 133:4
**fleet-wide** [1] - 133:4
**flesh** [1] - 114:20
**flight** [4] - 30:12, 34:1, 55:4, 56:12
**flip** [4] - 55:7, 55:8, 121:8, 121:9
**flip-flop** [3] - 55:8, 121:8, 121:9
**flip-flops** [1] - 55:7
**flipped** [1] - 84:6
**floor** [12] - 64:21, 77:5, 77:11, 77:13, 78:23, 78:24, 85:20, 85:23, 87:6, 88:21, 89:3,

116:21
**Floor** [2] - 2:6, 139:6
**flop** [3] - 55:8, 121:8, 121:9
**flops** [1] - 55:7
**FLORIDA** [4] - 1:1, 136:2, 137:3, 138:2
**Florida** [11] - 1:13, 1:21, 1:23, 2:4, 2:7, 136:4, 136:15, 137:16, 138:20, 139:2, 139:7
**flow** [1] - 110:2
**flush** [6] - 77:5, 77:10, 78:22, 78:23, 85:19, 89:3
**folder** [5] - 24:12, 26:4, 64:7, 118:22, 119:13
**folks** [1] - 11:10
**follow** [4] - 93:4, 93:7, 93:14, 94:19
**following** [9] - 8:3, 9:7, 24:17, 40:19, 44:5, 58:5, 81:7, 92:12, 128:13
**follows** [1] - 3:4
**foot** [16] - 61:18, 61:19, 62:17, 75:22, 75:24, 80:5, 80:7, 80:13, 120:17, 120:25, 121:1, 122:4, 122:20, 123:22, 126:3
**footage** [1] - 46:1
**FOR** [1] - 2:15
**Fore** [1] - 75:4
**foregoing** [3] - 136:7, 138:7, 140:20
**forget** [1] - 28:20
**forgot** [1] - 8:10
**form** [41] - 5:1, 16:1, 32:12, 33:8, 34:9, 35:2, 36:9, 36:16, 39:7, 39:19, 42:18, 42:23, 50:21, 54:6, 57:9, 59:6, 59:22, 61:20, 62:2, 62:23, 64:13, 66:17, 67:10, 68:7, 69:4, 72:15, 73:7, 75:17, 76:11, 76:12, 78:9, 83:25, 84:25, 86:12, 87:25, 107:4, 111:4, 131:2, 132:24, 133:21, 140:2
**former** [2] - 42:17, 42:21
**forth** [2] - 17:8, 138:10
**forward** [3] - 98:19,

114:21, 123:25
**foundation** [2] - 61:21, 63:1
**four** [3] - 3:24, 36:1, 124:19
**Fourteenth** [2] - 2:6, 139:6
**FOWLER** [2] - 2:6, 139:5
**fracture** [2] - 51:15, 129:17
**fractured** [2] - 126:16, 129:18
**fractures** [1] - 129:20
**frame** [1] - 40:11
**Frank** [1] - 75:4
**freak** [4] - 46:19, 51:12, 52:2
**frequency** [15] - 128:16, 129:5, 129:8, 129:23, 130:10, 130:16, 130:22, 131:1, 131:12, 131:16, 131:23, 132:8, 132:22, 133:5, 133:8
**frequently** [2] - 16:25, 17:11
**friction** [1] - 134:14
**frustrated** [1] - 109:3
**fulfill** [1] - 130:15
**full** [1] - 46:14
**fully** [1] - 77:24
**fundamental** [2] - 113:22, 114:1
**furloughs** [1] - 4:11
**FURTHER** [1] - 136:8
**further-out** [1] - 89:23
**future** [1] - 12:25

**G**

**gathered** [1] - 26:8
**geared** [1] - 18:8
**general** [1] - 103:10
**generally** [7] - 4:9, 4:11, 6:23, 25:6, 106:10, 111:24, 111:25
**generate** [6] - 106:14, 109:7, 110:5, 111:9, 115:24, 129:20
**generated** [4] - 109:11, 110:14, 111:19, 116:23
**gentleman** [1] - 24:1
**GG** [1] - 137:17
**given** [8] - 64:2, 66:4, 73:18, 92:14, 105:11, 118:11,

Detected

140:4, 140:21
glass [3] - 67:4, 71:13, 89:11
glued [1] - 105:3
Goose [3] - 40:21, 42:4, 44:9
grab [1] - 116:22
graduated [1] - 3:18
great [1] - 134:25
Gregory [1] - 126:6
Grey [3] - 40:21, 42:4, 44:9
ground [1] - 126:7
grounding [1] - 107:17
guardrail [1] - 78:17
guess [24] - 7:11, 8:8, 17:7, 64:21, 65:25, 74:19, 76:4, 80:15, 85:11, 90:11, 92:3, 93:2, 99:18, 101:20, 104:6, 105:1, 108:2, 110:7, 118:13, 122:21, 126:2, 128:1, 131:22, 132:21
guest [18] - 3:13, 4:12, 47:12, 47:25, 48:2, 48:3, 48:15, 48:17, 50:11, 92:7, 99:13, 109:16, 109:17, 113:2, 125:19, 127:24, 128:4, 128:9
Guest [2] - 48:18, 126:6
guest -related [1] - 4:12
guests [8] - 33:20, 35:8, 35:10, 35:14, 45:18, 45:20
guide [1] - 17:6
guys [1] - 24:19

**H**

H-A-D-Z-I-C [1] - 10:24
Hadzic [1] - 10:23
hairs [1] - 111:6
hand [3] - 103:9, 137:10
handbook [1] - 17:18
handicap [1] - 126:13
handicapped [1] - 127:2
handle [2] - 37:3, 37:19
handled [1] - 4:2
handling [1] - 29:6
handrail [16] - 18:24, 46:24, 51:21, 55:9,

64:20, 65:24, 71:14, 87:4, 87:18, 88:23, 88:25, 89:2, 116:20, 116:23, 117:1, 117:8
handrails [7] - 27:16, 117:3, 117:4, 117:8, 117:11, 117:13, 117:22
handwriting [1] - 120:24
happy [2] - 35:9, 35:10
hard [4] - 38:4, 51:16, 55:6, 88:14
hats [1] - 4:10
Hayden [2] - 121:6, 121:7
hazards [2] - 13:4, 13:24
head [1] - 126:17
heal [1] - 125:15
healed [1] - 123:25
health [1] - 132:15
hear [1] - 114:3
heard [3] - 24:1, 119:10, 122:9
heavily [5] - 14:15, 15:8, 27:22, 28:11, 107:18
heels [1] - 126:4
held [5] - 21:19, 45:14, 55:9, 71:21, 135:1
help [3] - 98:11, 100:18, 118:21
helpful [1] - 119:2
hereby [3] - 136:5, 138:6, 140:19
herein [1] - 140:23
hereto [1] - 138:10
herself [4] - 36:25, 44:15, 44:25, 45:8
hi [1] - 114:6
hierarchy [1] - 132:21
high [2] - 17:2, 25:11
high -traffic [2] - 17:2, 25:11
higher [5] - 129:6, 129:9, 129:19, 129:20, 133:6
highly [1] - 44:12
himself [1] - 28:4
hip [4] - 24:1, 122:10, 122:12, 122:13
history [2] - 31:22, 106:13
hit [4] - 55:5, 75:23, 89:5, 89:9
hitting [2] - 89:6, 89:10
HL324075 [1] - 97:10
HL327368 [1] - 99:19

HL327563 [1] - 100:3
HL328961 [1] - 101:7
HL331349 [1] - 101:18
HL331351 [1] - 102:11
HL331352 [1] - 103:12
HL331353 [1] - 104:3
HL338094 [1] - 104:9
HL339643 [1] - 104:25
hold [1] - 115:19
holding [3] - 27:15, 46:24, 51:21
home [4] - 11:23, 93:15, 94:17, 94:20
homicides [1] - 106:22
hopefully [1] - 97:15
hospital [1] - 93:10
hours [5] - 28:16, 36:2, 42:25, 43:2, 44:1
house [1] - 4:5
housekeepers [1] - 74:10
housekeeping [16] - 8:6, 10:22, 12:5, 12:18, 16:20, 16:23, 17:19, 18:19, 19:2, 100:17, 104:6, 105:21, 105:22, 113:21, 113:25, 114:8
human [3] - 30:3, 51:18, 54:21
hundred [1] - 67:14
hundreds [1] - 55:20
hurt [8] - 30:21, 62:22, 64:15, 78:5, 80:5, 87:24, 108:20, 109:10
hypothetical [1] - 62:25

**I**

Ice [1] - 108:22
idea [14] - 41:22, 49:8, 49:13, 61:12, 61:22, 62:11, 67:1, 67:21, 84:2, 84:6, 86:17, 89:21, 120:19, 126:23
identification [5] - 8:2, 61:5, 71:3, 72:1, 75:8
IDENTIFICATION [1] - 2:15
identified [2] - 29:20, 36:23
identify [7] - 13:23, 26:21, 43:25, 45:19,

98:11, 121:13, 133:13
identifying [1] - 132:22
illness [1] - 106:21
immediate [1] - 127:23
immediately [1] - 115:14
impact [1] - 51:14
impaired [2] - 44:23, 59:16
implementation [1] - 17:8
implemented [1] - 108:16
important [3] - 52:25, 113:22, 114:1
improper [2] - 62:25, 80:21, 122:4
IN [2] - 139:9, 140:2
in-house [1] - 4:5
inability [2] - 108:11, 110:9
inches [2] - 77:13, 89:3
incidences [1] - 118:13
incident [56] - 7:14, 7:25, 8:4, 8:21, 8:24, 10:14, 13:1, 14:10, 14:17, 19:16, 22:20, 23:14, 24:17, 25:15, 26:1, 26:9, 28:17, 32:18, 35:21, 37:6, 38:17, 39:16, 40:7, 40:13, 46:2, 50:5, 50:16, 54:4, 57:19, 58:6, 58:19, 62:5, 62:20, 81:8, 81:17, 83:14, 86:3, 90:3, 90:6, 96:18, 96:25, 104:15, 107:16, 107:23, 109:9, 109:12, 111:1, 112:7, 116:11, 123:13, 125:3, 126:11, 128:3, 128:16, 130:24
incidents [27] - 7:6, 22:13, 23:3, 24:8, 24:22, 24:24, 25:20, 29:18, 106:14, 107:2, 107:23, 109:22, 110:23, 111:7, 112:20, 113:7, 113:8, 113:12, 117:16, 119:22, 120:4, 130:10, 130:16,

132:10, 132:16, 133:2, 134:10
include [2] - 13:22, 23:23
included [3] - 24:4, 116:9, 117:7
includes [4] - 15:5, 15:7, 21:6, 39:11
including [4] - 16:10, 115:8, 115:9, 131:22
incorrectly [1] - 103:6
increased [1] - 29:20
increases [1] - 33:4
Index [1] - 119:15
indicate [2] - 101:12, 123:3
indicated [2] - 5:4, 90:6
indicates [1] - 22:2
indication [7] - 48:4, 48:22, 51:23, 81:3, 121:25, 122:7, 125:10
indiscernible ) [1] - 21:17
individuals [5] - 8:14, 11:7, 11:14, 12:2, 12:13
industry [1] - 35:17
inebriated [5] - 29:12, 30:19, 33:17, 128:4, 128:9
influence [3] - 44:22, 45:6, 46:11
information [20] - 5:15, 5:24, 6:13, 6:15, 6:20, 8:10, 9:14, 9:23, 11:8, 22:18, 24:8, 26:7, 57:16, 57:17, 57:22, 58:8, 93:6, 96:4, 96:12, 123:21
InfoSHIP [7] - 22:23, 23:12, 102:4, 107:13, 107:21, 124:23, 131:8
inherently [1] - 54:16
inhibitions [1] - 29:14
initiate [1] - 113:3
injure [3] - 30:6, 55:19, 122:20
injured [18] - 13:14, 32:9, 44:24, 45:8, 50:13, 57:1, 62:16, 67:23, 71:10, 74:6, 107:9, 109:10, 110:13, 110:21, 125:19, 127:24, 128:4, 128:9
injuries [4] - 33:5,

**injury** [11] - 45:17, 50:15, 80:10, 126:8
**injury** [11] - 45:17, 50:20, 60:18, 74:5, 93:22, 94:18, 106:6, 110:1, 111:21, 129:4, 129:20
**inquire** [1] - 130:23
**inquiry** [3] - 5:9, 5:13, 6:5
**inspect** [2] - 18:12, 87:10
**inspected** [14] - 8:3, 10:22, 14:2, 14:4, 16:5, 16:19, 46:15, 51:2, 58:5, 74:3, 81:7, 91:5, 124:1, 127:4
**inspecting** [4] - 16:22, 17:21, 18:19, 106:8
**inspection** [11] - 12:14, 24:19, 57:18, 74:17, 74:21, 75:1, 75:5, 76:5, 79:20, 84:22, 85:7
**inspections** [4] - 16:14, 19:11, 19:15, 59:12
**instability** [1] - 122:13
**instances** [1] - 29:11
**instead** [1] - 40:25
**instruct** [2] - 17:7, 112:5
**instructed** [1] - 109:17
**instructs** [1] - 17:14
**insurance** [3] - 3:25, 130:18, 133:12
**intact** [3] - 14:11, 14:12, 37:7
**Interacted** [1] - 47:15
**interested** [2] - 26:18, 136:10
**Interior** [1] - 96:16
**interior** [1] - 134:15
**internal** [1] - 130:4
**interpreted** [1] - 10:2
**interrogatories** [4] - 10:14, 12:3, 118:15, 118:24
**interrogatory** [2] - 51:24, 103:22
**Interrogatory** [2] - 119:8, 119:17
**interrupt** [1] - 117:18
**intoxicated** [14] - 14:15, 15:8, 27:14, 28:1, 28:5, 29:10, 31:8, 36:23, 38:25, 42:9, 43:14, 44:12, 47:8, 123:12
**intoxication** [5] -

**intoxication** [5] - 30:16, 32:6, 32:17, 33:2, 124:11
**investigate** [6] - 12:9, 109:16, 109:22, 111:11, 111:16, 112:9
**investigated** [8] - 8:21, 28:5, 83:14, 96:2, 106:23, 107:2, 107:7, 113:9
**investigation** [33] - 9:6, 10:18, 11:11, 12:12, 26:11, 37:11, 37:16, 52:12, 60:11, 60:21, 60:23, 68:19, 73:3, 81:24, 83:16, 91:21, 105:19, 105:20, 105:23, 106:1, 106:8, 106:16, 107:10, 107:19, 109:5, 110:6, 111:20, 112:1, 112:6, 120:15, 124:6, 131:19
**investigations** [1] - 112:15
**investigative** [1] - 107:11
**investigator** [6] - 50:25, 52:6, 60:14, 90:2, 90:5, 91:9
**investigators** [3] - 91:3, 91:15, 121:1
**involve** [1] - 29:20
**involved** [3] - 31:13, 32:16, 122:1
**involving** [3] - 22:13, 23:3, 26:9
**Irish** [2] - 38:7, 40:6
**issue** [13] - 10:5, 12:19, 18:24, 21:13, 31:11, 32:6, 32:7, 32:8, 58:1, 114:23, 114:25, 115:2
**issues** [5] - 4:19, 29:9, 80:25, 114:13, 122:12
**items** [1] - 39:11
**itinerary** [1] - 40:24
**itself** [7] - 9:17, 11:12, 20:11, 77:5, 91:1, 100:1, 101:14

**J**

**Jeanette** [3] - 1:21, 136:4, 139:23
**JEANETTE** [2] - 136:15, 137:16

**Jeannie** [2] - 10:19, 72:3
**JEANNIE** [1] - 139:1
**Jennifer** [3] - 123:16, 125:16, 125:17
**job** [4] - 42:13, 53:5, 70:17, 134:16
**John** [1] - 122:15
**judge** [3] - 10:4, 10:6, 125:19
**judgment** [6] - 47:5, 52:3, 122:4, 124:15, 125:12, 125:19
**JURAT** [1] - 138:1
**jury** [5] - 4:21, 66:25, 69:11, 70:3, 70:6

**K**

**keep** [5] - 37:20, 49:16, 70:18, 94:14, 130:13
**kicking** [2] - 77:12, 79:23
**kind** [6] - 4:8, 12:9, 17:14, 46:19, 52:1, 111:6
**knee** [2] - 108:19, 108:20
**knock** [1] - 70:21
**knowledge** [7] - 11:3, 15:22, 30:1, 31:17, 49:11, 79:9, 134:5
**known** [2] - 110:25, 129:18
**knows** [4] - 21:3, 30:9, 121:16, 127:3

**L**

**laceration** [2] - 26:25, 62:19
**lack** [2] - 61:20, 63:1
**lady** [1] - 8:11
**landing** [2] - 85:17, 126:7
**language** [3] - 102:18, 103:6, 127:18
**Large** [2] - 1:23, 138:20
**last** [8] - 10:20, 25:14, 28:16, 39:15, 40:12, 40:20, 43:17, 44:1, 126:5
**LAW** [2] - 1:5, 139:9
**Law** [33] - 7:14, 13:16, 14:8, 14:14, 15:7, 15:18, 26:1, 26:9, 26:23, 27:13, 28:9, 34:2, 35:20, 39:15,

43:21, 45:11, 45:12, 45:25, 46:6, 46:7, 47:15, 50:14, 54:2, 62:8, 62:16, 65:14, 74:6, 76:24, 106:5, 106:6, 112:4, 129:13
**law** [2] - 3:18, 92:12
**Law's** [7] - 22:25, 23:22, 25:2, 25:15, 49:20, 116:11, 127:20
**law's** [1] - 9:7
**lawsuit** [5] - 25:25, 61:1, 80:3, 82:20, 116:19
**lawsuits** [2] - 32:8, 106:15
**lawyer** [6] - 29:5, 38:11, 38:22, 53:3, 53:4, 58:15
**layperson** [3] - 84:13, 85:13, 88:12
**lead** [1] - 104:16
**least** [4] - 44:4, 44:14, 68:20, 114:8
**ledge** [7] - 60:13, 99:21, 99:24, 100:1, 100:6, 100:7, 100:8
**left** [5] - 48:2, 121:1, 122:10, 122:18, 122:20
**legal** [10] - 3:20, 4:18, 50:12, 106:24, 109:20, 111:18, 112:3, 112:25, 132:4, 132:13
**level** [8] - 30:16, 46:25, 100:25, 102:5, 113:22, 114:1, 127:23, 133:5
**levels** [2] - 120:2, 120:6
**Lido** [1] - 121:12
**life** [1] - 94:18
**life-threatening** [1] - 94:18
**lift** [1] - 126:3
**lifting** [1] - 126:2
**ligament** [1] - 108:12
**light** [1] - 70:19
**likely** [1] - 52:2
**limit** [3] - 33:11, 68:13, 96:11
**limitation** [1] - 96:15
**limitations** [1] - 5:22
**limited** [2] - 96:16, 96:23
**limits** [1] - 37:5
**line** [2] - 31:23, 98:19
**Line** [2] - 3:12, 4:3

**line's** [1] - 108:8
**lines** [1] - 35:16
**LINES** [1] - 1:8
**liquor** [4] - 37:4, 37:19, 38:5, 38:13
**listed** [2] - 20:10, 129:25
**listen** [1] - 53:3
**lists** [1] - 41:2
**literally** [1] - 46:20
**litigation** [15] - 4:13, 5:25, 6:2, 105:24, 106:3, 106:9, 106:25, 108:8, 109:5, 109:23, 111:10, 111:15, 112:2, 112:12, 113:3
**live** [2] - 118:18, 118:21
**LOCATION** [1] - 1:12
**location** [5] - 23:14, 26:13, 90:6, 121:11, 121:14
**logic** [1] - 81:22
**look** [39] - 14:7, 15:16, 15:19, 17:14, 17:20, 18:13, 19:14, 19:16, 24:15, 24:23, 25:4, 25:17, 25:24, 27:9, 27:12, 41:15, 41:20, 47:17, 50:15, 61:15, 61:17, 65:22, 68:11, 68:21, 68:24, 73:1, 78:14, 78:15, 87:10, 88:20, 91:13, 94:23, 95:7, 100:13, 107:22, 118:25, 122:2, 130:23, 134:20
**looked** [12] - 7:2, 22:12, 32:15, 32:21, 58:9, 63:6, 66:12, 72:17, 73:3, 91:6, 100:10, 133:3
**looking** [22] - 9:3, 18:6, 21:24, 24:24, 60:22, 68:23, 77:7, 79:7, 85:13, 87:1, 87:16, 88:5, 88:12, 89:14, 91:10, 97:9, 98:2, 98:12, 98:18, 98:24, 119:5, 119:16
**looks** [18] - 71:14, 73:11, 73:21, 76:17, 79:12, 84:12, 85:13, 86:24, 87:12, 88:11, 88:18, 88:19, 89:8, 89:9, 99:8, 102:24, 103:9, 116:20
**loose** [4] - 13:10, 17:4,

18:21, 46:18
**lose** [1] - 29:14, 30:4, 33:15
**loss** [3] - 131:24, 131:25, 132:6
**lost** [3] - 121:7, 122:10, 123:2
**low** [1] - 129:7
**lying** [1] - 126:6

## M

**Mabel** [1] - 126:6
**main** [1] - 41:14
**maintained** [1] - 17:23
**maintenance** [6] - 101:3, 102:10, 114:13, 114:25, 117:8
**man** [1] - 4:16
**manage** [1] - 130:12
**management** [1] - 132:5
**manager** [4] - 10:22, 12:5, 19:2, 104:6
**manifested** [2] - 28:6, 128:5
**manner** [1] - 32:24
**manual** [3] - 30:17, 44:6, 110:18
**Marceline** [1] - 11:1
**MARCELINE** [1] - 11:2
**March** [3] - 136:12, 137:11, 139:8
**MARGULIES** [1] - 2:2
**marine** [1] - 107:15
**maritime** [3] - 3:21, 4:2, 13:19
**mark** [5] - 64:2, 71:1, 71:24, 75:11, 122:3
**marked** [4] - 61:5, 71:3, 72:1, 75:8
**martini** [3] - 40:21, 42:4, 44:9
**materially** [1] - 25:1
**materials** [3] - 7:1, 61:12, 118:24
**matrix** [3] - 128:14, 129:1, 129:14
**matter** [1] - 139:14
**matters** [1] - 4:15
**Maurice** [2] - 6:25, 22:20
**mean** [29] - 3:20, 4:9, 11:15, 17:17, 20:15, 26:10, 36:10, 41:3, 41:10, 49:21, 50:4, 62:10, 73:8, 73:10, 76:2, 90:4, 93:1, 99:3, 100:2, 103:1,

104:14, 111:3, 111:5, 112:12, 124:7, 131:9, 133:10
**meaning** [4] - 54:10, 60:6, 81:15
**means** [6] - 4:23, 20:14, 20:18, 97:21, 99:12, 103:17
**Measures** [1] - 113:20
**mechanics** [1] - 80:4
**mechanism** [1] - 127:22
**medical** [35] - 26:24, 27:14, 28:2, 28:3, 37:15, 43:10, 43:11, 46:12, 47:2, 47:7, 47:16, 47:25, 48:4, 48:7, 48:10, 48:12, 48:13, 48:16, 49:3, 50:2, 90:17, 92:3, 92:4, 92:9, 92:13, 93:18, 93:19, 93:21, 94:24, 108:17, 109:18, 111:22, 113:4, 126:25
**medically** [1] - 126:25
**medication** [1] - 92:22
**meet** [1] - 109:12
**meeting** [1] - 89:10
**meetings** [1] - 4:17
**meets** [2] - 71:13, 88:21
**member** [2] - 30:19, 83:14
**members** [16] - 8:2, 8:5, 10:15, 11:17, 12:21, 14:2, 16:24, 17:7, 17:14, 18:11, 24:16, 68:19, 81:13, 81:17, 110:18, 112:8
**memorialize** [3] - 108:18, 109:6, 109:21
**meniscus** [1] - 108:24
**mentally** [1] - 127:2
**mention** [1] - 125:5
**mentioned** [5] - 4:20, 7:25, 16:14, 26:13, 73:19
**menu** [1] - 124:21
**menus** [1] - 23:14
**merged** [1] - 107:25
**metal** [16] - 46:21, 54:14, 62:7, 64:10, 64:20, 72:19, 73:9, 74:1, 74:7, 74:14, 75:14, 77:21, 77:25, 80:8, 88:20, 89:10
**Miami** [5] - 2:4, 2:7, 4:1, 139:2, 139:7

**MIAMI** [3] - 1:2, 136:3, 138:3
**MIAMI-DADE** [2] - 136:3, 138:3
**might** [18] - 5:21, 6:15, 19:19, 40:2, 44:14, 51:25, 66:25, 67:3, 67:19, 71:17, 72:10, 89:15, 94:21, 97:23, 110:4, 116:2, 116:23, 117:10
**mild** [1] - 48:1
**Milton** [1] - 11:1
**MILTON** [1] - 11:1
**mind** [1] - 8:23
**minor** [1] - 110:1
**minutes** [1] - 113:11
**misleading** [2] - 75:20, 88:16
**misled** [1] - 70:7
**misplaced** [2] - 120:16, 120:25
**miss** [1] - 109:24
**missed** [1] - 126:24
**missing** [36] - 67:9, 68:4, 71:17, 74:10, 75:16, 76:3, 76:7, 76:17, 76:19, 77:17, 77:20, 81:15, 81:16, 83:22, 83:23, 84:3, 84:11, 84:14, 84:18, 84:20, 84:21, 84:24, 86:6, 86:11, 88:20, 90:24, 99:10, 99:14, 99:16, 99:17, 99:22, 114:22, 115:11, 116:18
**misspoken** [1] - 40:2
**misstates** [1] - 54:7
**misstepped** [1] - 121:2
**misuse** [5] - 54:17, 54:25, 55:1, 60:14
**misused** [8] - 55:2, 55:3, 55:23, 56:4, 56:6, 58:21, 58:25, 59:14
**misusing** [1] - 55:13
**moderate** [1] - 108:13
**modifications** [5] - 14:7, 15:17, 15:23, 16:3, 96:13
**money** [1] - 35:7
**Monica** [14] - 6:2, 6:14, 6:24, 11:9, 19:20, 21:3, 21:9, 22:19, 22:22, 24:11, 116:17, 117:5, 118:10, 119:24
**monitor** [1] - 130:12

**monitored** [3] - 131:22, 131:23, 131:24
**months** [4] - 14:21, 19:18, 96:17, 96:19
**morning** [3] - 38:6, 40:6, 43:19
**most** [6] - 22:19, 35:7, 52:2, 113:22, 113:25, 134:11
**mostly** [1] - 5:25
**motion** [1] - 52:21
**motivating** [1] - 106:7
**motive** [1] - 108:9
**mouth** [1] - 57:5
**move** [19] - 15:11, 38:12, 45:2, 48:23, 52:7, 52:18, 53:6, 53:15, 53:19, 58:11, 66:5, 70:10, 80:20, 82:5, 82:12, 82:18, 91:16, 114:20
**moved** [1] - 60:1
**MR** [190] - 2:13, 3:6, 5:1, 5:3, 5:5, 7:19, 7:21, 7:22, 7:23, 9:10, 9:19, 9:23, 10:9, 10:10, 16:1, 16:13, 21:15, 21:21, 22:8, 22:11, 29:23, 31:3, 31:14, 31:25, 32:10, 32:12, 32:22, 33:7, 34:4, 34:9, 34:23, 35:2, 35:19, 36:9, 36:12, 36:16, 36:17, 38:3, 38:10, 39:7, 39:13, 39:19, 39:20, 41:6, 41:18, 42:15, 42:18, 42:19, 42:23, 43:16, 45:23, 49:7, 49:9, 49:14, 50:1, 50:9, 50:21, 50:23, 52:7, 52:8, 52:18, 52:19, 52:23, 53:6, 53:10, 53:15, 53:21, 53:24, 54:6, 54:24, 55:24, 56:2, 56:8, 56:15, 57:9, 57:11, 57:12, 57:13, 57:15, 57:16, 58:13, 58:17, 59:6, 59:7, 59:22, 59:23, 61:6, 61:20, 61:25, 62:2, 62:15, 62:23, 62:25, 63:15, 63:17, 63:21, 63:25, 64:13, 65:7, 66:17, 66:21, 67:10, 67:11, 68:7, 68:9, 69:4, 69:14, 70:10, 70:23, 71:4, 71:23,

72:2, 72:6, 72:15, 72:24, 73:7, 73:16, 74:24, 75:9, 75:17, 76:1, 76:9, 76:11, 76:14, 78:9, 79:24, 80:18, 80:20, 82:2, 82:5, 82:10, 82:14, 83:6, 83:7, 83:25, 84:16, 84:25, 85:24, 86:12, 87:21, 87:25, 89:12, 92:15, 92:24, 94:1, 94:2, 94:4, 94:6, 94:22, 95:1, 95:4, 95:6, 95:16, 95:19, 96:8, 96:20, 97:2, 97:8, 107:4, 108:3, 111:4, 111:13, 113:10, 113:14, 113:17, 114:3, 114:9, 117:17, 117:24, 118:5, 118:8, 118:12, 118:23, 119:4, 119:7, 119:9, 119:11, 119:14, 119:16, 119:18, 131:2, 131:15, 132:24, 133:9, 133:21, 133:24, 134:2, 134:18, 134:22, 135:3
**multiple** [1] - 58:2
**mused** [1] - 70:15
**must** [2] - 58:25, 59:14
**muted** [1] - 114:5
**Mynor** [1] - 122:8

## N

**nail** [4] - 27:1, 51:13, 62:18, 129:22
**nails** [1] - 62:18
**name** [5] - 3:8, 8:11, 10:20, 10:23, 28:20
**named** [1] - 121:5
**narrative** [4] - 23:15, 122:6, 122:25, 125:8
**natural** [1] - 106:21
**nature** [2] - 54:22, 108:17
**ne** [1] - 97:20
**near** [4] - 24:17, 63:9, 67:5, 67:23
**necessary** [1] - 9:24
**need** [15] - 4:18, 26:22, 33:24, 39:25, 70:15, 76:20, 94:21, 97:25, 98:10, 98:15, 98:20, 111:24,

113:8, 120:10, 128:21

**needed** [10] - 4:15, 14:17, 93:23, 94:15, 101:25, 104:8, 104:12, 105:2, 115:21, 130:12

**needs** [9] - 4:18, 12:20, 13:13, 97:23, 97:25, 98:21, 106:12, 132:3

**never** [3] - 32:14, 32:21, 131:10

**new** [1] - 14:23

**New** [1] - 4:1

**next** [22] - 63:8, 70:24, 84:10, 84:14, 92:2, 99:5, 99:18, 100:3, 100:23, 101:7, 101:18, 102:11, 103:12, 104:2, 104:9, 104:25, 108:4, 121:3, 122:8, 122:21, 123:10, 123:16

**nine** [9] - 14:16, 27:21, 28:15, 35:25, 36:13, 38:1, 38:5, 38:17, 40:1

**NO** [2] - 1:3, 139:9

**nobody** [4] - 45:13, 115:15, 123:13, 127:3

**noncompliant** [1] - 93:9

**none** [2] - 14:9

**nonskid** [2] - 101:15, 117:22

**normal** [21] - 14:11, 14:18, 14:22, 16:6, 16:7, 16:17, 17:11, 17:23, 18:14, 27:8, 37:6, 49:17, 60:7, 72:12, 72:21, 72:22, 115:19, 124:8, 124:9, 128:8

**normally** [2] - 47:9, 103:7

**nosing** [18] - 12:23, 13:10, 14:12, 18:13, 25:8, 25:10, 27:6, 46:21, 54:14, 54:15, 55:6, 74:1, 80:6, 96:14, 100:1, 101:14, 101:17, 132:12

**nosings** [3] - 25:7, 25:10, 117:22

**Notary** [3] - 1:22, 137:16, 138:20

**notation** [3] - 45:16, 48:22, 74:13

**note** [9] - 25:22, 47:12, 106:20, 108:5, 108:10, 111:2, 112:16, 123:8, 125:6

**noted** [7] - 28:2, 28:3, 46:13, 47:15, 47:23, 48:9, 52:22

**notes** [4] - 125:1, 125:13, 134:20, 136:7

**Notes** [4] - 97:24, 98:13, 98:14, 98:21

**nothing** [14] - 14:12, 14:17, 27:5, 46:16, 46:17, 51:4, 54:13, 60:15, 60:16, 74:4, 123:7, 124:9

**Notice** [1] - 1:23

**notice** [6] - 29:24, 31:20, 33:8, 44:8, 95:5, 139:19

**noticed** [2] - 104:7, 115:22

**notices** [1] - 30:19

**notified** [1] - 112:4

**nowhere** [1] - 63:9

**Number** [6] - 39:16, 40:10, 96:17, 119:8, 120:3

**number** [8] - 15:6, 32:15, 35:24, 77:3, 119:4, 119:15, 129:9, 129:23

**numbers** [3] - 72:3, 130:1, 131:23

**numerous** [1] - 14:2, 57:21

**nurse** [6] - 47:15, 47:23, 47:24, 48:15, 70:4, 92:6

---

**O**

**o'clock** [2] - 43:9, 44:20

**oath** [1] - 139:12

**OATH** [1] - 137:1

**object** [2] - 39:7, 92:15

**objection** [32] - 16:1, 29:23, 31:14, 32:10, 33:7, 35:2, 38:3, 41:6, 42:15, 42:23, 49:7, 50:1, 50:21, 54:6, 55:24, 56:8, 59:6, 68:7, 70:10, 73:7, 76:12, 80:18,

82:5, 82:11, 83:6, 84:25, 94:1, 95:1, 107:4, 131:2, 133:21, 133:24

**Objection** [23] - 5:1, 34:9, 36:9, 36:16, 39:19, 57:9, 59:22, 61:20, 62:2, 62:23, 64:13, 66:17, 67:10, 69:4, 72:15, 75:17, 76:11, 78:9, 83:25, 86:12, 87:25, 111:4, 132:24

**objective** [1] - 114:12

**observations** [1] - 47:1

**observe** [2] - 38:24, 44:8, 45:25

**observed** [5] - 28:5, 43:21, 44:21, 48:8, 128:4

**obtain** [1] - 96:2

**obtained** [1] - 22:18

**obvious** [1] - 53:14

**Obviously** [1] - 110:15

**obviously** [19] - 6:6, 6:25, 12:22, 14:4, 16:23, 18:23, 27:18, 36:24, 40:8, 44:15, 51:1, 55:11, 93:5, 94:12, 94:17, 101:25, 109:15, 109:25, 133:3

**occupational** [1] - 132:15

**occurred** [2] - 50:6, 50:7

**occurring** [1] - 13:1

**October** [3] - 14:20, 15:24, 16:12

**odor** [1] - 28:6

**OF** [12] - 1:1, 1:18, 2:2, 2:5, 136:1, 136:2, 136:3, 137:1, 137:3, 137:4, 138:2, 138:3

**offer** [1] - 35:12

**offered** [1] - 4:5

**office** [3] - 4:1, 8:12, 139:15

**officer** [9] - 6:11, 8:5, 8:21, 12:11, 46:13, 47:3, 74:11, 105:21, 140:3

**official** [4] - 48:9, 48:22, 70:5, 137:10

**offshore** [1] - 36:1

**often** [2] - 31:10, 129:10

**oftentimes** [1] - 29:7

**old** [2] - 107:7, 126:13

**ON** [2] - 2:2, 2:5

**on-site** [1] - 12:25

**onboard** [32] - 6:11, 7:15, 8:17, 11:21, 26:11, 27:22, 36:11, 39:12, 41:2, 51:1, 52:6, 52:13, 59:3, 64:25, 65:2, 66:3, 66:4, 67:23, 73:3, 73:20, 74:19, 77:22, 81:6, 92:12, 93:18, 94:8, 106:13, 108:15, 109:9, 112:2, 131:4, 131:16

**one** [72] - 6:3, 7:11, 8:4, 10:25, 11:5, 12:4, 13:14, 15:5, 17:24, 20:22, 30:23, 33:2, 35:13, 37:2, 42:3, 42:10, 42:12, 42:14, 42:22, 50:13, 50:19, 63:20, 69:1, 71:20, 72:8, 73:21, 78:25, 84:14, 86:14, 86:20, 86:24, 87:24, 89:13, 90:12, 92:6, 97:9, 97:13, 97:17, 99:5, 99:18, 99:21, 100:3, 100:23, 101:7, 101:18, 101:23, 101:24, 102:11, 102:14, 102:19, 103:12, 104:2, 104:9, 104:25, 106:15, 107:25, 115:8, 115:9, 119:17, 120:12, 121:3, 121:11, 122:8, 123:16, 124:11, 126:5, 127:16, 127:19, 129:10, 133:15, 133:16

**ones** [8] - 18:7, 65:23, 73:18, 77:4, 105:6, 121:10, 127:7, 131:5

**Ong** [2] - 47:24, 48:15

**ONG** [1] - 47:24

**open** [1] - 133:4

**open-deck** [1] - 133:4

**opened** [1] - 97:17

**operation** [3] - 11:15, 11:24, 115:20

**operational** [2] - 4:15, 4:18

**operationally** [1] - 35:17

**opinion** [2] - 9:17, 82:3

**opportunity** [2] - 36:6, 64:4

**opposing** [1] - 116:6

**or..** [1] - 24:6

**order** [23] - 14:13, 18:24, 19:8, 19:13, 20:11, 20:16, 20:18, 21:7, 22:3, 37:8, 55:15, 97:15, 99:9, 102:14, 114:11, 115:2, 115:24, 116:1, 116:3, 116:7, 116:15, 117:1, 130:25

**Order** [1] - 1:13, 97:12

**orders** [21] - 19:18, 19:21, 20:2, 20:3, 20:5, 21:2, 21:9, 21:10, 21:23, 56:23, 95:9, 96:1, 96:11, 102:4, 102:22, 102:23, 105:5, 116:4, 116:9, 117:9, 117:13

**ordinary** [1] - 51:5

**original** [1] - 139:18

**originally** [1] - 112:22

**orthopedic** [1] - 93:15

**orthopedist** [3] - 93:4, 93:7, 94:16

**otherwise** [1] - 55:18

**outdated** [1] - 108:2

**outer** [1] - 134:12

**outside** [2] - 31:19, 121:18

**overconsumption** [4] - 29:21, 31:5, 31:12, 32:7

**overly** [1] - 42:9

**oversee** [1] - 4:12

**overservice** [1] - 32:16

**owe** [1] - 32:3

**Own** [1] - 18:7

**own** [11] - 27:20, 29:13, 30:9, 33:21, 45:1, 52:4, 55:15, 120:23, 120:24, 128:22

---

**P**

**P.A** [3] - 2:2, 2:6, 139:5

**p.m** [8] - 1:15, 40:21, 42:3, 42:12, 43:17, 43:21, 44:5, 135:5

**package** [21] - 28:13, 28:15, 28:22, 28:23, 28:24, 33:4, 34:6,

34:18, 34:25, 35:1, 35:22, 36:4, 37:22, 38:16, 39:2, 39:4, 40:23, 40:24, 41:1, 123:9, 124:10
**packages** [2] - 49:1, 49:2
**PAGE** [2] - 2:16, 138:1
**page** [3] - 108:4, 138:10, 140:3
**PAGE /LINE** [1] - 140:6
**pages** [2] - 136:7, 138:7
**paid** [3] - 36:5, 36:7, 39:11
**paid -for** [1] - 39:11
**pain** [1] - 108:13
**paint** [1] - 100:6
**painted** [2] - 100:11, 100:15
**panorama** [1] - 121:18
**paragraph** [1] - 81:21
**parameters** [8] - 105:7, 112:10, 112:14, 112:18, 112:21, 116:5, 118:6, 119:21
**part** [16] - 3:8, 14:6, 23:13, 80:5, 83:22, 83:23, 84:3, 84:8, 84:14, 84:18, 84:20, 84:21, 84:23, 116:20, 131:19, 132:1
**PART** [1] - 140:2
**particular** [18] - 5:14, 6:20, 16:8, 19:1, 21:13, 22:22, 23:4, 26:9, 39:18, 40:10, 46:4, 51:9, 96:23, 101:1, 132:9, 133:1, 133:2, 133:7
**parties** [2] - 136:9, 139:19
**parties '** [1] - 136:10
**party** [1] - 139:19
**pass** [1] - 30:7
**passenger** [16] - 12:10, 23:9, 26:19, 26:20, 29:10, 32:9, 39:3, 45:17, 49:2, 50:13, 110:8, 110:11, 110:24, 120:15, 120:16, 121:13
**Passenger** [1] - 108:10
**passengers** [15] - 13:16, 13:24, 16:18, 16:24, 17:10, 22:13,

30:8, 30:15, 32:4, 34:25, 35:1, 44:7, 49:6, 50:19, 110:20
**passing** [1] - 19:4
**past** [2] - 21:7, 133:11
**pay** [1] - 39:4
**paying** [4] - 36:7, 36:14, 39:6, 55:17
**pc** [3] - 99:11, 99:14, 99:15
**PELAEZ** [97] - 5:1, 5:3, 7:19, 7:22, 9:10, 10:9, 16:1, 21:15, 21:21, 29:23, 31:14, 32:10, 32:12, 33:7, 34:9, 35:2, 36:9, 36:16, 38:3, 39:7, 39:19, 41:6, 42:15, 42:18, 42:23, 49:7, 49:9, 50:1, 50:21, 50:23, 52:8, 52:19, 53:6, 53:15, 54:6, 55:24, 56:8, 57:9, 57:11, 57:13, 57:16, 59:6, 59:22, 61:20, 62:2, 62:23, 62:25, 63:15, 63:21, 64:13, 66:17, 67:10, 68:7, 69:4, 70:10, 72:15, 73:7, 74:24, 75:17, 76:9, 76:11, 78:9, 80:18, 80:20, 82:5, 83:6, 83:25, 84:25, 86:12, 87:25, 92:15, 94:1, 94:4, 94:6, 95:1, 95:4, 95:16, 96:8, 97:2, 107:4, 111:4, 113:14, 114:3, 117:17, 117:24, 118:5, 118:8, 118:23, 119:7, 119:11, 119:14, 131:2, 132:24, 133:21, 133:24, 134:2, 135:3
**Pelaez** [3] - 2:8, 65:9, 88:7
**pending** [1] - 20:25
**penicillin** [1] - 92:21
**people** [13] - 32:17, 33:13, 33:16, 34:13, 34:15, 37:2, 51:7, 51:8, 55:21, 59:3, 108:23, 124:5, 132:11
**per** [4] - 29:3, 33:3, 37:18, 39:5
**percentage** [1] - 49:5
**perfect** [3] - 73:9, 74:2, 134:13

**perform** [1] - 20:18
**performed** [2] - 20:16, 20:19, 117:21
**perhaps** [1] - 17:17
**period** [1] - 54:4
**permission** [1] - 8:23
**person** [8] - 8:20, 12:17, 30:19, 33:13, 33:18, 44:12, 54:18, 116:22
**personal** [6] - 29:25, 31:16, 31:22, 49:11, 58:8, 134:4
**personally** [3] - 41:8, 75:1, 137:8
**personnel** [1] - 46:12
**perspective** [3] - 88:18, 111:18, 114:8
**ph** [2] - 122:8, 126:6
**ph)** [1] - 122:16
**photo** [6] - 65:4, 65:21, 78:16, 81:3, 89:23, 90:24
**Photograph** [4] - 2:17, 2:17, 2:18, 2:18
**photograph** [40] - 13:12, 60:25, 61:9, 64:1, 65:3, 66:11, 66:23, 67:15, 67:19, 67:21, 68:5, 68:25, 69:10, 69:21, 69:25, 70:1, 71:5, 71:7, 71:15, 72:7, 73:1, 73:21, 78:24, 79:6, 79:15, 85:14, 85:22, 86:1, 86:6, 86:8, 86:9, 86:14, 86:19, 87:19, 88:13, 88:14, 95:22, 100:14, 116:19
**photographed** [4] - 90:1, 90:21, 91:5, 91:25
**photographs** [37] - 24:12, 24:16, 24:22, 25:25, 26:5, 60:10, 60:22, 61:15, 66:12, 68:22, 68:23, 73:2, 73:18, 73:19, 73:24, 74:21, 74:22, 74:25, 75:3, 76:21, 79:18, 85:15, 87:4, 88:5, 89:14, 89:16, 90:14, 91:9, 91:10, 91:12, 91:14, 91:15, 91:20, 91:24, 98:24, 114:18
**photos** [5] - 24:25, 81:23, 85:6, 91:18, 107:12
**phrase** [1] - 125:2

**physician** [3] - 93:15, 108:15, 110:11
**picture** [34] - 61:23, 62:11, 63:5, 63:11, 64:12, 64:18, 65:12, 66:16, 67:2, 67:17, 67:24, 69:3, 69:7, 71:20, 77:6, 77:8, 77:17, 77:20, 78:1, 78:19, 80:8, 82:22, 83:24, 84:7, 84:13, 85:3, 87:7, 87:23, 88:10, 88:15, 89:7, 115:5, 116:8
**pictures** [16] - 24:20, 25:5, 25:18, 49:23, 51:1, 63:7, 65:1, 72:10, 72:17, 74:13, 74:17, 78:12, 89:20, 90:9, 115:6
**pie** [1] - 133:13
**piece** [38] - 6:22, 18:20, 62:7, 67:7, 67:9, 68:4, 71:16, 74:7, 74:9, 75:16, 76:3, 76:6, 76:15, 76:17, 76:18, 77:16, 77:20, 77:23, 78:7, 80:12, 81:16, 84:11, 85:19, 85:21, 86:5, 86:10, 86:19, 88:20, 90:24, 99:16, 99:17, 105:2, 114:22, 115:11, 116:2, 116:3, 116:18
**place** [8] - 27:7, 30:14, 34:25, 42:8, 57:19, 105:20, 115:18
**placed** [1] - 128:7
**placement** [1] - 122:4
**plaintiff** [2] - 81:5, 81:14
**Plaintiff** [1] - 1:6
**PLAINTIFF** [1] - 2:2
**Plaintiff 's** [22] - 61:3, 61:4, 61:7, 84:2, 65:13, 66:9, 68:3, 68:16, 68:25, 70:25, 71:2, 71:24, 71:25, 73:1, 73:5, 74:8, 75:7, 75:11, 75:13, 76:4, 82:16, 82:19
**PLAINTIFF 'S** [1] - 2:16
**plaintiff 's** [4] - 75:4, 81:4, 96:10, 96:18
**plan** [1] - 41:15
**play** [1] - 32:21
**pleasure** [1] - 134:23
**point** [13] - 22:10,

30:11, 32:1, 32:2, 33:25, 36:24, 44:22, 45:6, 58:12, 63:16, 73:17, 76:7, 77:19
**pointed** [1] - 70:4
**pointing** [1] - 78:3
**policies** [1] - 30:17
**poor** [6] - 47:5, 52:3, 122:4, 124:15, 125:11, 125:19
**pop** [1] - 122:14
**popping** [1] - 24:2, 122:9
**port** [17] - 27:11, 97:2, 97:3, 98:7, 98:8, 98:17, 98:20, 99:10, 99:13, 99:16, 103:2, 103:5, 103:7, 104:20, 104:21, 120:1
**Port** [2] - 97:20, 101:9
**portion** [1] - 124:24
**Portside** [1] - 101:19
**portside** [5] - 102:12, 102:13, 102:15, 102:16, 103:17
**poses** [1] - 69:17
**position** [9] - 3:22, 4:5, 26:7, 50:6, 50:11, 53:5, 68:21, 69:1, 105:18
**positive** [1] - 47:13
**possession** [1] - 75:3
**possibility** [1] - 89:13
**possible** [6] - 12:19, 13:7, 108:12, 114:14, 115:4, 130:13
**possibly** [1] - 36:25
**potential** [4] - 83:4, 83:10, 83:11, 114:23
**preceding** [1] - 96:18
**preface** [1] - 68:17
**prepaid** [1] - 34:6
**preparation** [3] - 6:23, 8:9, 14:6
**prepare** [2] - 5:13, 8:15
**prepared** [2] - 8:1, 105:24
**present** [1] - 74:20
**presentation** [1] - 92:13
**presented** [4] - 37:14, 37:16, 114:23, 114:25
**preserved** [1] - 10:8
**pretty** [12] - 7:7, 14:14, 15:8, 16:25, 17:1, 27:22, 28:10, 38:8,

61:19, 73:12, 73:24, 103:18
**prevent** [2] - 12:25, 30:15
**preventing** [2] - 113:23, 114:1
**prevention** [3] - 131:24, 131:25, 132:7
**Prevention** [1] - 18:10
**Preventive** [2] - 113:19, 128:12
**previous** [1] - 77:2
**primary** [1] - 106:7
**Princess** [2] - 27:24, 36:3
**print** [1] - 21:2
**printed** [1] - 62:6
**priors** [1] - 113:18
**privilege** [1] - 9:16
**privileges** [1] - 10:7
**problem** [1] - 14:5
**problems** [3] - 59:19, 122:12, 123:5
**procedure** [6] - 17:25, 18:18, 108:1, 113:19, 114:11, 115:1
**procedures** [13] - 12:9, 17:6, 17:8, 17:13, 17:20, 18:6, 18:16, 30:14, 35:21, 42:8, 44:6, 112:7, 128:11
**proceed** [1] - 139:18
**produce** [2] - 53:12, 117:14
**produced** [5] - 7:3, 19:22, 21:17, 21:22, 23:21
**product** [5] - 9:16, 9:18, 10:1, 10:3, 10:4
**production** [3] - 19:24, 95:15, 105:12
**Professional** [3] - 1:22, 136:5, 136:15
**prominently** [1] - 128:7
**promptly** [2] - 114:14, 115:3
**pronounced** [2] - 120:13, 121:24
**properly** [4] - 29:16, 34:1, 56:14, 125:20
**prosecutor** [1] - 3:24
**protocol** [1] - 12:16
**protocols** [2] - 44:11, 131:11
**protrude** [1] - 74:5

**protruded** [1] - 80:8
**protrudes** [1] - 72:14
**protruding** [4] - 46:17, 54:13, 60:15, 124:9
**protrusion** [1] - 73:6
**provide** [4] - 11:8, 24:8, 81:4, 120:10
**provided** [16] - 12:8, 57:22, 73:2, 73:4, 75:2, 89:15, 89:17, 90:9, 102:3, 105:6, 112:18, 118:14, 118:25, 119:14, 120:11, 128:12
**PROVIDES** [1] - 140:2
**provision** [3] - 110:8, 128:14, 128:18
**Public** [3] - 1:22, 137:16, 138:20
**pull** [10] - 8:24, 9:1, 9:4, 21:3, 21:12, 47:16, 47:18, 131:7, 134:17
**pulled** [3] - 19:20, 65:22, 119:3
**pulls** [1] - 132:16
**purchase** [12] - 30:25, 34:18, 35:1, 36:20, 36:21, 39:3, 39:14, 39:17, 39:22, 40:20, 116:3
**purchased** [4] - 29:3, 35:22, 40:4, 41:21
**purchases** [5] - 27:19, 28:8, 28:18, 37:23, 45:1
**purpose** [1] - 34:8
**purposes** [5] - 52:24, 86:3, 130:16, 130:19, 133:13
**Pursuant** [1] - 1:13
**pursuant** [3] - 1:23, 111:11, 112:7
**put** [15] - 24:11, 47:7, 59:20, 61:2, 63:18, 64:7, 66:8, 70:20, 76:18, 77:19, 84:23, 96:8, 99:8, 117:1, 120:15
**puts** [1] - 19:3
**putting** [5] - 77:15, 77:18, 85:25, 86:2, 90:14

## Q

**qualifications** [1] - 94:24
**question -by-question** [1] - 6:19

**questions** [20] - 7:6, 8:14, 8:25, 9:14, 22:6, 24:13, 38:22, 50:5, 53:9, 53:18, 53:19, 58:10, 67:20, 70:20, 80:16, 80:22, 81:9, 81:11, 118:20, 134:23
**quicker** [1] - 98:11
**quickly** [3] - 17:5, 33:18, 102:7

## R

**rail** [1] - 67:4
**railing** [5] - 75:14, 84:10, 84:11, 87:11, 90:24
**raise** [1] - 10:5
**raised** [4] - 18:21, 46:17, 60:12, 75:24
**Ramon** [2] - 8:20, 10:18
**ran** [2] - 66:1, 96:22
**rare** [2] - 133:3, 133:8
**rarer** [2] - 134:9, 134:16
**rate** [3] - 129:3, 131:11, 131:16
**rated** [1] - 128:13
**rather** [1] - 126:2
**rating** [1] - 129:20
**ratings** [2] - 128:15, 134:11
**RE** [1] - 139:9
**reach** [1] - 63:16
**reached** [1] - 127:14
**read** [13] - 7:10, 26:2, 48:13, 80:3, 81:21, 92:9, 110:10, 122:5, 125:8, 130:2, 135:3, 138:6, 140:20
**reading** [4] - 10:13, 60:19, 60:20, 139:17
**really** [24] - 17:21, 18:2, 26:24, 27:1, 33:12, 34:15, 34:16, 41:14, 43:1, 43:8, 70:15, 72:20, 78:2, 103:8, 108:20, 117:3, 121:10, 123:11, 123:19, 126:20, 126:21, 126:22, 127:3, 127:6
**realtime** [2] - 52:14, 112:14
**REASON** [1] - 140:6
**reason** [6] - 15:4, 23:10, 34:5, 40:23, 44:8, 54:15, 60:13,

81:22
**reasonable** [12] - 13:17, 13:20, 13:21, 13:22, 16:15, 17:9, 29:13, 30:8, 32:3, 33:20, 52:4, 55:14
**reasonably** [1] - 37:25
**reasons** [3] - 128:21, 130:17, 140:4
**receipt** [1] - 40:3
**receive** [2] - 108:14, 110:22
**received** [2] - 92:5, 108:7
**recent** [1] - 85:7
**recently** [2] - 74:18, 79:21, 88:8
**recess** [2] - 63:24, 113:16
**recognizable** [1] - 91:13
**reconfigured** [1] - 79:12
**reconsider** [1] - 62:20
**Record** [1] - 139:24
**record** [11] - 15:15, 21:20, 45:15, 52:19, 53:11, 60:20, 71:22, 81:22, 96:9, 135:2, 136:7
**records** [5] - 19:10, 19:15, 28:2, 48:9, 48:13, 70:5, 92:5, 92:8, 92:10
**RECROSS** [1] - 2:13
**red** [1] - 105:13
**REDIRECT** [1] - 2:13
**refer** [4] - 8:24, 9:20, 19:25, 123:20
**reference** [10] - 7:4, 43:24, 82:20, 83:15, 95:8, 98:4, 98:6, 119:12, 124:13, 139:11
**referencing** [1] - 37:3
**referred** [2] - 44:6, 92:6
**referring** [6] - 18:3, 26:5, 67:20, 98:16, 100:7, 115:10
**reflect** [1] - 86:8
**refurbished** [1] - 79:10
**refurbishment** [1] - 6:12
**regard** [1] - 108:2
**regarding** [11] - 7:6, 21:23, 46:2, 48:11, 50:8, 57:18, 80:16, 80:23, 81:9, 96:12,

114:11
**regardless** [4] - 78:3, 108:14, 110:10, 114:24
**related** [4] - 4:12, 14:10, 21:4, 117:13
**relationship** [1] - 82:25
**relative** [2] - 136:9, 136:9
**relax** [2] - 70:1, 70:8
**relevant** [5] - 19:19, 21:13, 23:17, 31:24, 117:11
**rely** [1] - 33:19
**remained** [1] - 92:12
**remedial** [1] - 130:11
**remember** [6] - 27:15, 46:23, 51:20, 65:23, 77:3, 126:15
**Remote** [1] - 1:12
**remove** [1] - 25:9
**repair** [3] - 13:6, 13:13, 115:23
**repaired** [6] - 12:20, 76:18, 83:24, 86:10, 115:1, 115:22
**repairs** [7] - 14:7, 15:17, 15:23, 16:3, 96:13, 102:2, 117:21
**repatriated** [1] - 11:23
**repeatedly** [2] - 81:2, 81:12
**rephrase** [4] - 15:3, 15:14, 38:19, 83:10
**replace** [4] - 14:23, 25:12, 102:25, 103:10
**replaced** [14] - 14:25, 16:9, 25:4, 25:7, 25:9, 25:16, 83:24, 84:23, 86:11, 101:25, 104:8, 104:12, 115:22
**report** [33] - 7:4, 8:1, 8:24, 9:5, 9:13, 9:25, 10:15, 11:12, 24:21, 43:24, 50:17, 109:2, 109:14, 109:16, 109:25, 110:14, 112:9, 120:18, 121:6, 121:25, 123:3, 123:10, 123:12, 123:21, 127:11, 127:15, 127:19, 128:19, 128:25, 130:3, 130:6, 132:18, 136:5
**reported** [15] - 23:9, 26:23, 48:12, 59:2,

108:14, 110:3, 110:10, 110:15, 110:17, 110:24, 112:20, 114:13, 115:3, 120:15, 122:21
**Reporter** [3] - 1:22, 136:5, 136:15
**REPORTER** [1] - 136:1
**reporting** [6] - 22:24, 105:11, 105:15, 106:19, 110:20, 111:12
**REPORTING** [1] - 139:1
**reports** [7] - 24:7, 24:12, 109:11, 114:11, 115:2, 118:19, 131:6
**represent** [1] - 7:13
**REPRESENTATIVE** [1] - 1:18
**representative** [4] - 4:14, 5:8, 6:1, 50:10
**representatives** [1] - 53:13
**Request** [1] - 97:10
**request** [22] - 6:17, 18:25, 19:3, 19:12, 19:23, 20:17, 20:18, 20:25, 21:1, 21:5, 21:9, 21:10, 22:2, 95:14, 96:1, 96:3, 96:11, 101:1, 103:19, 104:5, 109:20, 117:15
**requested** [7] - 17:6, 20:9, 21:14, 35:15, 117:20, 118:9, 136:6
**requests** [3] - 6:2, 21:24, 95:9
**require** [1] - 37:22
**required** [2] - 16:4, 49:25
**requirements** [1] - 5:14
**research** [5] - 5:20, 22:16, 23:2, 41:15, 116:12
**researched** [1] - 5:18
**reserved** [1] - 22:17
**resistancy** [1] - 134:11
**resolved** [1] - 10:4
**respect** [8] - 4:24, 8:9, 18:11, 86:5, 127:10, 127:15, 129:11, 129:13
**respond** [2] - 9:13,

53:18
**responded** [3] - 27:2, 57:21, 58:1
**responding** [1] - 58:10
**response** [6] - 6:16, 52:16, 52:17, 52:21, 58:14, 119:8
**responses** [5] - 7:2, 7:24, 19:23, 95:14, 119:6
**responsible** [3] - 29:19, 32:2, 37:21
**responsibly** [4] - 34:22, 37:4, 37:25, 39:9
**rest** [1] - 31:1
**result** [7] - 26:10, 106:21, 109:11, 111:25, 112:1, 113:8, 123:2
**results** [2] - 110:8, 117:6
**resumption** [1] - 11:24
**retrieved** [1] - 105:7
**reveal** [1] - 120:5
**revealed** [1] - 119:20
**review** [2] - 9:12, 136:6
**reviewed** [7] - 5:12, 7:1, 7:12, 28:8, 73:19, 92:4, 92:8
**Ricky** [1] - 122:8
**ripped** [2] - 62:18, 80:9
**rise** [1] - 54:11
**risk** [10] - 29:15, 29:20, 33:5, 36:24, 128:14, 129:1, 129:14, 130:18, 130:22, 132:5
**RiskConsole** [1] - 23:1
**RIVKIND** [95] - 2:2, 2:13, 3:6, 5:5, 7:21, 7:23, 9:19, 9:23, 10:10, 16:13, 22:8, 22:11, 31:3, 31:25, 32:22, 34:4, 34:23, 35:19, 36:12, 36:17, 38:10, 39:13, 39:20, 41:18, 42:19, 43:16, 45:23, 49:14, 50:9, 52:7, 52:18, 52:23, 53:10, 53:21, 53:24, 54:24, 56:2, 56:15, 57:12, 57:15, 58:13, 58:17, 59:7, 59:23, 61:6, 61:25, 62:15,

63:17, 63:25, 65:7, 66:21, 67:11, 68:9, 69:14, 70:23, 71:4, 71:23, 72:2, 72:6, 72:24, 73:16, 75:9, 76:1, 76:14, 79:24, 82:2, 82:10, 82:14, 83:7, 84:16, 85:24, 87:21, 89:12, 92:24, 94:2, 94:22, 95:6, 95:19, 96:20, 97:8, 108:3, 111:13, 113:10, 113:17, 114:9, 118:12, 119:4, 119:9, 119:16, 119:18, 131:15, 133:9, 134:18, 134:22
**Rivkind** [11] - 2:4, 53:8, 57:11, 67:13, 70:13, 78:10, 81:10, 81:20, 82:1, 88:2
**Rivkind 's** [2] - 53:7, 53:16
**room** [2] - 41:14, 121:18
**root** [1] - 127:25
**rounds** [1] - 88:25
**routine** [1] - 102:10
**rubber** [5] - 46:21, 54:12, 104:11, 122:19, 123:1
**rule** [1] - 5:14
**RULE** [1] - 140:2
**run** [2] - 29:15, 107:18
**running** [1] - 55:17

## S

**safe** [1] - 130:13
**safely** [4] - 34:17, 34:21, 37:24, 46:10
**safety** [40] - 13:17, 14:19, 16:6, 16:17, 17:12, 18:14, 26:21, 27:8, 27:20, 30:9, 31:5, 32:3, 33:21, 45:1, 50:18, 51:4, 52:4, 54:10, 55:15, 56:19, 57:1, 59:4, 59:19, 60:24, 61:16, 61:17, 62:21, 66:15, 68:22, 69:2, 69:17, 83:4, 115:13, 123:4, 124:8, 125:24, 127:5, 130:19, 132:14, 132:15
**sail** [2] - 11:25, 35:11
**Sail** [8] - 27:19, 28:17, 30:24, 36:22, 37:1,

37:12, 44:25, 123:15
**SANCHEZ** [2] - 136:15, 137:16
**Sanchez** [3] - 1:21, 136:4, 139:23
**sandal** [1] - 124:2
**sandals** [2] - 123:25, 124:2
**Santonia** [1] - 120:12
**Santonio** [1] - 121:24
**savings** [4] - 29:2, 34:14, 34:18, 34:20
**saw** [14] - 24:20, 28:17, 40:18, 60:12, 60:13, 64:5, 64:14, 74:4, 74:8, 74:22, 77:21, 77:25, 80:8, 123:13
**Sawan** [4] - 8:20, 10:18, 10:23, 11:20
**SAWAN** [1] - 10:19
**scale** [1] - 73:13
**schedule** [1] - 16:8
**school** [1] - 3:18
**scope** [12] - 29:24, 31:15, 31:20, 33:8, 34:10, 35:3, 41:7, 49:10, 92:16, 94:4, 95:2, 134:2
**screen** [8] - 71:12, 71:16, 77:9, 78:25, 79:16, 86:15, 90:15, 95:21
**seal** [1] - 137:10
**search** [14] - 22:22, 96:7, 96:21, 96:25, 98:3, 107:23, 116:14, 116:16, 116:23, 117:4, 117:7, 118:8, 119:19, 120:5
**searched** [4] - 23:11, 104:18, 116:5, 117:3
**searches** [2] - 22:20, 23:16
**searching** [1] - 116:24
**second** [6] - 66:23, 86:19, 89:22, 93:9, 117:18, 128:1
**section** [5] - 23:16, 125:7, 128:24, 130:5, 130:8
**security** [13] - 6:10, 8:4, 8:21, 12:11, 27:2, 46:13, 47:3, 74:11, 81:6, 105:21, 105:22, 106:23, 107:18
**see** [54] - 7:21, 17:24, 18:9, 18:12, 20:5,

20:8, 21:1, 25:5, 26:3, 41:21, 43:23, 44:1, 46:5, 46:8, 50:14, 50:19, 50:22, 53:25, 61:7, 61:11, 64:12, 65:1, 65:23, 65:24, 66:15, 67:7, 67:8, 67:12, 68:22, 73:4, 73:10, 73:15, 74:20, 75:14, 82:18, 87:17, 88:14, 91:17, 91:19, 93:9, 94:16, 98:13, 100:9, 100:14, 119:17, 122:7, 123:23, 124:12, 124:13, 125:4, 132:9
**seeing** [1] - 65:24
**seem** [1] - 134:13
**select** [2] - 124:17, 124:22
**self** [4] - 101:20, 105:2, 128:22, 130:5
**self-critical** [2] - 128:22, 130:5
**self-explanatory** [2] - 101:20, 105:2
**send** [1] - 72:4
**sending** [1] - 103:19
**sense** [5] - 30:3, 43:2, 94:9, 102:23, 107:20
**sent** [1] - 72:9
**separate** [4] - 20:22, 26:4, 69:21, 140:3
**sequence** [2] - 7:11, 40:5
**serious** [5] - 50:20, 80:10, 112:22, 126:8, 132:19
**serve** [4] - 4:13, 4:20, 42:8, 44:9
**served** [6] - 37:9, 39:23, 40:12, 42:4, 43:25, 44:13
**servers** [1] - 42:4
**service** [4] - 11:25, 30:17, 44:7, 102:10
**services** [8] - 35:12, 35:14, 106:23, 109:17, 113:2, 132:4, 132:13
**serving** [1] - 30:22
**set** [8] - 6:20, 17:8, 66:3, 79:14, 91:9, 91:10, 92:8, 138:9
**sets** [2] - 102:17, 103:3
**several** [1] - 108:16
**severe** [7] - 50:14, 62:19, 94:11,

108:11, 108:13, 110:8, 111:21
**severely** [1] - 51:13
**severities** [1] - 132:17
**severity** [6] - 128:16, 129:4, 129:6, 129:7, 129:16, 131:12
**Sexton** [1] - 126:6
**sexual** [3] - 31:10, 31:21, 31:22
**shall** [4] - 128:13, 139:17, 139:18, 140:3
**sharing** [1] - 95:22
**sharp** [1] - 54:13
**SHEET** [1] - 140:1
**ship** [34] - 6:4, 6:7, 11:22, 14:5, 14:21, 14:24, 16:9, 29:19, 31:6, 36:1, 41:24, 42:1, 51:8, 59:3, 66:20, 69:9, 77:22, 85:7, 92:12, 100:19, 100:22, 101:3, 102:7, 103:19, 104:22, 106:11, 107:19, 109:9, 110:13, 115:20, 119:25, 131:17, 133:2, 133:7
**ship's** [9] - 48:10, 48:13, 49:3, 92:4, 92:9, 92:13, 93:18, 93:21, 103:6
**shipboard** [1] - 91:20
**ships** [9] - 6:8, 11:15, 29:22, 31:11, 33:6, 50:14, 79:9, 130:13, 132:23
**shoe** [7] - 55:7, 122:18, 122:25, 123:17, 123:24, 125:23, 126:2
**shop** [1] - 40:8
**shore** [1] - 93:5
**shoreside** [6] - 6:4, 6:7, 6:12, 93:19, 93:24, 107:17
**short** [2] - 63:24, 113:16
**SHORTHAND** [1] - 136:1
**show** [11] - 20:3, 60:23, 60:25, 64:18, 65:21, 67:24, 69:25, 71:20, 74:16, 75:10, 78:12
**showed** [8] - 65:3, 75:15, 76:3, 76:21, 77:2, 77:17, 90:20,

115:8
**showing** [4] - 77:9, 89:16, 91:11, 91:12
**shown** [3] - 73:5, 83:23, 85:22
**shows** [2] - 40:3, 64:9
**sic** [1] - 30:7
**side** [24] - 78:14, 97:20, 97:25, 98:1, 98:4, 98:6, 98:7, 98:8, 98:9, 98:10, 98:14, 98:17, 98:20, 98:21, 99:10, 99:13, 99:16, 101:9, 104:10, 104:21, 104:23, 132:16
**Sign** [8] - 27:19, 28:17, 30:24, 36:22, 37:1, 37:12, 44:25, 123:15
**sign** [12] - 46:21, 64:17, 65:18, 91:1, 101:19, 101:21, 102:19, 102:20, 102:25, 103:11, 103:15, 104:7
**signature** [1] - 139:13
**signing** [1] - 139:18
**signs** [3] - 44:11, 102:22, 128:7
**similar** [3] - 73:5, 73:21, 79:18, 83:17, 86:24, 87:17, 88:14, 117:15, 118:13
**simple** [6] - 3:7, 59:13, 66:8, 68:15, 69:1, 78:2
**simply** [2] - 42:21, 86:22
**Sincerely** [1] - 139:20
**sit** [1] - 27:11
**site** [2] - 12:25, 104:15
**situation** [1] - 5:22
**situations** [2] - 110:21, 112:19
**six** [6] - 19:17, 36:6, 36:10, 96:17, 120:6, 120:8
**skeleton** [1] - 6:9
**skid** [1] - 104:11
**slides** [1] - 121:10
**Slip** [1] - 18:10
**slip** [5] - 23:24, 23:25, 29:8, 133:15, 134:11
**slip-and-fall** [1] - 23:25
**slip-and-falls** [2] - 23:24, 133:15
**slip-fall/trip-fall** [1] - 29:8

**slipped** [2] - 24:3, 122:23
**Slips** [1] - 113:20
**slips** [2] - 113:23, 114:2
**slurred** [1] - 28:6, 47:14, 128:5
**slurring** [2] - 43:13, 46:14
**small** [2] - 48:2, 71:13
**smell** [2] - 49:6, 128:5
**smelled** [2] - 47:8, 92:7
**smells** [3] - 47:14, 48:2, 48:17
**someone** [8] - 12:18, 24:3, 29:12, 32:19, 100:19, 100:20, 108:18, 116:1
**sometimes** [3] - 21:7, 22:20, 124:18
**somewhere** [4] - 64:5, 86:21, 110:4, 121:16
**son** [2] - 126:13, 127:1
**soon** [4] - 13:6, 93:4, 114:14, 115:3
**sorry** [15] - 28:4, 39:21, 40:14, 40:16, 50:24, 52:9, 59:5, 92:25, 93:1, 93:13, 96:5, 98:18, 117:17, 119:9
**sort** [4] - 12:16, 35:17, 107:6, 111:5
**sound** [2] - 24:2, 122:10
**sounds** [4] - 8:7, 41:11, 41:24, 107:1
**sources** [1] - 107:24
**SOUTHERN** [1] - 1:1
**speaking** [7] - 4:9, 4:12, 18:22, 32:25, 40:7, 82:11, 106:10
**specialist** [1] - 93:25
**specifically** [5] - 18:22, 21:8, 38:23, 41:12, 47:17
**specificity** [1] - 100:25
**specifics** [2] - 18:3, 70:4
**speculation** [3] - 31:14, 49:9, 63:1
**speech** [5] - 28:6, 43:13, 46:14, 47:14, 128:5
**Spill** [1] - 18:7
**spillage** [1] - 18:8
**splitting** [1] - 111:6
**spoken** [1] - 11:16
**sprain** [2] - 94:11,

129:21
**SS** [2] - 136:3, 138:2
**staff** [23] - 3:13, 6:10, 16:20, 17:19, 18:19, 27:2, 28:3, 30:18, 37:14, 43:11, 47:2, 48:7, 48:10, 48:12, 48:16, 64:24, 66:4, 90:17, 93:18, 93:21, 98:10, 109:18, 111:20
**stained** [1] - 25:13
**stair** [14] - 27:5, 46:22, 54:17, 54:18, 55:6, 65:19, 67:22, 73:22, 79:14, 91:1, 101:24, 116:25, 120:17, 125:20
**staircase** [12] - 16:25, 19:19, 56:14, 76:23, 77:5, 77:8, 86:23, 91:2, 98:19, 99:13, 100:10, 104:11
**Staircase** [3] - 96:17, 118:1, 120:2
**staircases** [2] - 133:5, 133:16
**stairs** [112] - 8:3, 12:14, 12:23, 13:5, 13:24, 14:1, 14:25, 15:18, 15:24, 16:16, 17:10, 17:11, 18:13, 22:14, 23:18, 24:25, 25:2, 26:12, 26:19, 27:7, 27:9, 30:12, 34:1, 44:24, 45:7, 45:25, 45:4, 46:10, 46:16, 49:17, 50:17, 51:9, 51:11, 53:1, 54:1, 54:9, 55:1, 55:2, 55:3, 55:5, 55:13, 55:15, 55:21, 55:23, 56:4, 56:13, 56:16, 57:1, 57:6, 57:20, 58:3, 58:5, 58:9, 59:4, 59:15, 59:17, 60:14, 61:24, 62:4, 62:8, 63:9, 64:17, 65:14, 65:15, 65:17, 67:3, 67:5, 71:14, 73:10, 74:2, 74:4, 78:4, 79:14, 80:23, 81:1, 90:8, 96:14, 96:22, 98:2, 98:9, 99:4, 102:12, 102:16, 102:17, 103:3, 103:7, 104:13, 104:14, 104:16, 114:19, 116:10, 117:10,

117:25, 120:25, 121:7, 121:18, 122:5, 122:14, 123:5, 123:8, 124:16, 125:12, 125:25, 127:25, 128:7, 132:20, 133:1, 134:9, 134:12, 134:15
**Stairway** [2] - 23:20, 26:14
**stairway** [10] - 19:21, 21:13, 23:4, 23:20, 23:21, 65:6, 79:17, 83:18, 97:1, 133:7
**stairways** [1] - 119:25
**stairwell** [28] - 16:11, 16:24, 24:5, 27:2, 43:10, 60:10, 60:17, 62:13, 63:6, 63:7, 63:12, 71:9, 79:11, 85:9, 85:18, 87:2, 87:17, 87:23, 88:4, 89:23, 89:25, 98:7, 104:19, 104:24, 105:1, 116:25, 117:2
**Stairwell** [2] - 16:11, 104:19
**stairwells** [2] - 18:23, 86:21
**stand** [1] - 11:16
**standard** [2] - 13:19, 35:18
**stands** [1] - 99:15
**starboard** [11] - 27:11, 97:2, 97:3, 98:8, 103:7, 104:10, 104:20, 104:21, 104:22, 120:1, 121:17
**start** [3] - 3:7, 39:1, 43:6
**started** [3] - 3:23, 38:13, 121:20
**starting** [1] - 38:6
**state** [2] - 15:2, 128:9
**State** [3] - 1:23, 137:16, 138:20
**STATE** [3] - 136:2, 137:3, 138:2
**statement** [13] - 15:7, 45:17, 46:7, 55:2, 62:21, 89:18, 89:19, 91:16, 112:23, 113:24, 120:23, 125:22, 140:4
**statements** [3] - 58:19, 106:2, 107:12
**STATES** [1] - 1:1
**stating** [1] - 53:10

status [1] - 11:18
stay [2] - 25:7, 25:10
stays [1] - 25:8
steadily [1] - 38:8
stenographic [1] -
136:7
stenographically [1] -
136:5
Step [9] - 46:21,
65:18, 90:25,
101:21, 102:19,
102:20, 103:10,
103:15, 104:7
step [13] - 55:10,
64:16, 72:13, 101:9,
101:19, 122:24,
123:18, 123:24,
124:3, 126:24
Step' [1] - 128:6
steps [27] - 13:5,
13:24, 17:16, 18:12,
18:15, 19:15, 22:14,
25:15, 38:2, 46:8,
51:5, 58:21, 58:22,
59:1, 59:2, 61:13,
62:22, 64:8, 64:9,
74:12, 77:20, 89:1,
106:7, 106:8,
117:21, 124:5,
128:10
still [9] - 10:3, 11:14,
11:16, 11:17, 86:15,
87:12, 95:21, 107:6
stipulation [5] - 9:11,
9:20, 10:7, 24:9,
127:13
stop [2] - 30:21, 70:12
straight [1] - 72:19
strain [1] - 94:11
streamline [1] - 113:4
Street [2] - 2:3, 139:1
stricken [1] - 53:2
strike [16] - 11:4, 15:1,
38:12, 45:2, 52:7,
52:18, 52:21, 53:7,
53:15, 60:1, 66:5,
70:11, 80:20, 80:21,
82:6, 82:13
strip [7] - 67:8, 72:19,
101:9, 104:11,
122:19, 123:1
stripping [1] - 72:13
strips [5] - 14:18,
27:6, 101:15, 117:24
strong [2] - 28:6,
128:5
stub [6] - 49:22,
77:11, 79:1, 79:22,
85:20, 89:4
stubbed [14] - 9:9,

26:25, 43:9, 46:20,
51:12, 51:16, 54:23,
55:11, 60:12, 62:8,
64:23, 65:18, 66:2,
80:1
stubbing [1] - 9:8
stuck [3] - 62:17,
122:18, 132:11
studied [1] - 32:24
study [2] - 48:25,
132:8
stuff [6] - 4:8, 33:1,
116:10, 120:9,
132:12, 132:19
style [1] - 14:23
styled [1] - 139:12
Subject [3] - 97:18,
98:14, 98:19
subject [8] - 16:10,
79:17, 85:12, 96:14,
96:15, 97:19,
117:25, 119:25
subscribed [1] -
138:17
substance [1] - 140:2
suffered [3] - 50:19,
62:19, 106:6
suffering [1] - 126:8
suggest [1] - 139:15
suggesting [1] - 87:22
suicides [1] - 106:22
suitable [1] - 139:16
Suite [2] - 2:3, 139:2
summary [1] - 107:11
supplement [1] -
103:21
supplemental [8] -
19:23, 95:14,
105:12, 118:14,
118:23, 119:5,
119:7, 120:9
supplied [1] - 6:16
supposed [1] - 112:8
supposedly [1] - 32:2
Supreme [1] - 1:13
surfaced [1] - 116:7
surgery [1] - 49:24
surrounding [1] - 91:2
survelliance [1] - 46:1
suspected [1] -
108:12
sustaining [1] - 126:8
susta ins [1] - 106:11
SUZANNE [8] - 1:19,
2:12, 3:2, 136:6,
137:8, 138:14,
139:5, 139:10,
140:25
Suzanne [1] - 3:10
Suzie [2] - 3:11, 114:4

swelling [2] - 108:11,
110:9
sworn [2] - 3:4, 137:9
Sworn [1] - 138:17
system [6] - 19:9,
20:19, 20:25, 21:4,
102:5, 107:8

**T**

talks [1] - 12:10
Tamara [1] - 7:14
TAMARA [2] - 1:5,
139:9
task [1] - 20:18
team [10] - 6:12,
12:21, 16:23, 22:21,
73:3, 74:23, 83:14,
89:15, 132:14,
132:15
teams [1] - 6:4
tear [3] - 72:22, 74:3,
98:11
Technical [1] - 21:18
technically [2] - 29:2,
109:1
telephone [1] - 139:15
template [1] - 23:13
ten [2] - 40:1, 41:12
tend [2] - 29:13, 29:14
terminology [1] -
101:4
test [1] - 134:13
testified [5] - 3:4,
59:11, 81:2, 81:12,
84:2
testify [8] - 5:10, 5:16,
5:24, 8:15, 9:21,
9:24, 50:3, 84:22
testifying [1] - 91:11
testimony [7] - 7:10,
54:7, 65:12, 68:17,
80:21, 86:7, 106:4
that.. [1] - 121:10
THE [72] - 2:2, 2:5,
5:2, 9:22, 16:2, 30:2,
31:18, 32:11, 32:13,
33:10, 34:13, 35:5,
36:10, 38:4, 39:8,
41:10, 42:16, 42:24,
45:16, 49:8, 49:13,
50:22, 50:24, 52:9,
54:8, 55:25, 56:10,
57:10, 61:22, 62:3,
62:24, 63:4, 64:14,
66:18, 68:8, 69:5,
70:12, 72:16, 73:8,
75:18, 76:10, 78:10,
80:19, 81:19, 84:1,
85:1, 86:13, 88:1,

92:19, 94:5, 94:8,
95:3, 95:13, 95:17,
97:3, 107:5, 111:5,
113:15, 114:5,
117:23, 118:4,
118:7, 118:10,
119:1, 119:13,
131:3, 132:25,
133:22, 133:25,
134:6, 134:21,
134:24
them .. [1] - 140:4
themselves [14] - 6:8,
14:1, 24:13, 30:21,
31:8, 34:16, 34:20,
51:11, 54:15, 55:14,
65:16, 99:4, 118:20,
120:18
therein [1] - 9:18
Thereupon [12] - 3:1,
21:19, 45:14, 61:4,
63:24, 71:2, 71:21,
71:25, 75:7, 113:16,
135:1, 135:4
thinks [1] - 51:24
third [4] - 69:6,
122:24, 123:17,
123:24
thorough [3] - 109:4,
111:20, 116:12
thoroughly [1] - 113:9
thousands [1] - 55:20
threatening [1] -
94:18
three [10] - 8:2, 8:13,
11:7, 11:10, 11:14,
22:24, 23:5, 23:22,
96:19, 124:19
threshold [2] - 18:21,
101:14
throughout [9] -
14:24, 16:9, 27:21,
28:11, 29:3, 33:14,
38:8, 43:4, 44:16
ticket [1] - 4:16
TIME [1] - 1:15
timestamp [1] - 20:20
title [1] - 18:10
TO [1] - 139:5
today [9] - 4:22, 5:10,
6:24, 8:15, 27:12,
31:19, 70:14, 80:15,
91:13
today 's [7] - 11:8,
31:15, 34:10, 35:3,
41:7, 49:10, 134:2
toe [27] - 9:8, 9:9,
26:25, 43:9, 46:20,
48:1, 48:16, 51:12,
51:15, 54:23, 55:11,

60:12, 62:9, 64:23,
65:18, 66:2, 77:11,
79:1, 79:22, 80:1,
80:9, 85:20, 89:4,
94:10, 94:12, 129:18
toes [3] - 49:21, 49:24,
72:10
together [1] - 140:22
took [20] - 3:19, 49:1,
51:1, 57:18, 62:11,
65:4, 68:20, 73:3,
74:25, 78:19, 85:6,
87:23, 88:15, 90:19,
91:9, 91:15, 98:25,
105:20, 139:19
top [8] - 21:25, 25:8,
75:21, 82:11, 85:17,
97:10, 101:23,
102:20
topic [1] - 92:3
topics [1] - 5:3
tore [1] - 108:24
torn [1] - 25:13
touch [2] - 87:5,
115:18
towards [1] - 18:8
traffic [1] - 17:2, 25:11
trained [1] - 47:2
trainee [1] - 104:7
training [3] - 17:18,
131:11, 131:13
transcribed [1] -
139:13
transcript [6] - 136:6,
136:7, 138:7,
139:13, 139:19,
140:20
trauma [2] - 48:1,
48:16
traveling [1] - 28:9
traverse [5] - 44:24,
45:7, 46:8, 46:10,
115:19
traversed [1] - 14:3
traversing [3] - 45:25,
54:18, 55:15
tread [4] - 13:10,
14:12, 25:8, 54:11
treatment [13] - 47:12,
92:3, 92:5, 93:22,
93:24, 94:20, 94:25,
106:11, 106:12,
106:6, 108:7,
108:15, 108:21
trend [1] - 132:9
tried [3] - 36:19, 37:8,
113:4
trigger [1] - 109:1
triggers [3] - 18:25,
108:7, 109:19

**trip** [8] - 23:3, 23:8, 46:18, 117:10, 122:19, 126:4, 132:11, 134:8
**trip-and-fall** [1] - 117:10
**trip-and-falls** [3] - 23:3, 132:11, 134:8
**trip-falls** [1] - 23:8
**tripped** [8] - 23:10, 64:16, 90:25, 121:8, 121:9, 122:25, 123:2, 124:3
**Trips** [2] - 18:10, 113:20
**trips** [4] - 24:3, 113:23, 114:2, 119:23
**true** [4] - 32:6, 136:7, 138:8, 140:23
**try** [9] - 12:25, 13:13, 30:15, 45:3, 53:3, 106:15, 109:21, 109:24, 111:7
**trying** [7] - 40:15, 40:16, 63:19, 80:11, 107:22, 114:4, 130:15
**turned** [1] - 112:21
**twice** [1] - 16:20
**two** [24] - 8:5, 10:15, 11:23, 12:2, 12:13, 15:6, 20:22, 27:3, 28:16, 33:16, 42:11, 42:14, 42:25, 43:1, 44:1, 51:2, 62:18, 82:12, 102:17, 102:23, 103:2, 103:3, 107:24, 130:15
**type** [13] - 12:19, 29:18, 38:13, 38:20, 38:23, 92:21, 104:5, 107:1, 111:14, 130:24, 132:9, 133:18
**types** [2] - 106:14, 134:9
**typically** [2] - 19:13, 111:17

**U**

**ultimately** [1] - 4:5
**unable** [3] - 46:10, 80:15, 121:13
**under** [12] - 13:20, 13:21, 33:4, 37:22, 44:11, 44:21, 45:5, 97:18, 106:23,

128:12, 132:5, 139:12
**underneath** [2] - 84:5, 131:21
**undersigned** [1] - 137:7
**understood** [1] - 5:6
**unfortunately** [1] - 34:2, 46:3
**UNITED** [1] - 1:1
**unknown** [3] - 121:12, 126:9, 126:20
**unless** [5] - 47:11, 77:12, 79:23, 103:5, 116:25
**unlimited** [6] - 28:12, 28:19, 33:4, 34:5, 34:7
**unnecessary** [1] - 53:16
**unsafe** [4] - 13:4, 13:23, 49:18, 50:18
**unusual** [1] - 32:7
**up** [43] - 8:24, 9:1, 9:4, 29:1, 31:11, 32:8, 34:7, 37:23, 39:5, 39:10, 40:15, 47:17, 47:18, 47:19, 49:1, 55:21, 60:4, 61:2, 63:19, 64:21, 65:22, 67:18, 67:19, 70:20, 71:14, 73:24, 90:14, 93:4, 93:7, 93:14, 94:20, 97:6, 97:17, 116:21, 119:3, 121:7, 121:9, 121:20, 123:1, 124:3, 126:3, 132:18
**uploaded** [1] - 107:13

**V**

**vacation** [1] - 34:16
**vacuumed** [1] - 16:21
**various** [2] - 120:6, 134:7
**Vazquez** [17] - 3:10, 9:12, 30:1, 34:12, 41:9, 49:12, 50:1, 53:9, 53:18, 58:7, 63:3, 68:13, 70:9, 75:2, 82:4, 92:18, 119:15
**VAZQUEZ** [9] - 1:19, 2:12, 3:2, 136:6, 137:8, 138:14, 139:5, 139:10, 140:25
**Vega** [1] - 6:25
**versus** [1] - 23:8,

32:17, 100:15
**vessel** [5] - 15:25, 16:8, 24:19, 40:24, 96:15
**Victor** [4] - 2:8, 95:15, 118:20, 119:6
**video** [2] - 46:1, 67:1
**Video** [1] - 1:12
**view** [1] - 85:17
**visibly** [1] - 16:22
**visually** [2] - 17:19, 17:21
**volunteered** [1] - 82:10
**vs** [1] - 1:7

**W**

**walt** [4] - 30:18, 37:14, 43:4, 119:2
**waive** [1] - 9:25
**waived** [1] - 139:18
**waiving** [2] - 9:15, 24:9
**walk** [6] - 13:25, 30:12, 34:1, 79:1, 115:19
**walked** [2] - 55:10, 64:22
**walking** [4] - 115:15, 115:16, 126:21, 127:22
**wall** [16] - 64:19, 64:20, 64:22, 65:24, 66:1, 67:4, 71:13, 79:1, 79:23, 84:10, 84:15, 88:22, 89:5, 89:6, 89:9, 115:16
**wants** [3] - 35:8, 53:12, 140:3
**watch** [2] - 64:16, 101:19
**Watch** [9] - 46:20, 65:16, 90:25, 101:20, 102:19, 102:20, 103:10, 103:15, 104:7
**watching** [1] - 67:1
**waters** [1] - 39:11
**wear** [3] - 4:9, 72:22, 74:2
**wearing** [2] - 123:25, 124:1
**wedge** [1] - 124:2
**wedged** [2] - 124:1, 125:15
**weekly** [1] - 132:18
**welcome** [1] - 40:24
**West** [1] - 139:1
**wet** [1] - 134:13

**whereas** [1] - 89:7
**WHITE** [2] - 2:6, 139:5
**whole** [3] - 95:20, 96:4, 125:8
**wide** [1] - 133:4
**Wilson** [1] - 4:2
**WITNESS** [71] - 5:2, 9:22, 16:2, 30:2, 31:18, 32:11, 32:13, 33:10, 34:13, 35:5, 36:10, 38:4, 39:8, 41:10, 42:16, 42:24, 45:16, 49:8, 49:13, 50:22, 50:24, 52:9, 54:8, 55:25, 56:10, 57:10, 61:22, 62:3, 62:24, 63:4, 64:14, 66:18, 68:8, 69:5, 70:12, 72:16, 73:8, 75:18, 76:10, 78:10, 80:19, 81:19, 84:1, 85:1, 86:13, 88:1, 92:19, 94:5, 94:8, 95:3, 95:13, 95:17, 97:3, 107:5, 111:5, 113:15, 114:5, 117:23, 118:4, 118:7, 118:10, 119:1, 119:13, 131:3, 132:25, 133:22, 133:25, 134:6, 134:21, 134:24, 137:10
**witness** [17] - 3:3, 4:21, 4:23, 9:5, 50:4, 52:20, 57:14, 57:17, 57:20, 57:25, 80:22, 81:2, 81:11, 106:2, 107:11, 140:3, 140:4
**witnessed** [1] - 45:10
**witnesses** [4] - 27:3, 45:21, 51:3, 52:14
**WO 502756** [1] - 97:12
**woman** [2] - 125:15, 126:12
**wondering** [1] - 133:17
**word** [1] - 110:17
**words** [4] - 109:8, 120:24, 130:15, 130:21
**works** [1] - 20:25
**worn** [1] - 25:13
**wrlst** [1] - 126:17
**write** [2] - 47:13, 72:2
**writing** [1] - 17:13
**wrote** [5] - 57:4, 98:17, 120:23, 125:18, 125:21

**Y**

**yanked** [1] - 49:3
**year** [2] - 19:18, 55:21
**years** [12] - 3:24, 22:24, 23:5, 23:22, 25:12, 35:15, 53:21, 108:17, 113:1, 126:13, 132:3, 134:8
**York** [1] - 4:1
**yourself** [3] - 30:6, 55:19, 68:22
**YOURSELF** [1] - 139:11

**Z**

**zoom** [2] - 71:12, 71:19
**zoomed** [1] - 73:11, 73:12